**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| ABBOTT BIOTECHNOLOGY LTD. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | C.A. No. 09-40089-FDS |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | **REDACTED VERSION** |
| CENTOCOR ORTHO BIOTECH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.   INTRODUCTION .........................................................................................................1

    A.   Overview of the Lawsuit ..................................................................................1

    B.   Methotrexate......................................................................................................2

    C.   Anti-TNFα Antibodies ...................................................................................3

    D.   Background of this Lawsuit .........................................................................3

II.   GENERAL PRINCIPLES OF CLAIM CONSTRUCTION ...................................5

III.   CONSTRUCTION OF THE PATENT TERMS IN DISPUTE .............................7

    A.   "Administering to the Subject" ...................................................................7

    B.   "Administering to the Subject Both an Antibody and Methotrexate"...........9

        1.   The Claim Language Must Be Interpreted in Light of the Prosecution
            History, and the "Both" Limitation Must Be Given Meaning .............................10

        2.   A Construction Requiring Administration of an Antibody and  Methotrexate
            Together is Consistent with the Specification ......................................................12

    C.   Construction of Claim Terms on Which the Parties Agree..........................................15

IV.   CONCLUSION ........................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bicon, Inc. v. Straumann Co.,*
441 F.3d 945 (Fed. Cir. 2006)................................................................................6, 12

*Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,*
214 F.3d 1302 (Fed. Cir. 2000)....................................................................................11

*Goodyear Dental Vulcanite Co. v. Davis,*
102 U.S. 222 (1880) .......................................................................................................6

*Inverness Med. Switzerland GmbH v. Warner Lambert Co.,*
309 F.3d 1373 (Fed. Cir. 2002)....................................................................................11

*Mangosoft, Inc. v. Oracle Corp.,*
525 F.3d 1327 (Fed. Cir. 2008)..................................................................6, 7, 11, 12

*Markman v. Westview Instruments,*
517 U.S. 370 (1996) .......................................................................................................5

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995) .......................................................................................6

*Merck & Co. v. Teva Pharms., Inc.,*
395 F.3d 1364 (Fed. Cir. 2005)..................................................................6, 10, 11, 12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
521 F.3d 1351 (Fed. Cir. 2008)....................................................................................7

*On Demand Mach. Corp. v. Ingram Indus. Inc.,*
442 F.3d 1331 (Fed. Cir. 2006)....................................................................................15

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)..............................................................................5, 6, 8

*Renishaw PLC v. Marposs Societa' per Azioni,*
158 F.3d 1243 (Fed. Cir. 1998)....................................................................................6

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996).................................................................................5, 6

Defendant Centocor Ortho Biotech, Inc. ("Centocor") hereby submits this opening brief in support of its proposed constructions of disputed terms appearing in the asserted claims of U.S. Patent 7,223,394 (the "394 patent," Verrecchio Decl. Ex. 1) and 7,541,031 (the "031 patent," Verrecchio Decl. Ex. 2) (collectively, "the asserted patents").

## I.    INTRODUCTION

### A.    Overview of the Lawsuit

Each of the patents-in-suit, the 394 patent and the 031 patent, claims methods for treating rheumatoid arthritis by administering two drugs, an antibody and methotrexate.  Claim 1 of the 394 patent is representative of the asserted claims (with disputed claim term bolded and italicized):

> 1.    A method for treating a subject suffering from rheumatoid arthritis, comprising ***administering to the subject both an antibody and methotrexate***, such that the rheumatoid arthritis is treated, wherein the antibody is an isolated human antibody, or an antigen-binding portion thereof, [that] dissociates from human TNFα with a $K_d$ of 1 x $10^{-8}$ M or less and a $K_{off}$ rate constant of 1 x $10^{-3}$ s$^{-1}$ or less, both determined by surface plasmon resonance, and neutralizes human TNFα cytotoxicity in a standard in vitro L929 assay with an $IC_{50}$ of 1 x $10^{-7}$ M or less.

The antibodies used in the method claims of the patents are human anti-TNFα antibodies having certain binding affinities ($K_d$ and $K_{off}$) and neutralizing activities ($IC_{50}$ in L929 assay).  The claims also require that an effect be achieved, namely, the antibody and methotrexate are administered to a patient suffering from rheumatoid arthritis "such that the rheumatoid arthritis is treated."

Centocor manufactures and sells an anti-TNFα antibody product called SIMPONI® (hereinafter "Simponi"), for the treatment of rheumatoid arthritis and other diseases.  Abbott asserts that Centocor infringes the method of treatment claims of the 394 and 031 patents by selling Simponi for the treatment of rheumatoid arthritis.

Simponi is a prescription medicine that, in combination with methotrexate, is indicated for the treatment of adult patients with moderately- to severely-active rheumatoid arthritis (Verrecchio Decl. Ex. 3, SIMPONI® package insert).  It is administered once monthly as an injection under the skin (*Id*. at 3).  Simponi may be administered by a medical professional, or a doctor may decide that a patient or caregiver can give injections at home (*Id*. at 3, 41).

Centocor neither manufactures nor sells methotrexate.  Methotrexate is not sold in combination with the accused Simponi drug product.   It is always up to a treating physician's discretion to decide whether and how to prescribe methotrexate treatment.

**B.    Methotrexate**

Methotrexate is a chemical drug and belongs to the drug class known as DMARDs, or disease-modifying anti-rheumatic drugs.  It was developed in the 1940's as a treatment for leukemia and was first used as a chemotherapy drug.  Neither Abbott nor Centocor developed methotrexate.  It is generally taken orally, in the form of a tablet, but it is also available in an injectable formulation.  The dose and frequency with which it is taken by a patient with rheumatoid arthritis is determined by the patient's prescribing physician.  Methotrexate can have unpleasant side effects, such as nausea and other gastrointestinal problems.  It can also cause a decrease in bone marrow function and cause liver problems.  As a result of these side effects, some patients cannot safely take methotrexate.

Despite its potentially harmful side effects, methotrexate can be an effective treatment for rheumatoid arthritis.  It is also inexpensive and is, therefore, among the first line treatments for many patients diagnosed with rheumatoid arthritis.  If a patient's disease is not adequately controlled by methotrexate, physicians frequently move on to a biologic treatment, such as Centocor's Simponi (golimumab), the product accused in this lawsuit, or Centocor's REMICADE® (infliximab),  Abbott's HUMIRA® (adalimumab), or Amgen's ENBREL®

(etanercept).   Each of these biologics, except ENBREL®, is an anti-TNFα antibody. ENBREL® is a TNF receptor fusion protein.

### C.     Anti-TNFα Antibodies

Antibodies are part of the immune system.  They are proteins produced in response to, for example, invasion by a foreign substance, such as a virus or bacteria.  An antibody is capable of binding to the foreign substance. The substances to which antibodies bind are known broadly as antigens.  Once the antibody has bound to the antigen, its presence on the antigen enables other immune system cells to locate the antigen and either destroy it or expel it from the body.  The antigen of interest in the asserted patents is the protein called tumor necrosis factor alpha, TNFα.

Some diseases are caused by the body's immune system attacking normal human tissue rather than a foreign invader.  These diseases are known as autoimmune diseases. One example of this is rheumatoid arthritis, in which a person's own immune system overproduces TNFα. Although TNFα is a naturally occurring protein in the body and is an important part of the immune system, the overproduction of TNFα can cause the immune system to attack healthy tissues in the joints, resulting in inflammation, pain, stiffness, swelling, and joint damage. Because TNFα is produced by one's own body, the immune system does not recognize it as a foreign, harmful antigen and rarely produces specific antibodies to destroy it.  Immunologists have therefore developed techniques for producing antibodies that can be used as a safe and effective means for inhibiting the negative properties of TNFα.  Centocor's Simponi product is such an antibody.

### D.     Background of this Lawsuit

The asserted patents are part of a family of patents stemming from an original patent application filed in 1996.  That original application issued as U.S. Patent No. 6,090,382 (the "382 patent," Verrecchio Decl. Ex. 4) which claims human anti-TNFα antibodies *per se*.  The

382 patent claims use language to define the human anti-TNFα antibodies (by their $K_d$, $K_{off}$, and $IC_{50}$ in an L929 assay) which is identical to the language used in the asserted patents to define the human anti-TNFα antibodies that are administered with methotrexate to treat rheumatoid arthritis.

Another patent in the family, U.S. 6,509,015 (the "015 patent," Verrecchio Decl. Ex. 5) claims, among other things, methods for "inhibiting human TNFα activity in a human subject suffering from a disorder in which TNFα activity is detrimental," including rheumatoid arthritis, by administering to the subject a human TNFα antibody "with at least one additional therapeutic agent" (see, e.g., *id*. at 55:54-59:18, claims 4, 17, 69).   Like the above-mentioned 382 patent claims, the 015 patent also defines the anti-TNF antibodies by the same $K_d$, $K_{off}$, and $IC_{50}$ values as recited in the claims of the patents-in-suit.

Neither the 382 patent nor the 015 patent is asserted in this lawsuit;



(Verrecchio Decl. Ex. 6, *Centocor v. Abbott*, 07-cv-0139 (E.D. Texas), trial exhibit PX 465 at ABT01394626).

The 394 and 031 patents claim priority to a February 1997 PCT application, which was the first application in the family to expressly mention methotrexate as an additional therapeutic agent with which an anti-TNFα antibody may be combined.  Prior to February 1997, scientists at the Kennedy Institute had invented and disclosed the administration

4

of anti-TNFα antibodies in combination with methotrexate for the treatment of rheumatoid

arthritis (Verrecchio Decl. Ex. 8, U.S. Patent No. 6,270,766 at 2:33-9:41, 18:18-38:21;

Verrecchio Decl. Ex. 9, WO94/08619 at 10-12, 24).  ████████████████████

████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

██████████████████  However, according to Abbott, Centocor infringes

the 394 and 031 patents because Simponi is indicated for use with the specific therapeutic agent

methotrexate in treating rheumatoid arthritis.

## II.    GENERAL PRINCIPLES OF CLAIM CONSTRUCTION

The principles of claim construction are well known.  "[T]he construction of a patent,

including terms of art within its claim, is exclusively within the province of the court." *Markman*

*v. Westview Instruments*, 517 U.S. 370, 372 (1996).  "[T]he words of a [patent] claim are

'generally given their ordinary and customary meaning,'" which is "the meaning that the term

would have to a person of ordinary skill in the art in question . . . as of the [patent's] effective

filing date." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  In interpreting a

claim, "the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself,

including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*,

90 F.3d at 1582.  The patent specification "is always highly relevant to the claim construction

analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

*Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  "The construction that stays true

to the claim language and most naturally aligns with the patent's description of the invention [in the specification] will be, in the end, the correct construction." *Id*. at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). "The [patent] specification acts as a dictionary when it expressly defines terms used in the claims." *Vitronics*, 90 F.3d at 1582. Where the patentee has clearly defined a term in the specification, that definition "[u]sually . . . is dispositive." *Id*.

The prosecution history for a patent is also relevant evidence to consider during claim construction. The prosecution history "is often of critical significance in determining the meaning of the claims" because it "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id.* Although the prosecution history can and should be used to understand the language used in the claims, it cannot "enlarge, diminish, or vary" the limitations in the claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) (quoting *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227 (1880)).

A goal of claim construction is to give effect to all terms in the claim. *Merck & Co. v. Teva Pharms., Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). It is especially true that a word in a claim cannot be ignored when the word was added to the claim during prosecution. *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008). For example, in *Mangosoft*, the Court affirmed the district court's construction of the term "local" as having its ordinary meaning. *See id*. at 1331. A basis for the Court's construction was that the patentee added the term during prosecution and then argued for a construction that would render the term "superfluous." *Id.* at

6

1330.  The *Mangosoft* Court recognized that "Mangosoft's proposed construction ascribe[d] no meaning to the term 'local' not already implicit in the rest of the claim." *Id*. at 1330-31 (further reasoning that "[t]his defect is particularly severe because Mangosoft added the word 'local' to claim 1 during prosecution to distinguish prior art.").

Finally, when the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-1363 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

## III.   CONSTRUCTION OF THE PATENT TERMS IN DISPUTE

### A.   "Administering to the Subject"

Each of the 394 and 031 patent claims asserted in this lawsuit recites methods for "treating a subject suffering from rheumatoid arthritis comprising *administering to the subject both an antibody and methotrexate,* such that the rheumatoid arthritis is treated" (Verrecchio Decl. Ex. 1 at 65:52; Verrecchio Decl. Ex. 2 at 59:39-60:63, emphasis added).   The parties dispute the construction of the italicized claim language.   For ease of discussion, Centocor breaks the discussion of this claim term into two parts, starting with the "administering to the subject" phrase.   The parties' proposed constructions are as follows:

| "administering to the subject" | |
|---|---|
| **Centocor's Proposed Construction** | **Abbott's Proposed Construction** |
| Introducing to the body of the subject | Plain meaning |

The plain meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art. *Phillips*, 415 F.3d at 1313. The plain meaning of a term may be evidenced by a variety of sources, including *inter alia*, the use of the term within the claims themselves, the specification, and the prosecution history. *Id.* at 1314.

The plain meaning of "administering to the subject" *is* "introducing to the body of the subject," as Centocor's construction proposes. "Administering to the subject" is distinct, for example, from *prescribing* a drug that is then administered by someone else. "Administering to the subject" requires the act of introducing the drug to the body of the subject. This follows not only from the plain meaning of the term "administering," but also from the claim language "so that the rheumatoid arthritis is treated." That can happen only if the drug is introduced to the body of the subject.

This plain meaning construction is also consistent with the use of the term "administer" in the asserted patents' specifications. For example, in the section captioned "Pharmaceutical Compositions and Pharmaceutical Administration," the patents state that the preferred form of the pharmaceutical composition for the antibodies—e.g., injectable solution, solid tablet, or suppositories—"depends on the intended *mode of administration* and therapeutic application" (Verrecchio Decl. Ex. 1 at 21:66-22:5; Verrecchio Decl. Ex. 2 at 21:40-46 (emphasis added)). The specifications note that:

> The preferred *mode of administration* is parenteral (e.g., intravenous, subcutaneous, intraperitoneal, intramuscular). In a preferred embodiment, the antibody is *administered* by intravenous infusion or injection. In another preferred embodiment, the antibody is *administered* by intramuscular or subcutaneous injection.

(Verrecchio Decl. Ex. 1 at 22:8-13; Verrecchio Decl. Ex. 2 at 21:49-54, (emphasis added)).  Thus, the use of "administer" in the patent is consistent with Centocor's plain meaning construction – "introducing to the body of the subject."

Abbott contends that no construction of "administering to the subject" is needed, and that it should merely take its plain meaning.  Abbott has not explained how the plain meaning of the term is any different from the construction offered by Centocor.

### B.      "Administering to the Subject Both an Antibody and Methotrexate"

The second part of the construction of this claim term is "both an antibody and methotrexate."  Centocor contends that this phrase requires construction and that its proposed construction is in keeping with the plain meaning of the language.  Abbott contends that the meaning of the phrase is clear on its face and that it "merely requires that the two drugs (i.e., both drugs) be administered such that rheumatoid arthritis is treated by the combination" (Verrecchio Decl. Ex. 10, Email from D. Frazier to A. Verrecchio and S. Maslowski dated 1/18/2011).

The parties' proposed constructions of the entire phrase containing this language are set forth in the chart below.

| "administering to the subject both an antibody and methotrexate" | |
| --- | --- |
| **Centocor's Proposed Construction** | **Abbott's Proposed Construction** |
| Introducing to the body of the subject an antibody and methotrexate together | Plain meaning |

The claims do not recite merely administering "an antibody and methotrexate."  They recite administering "*both* an antibody and methotrexate."  As explained below, this phrase

means that an antibody and methotrexate must be administered *together*.  This meaning is consistent with the claim language, prosecution history, specification, and extrinsic evidence.

### 1.    The Claim Language Must Be Interpreted in Light of the Prosecution History, and the "Both" Limitation Must Be Given Meaning

The prosecution history in this case provides an important insight into the proper claim construction of the "both an antibody and methotrexate" claim language.  During the prosecution of the application that issued as the 394 patent, Abbott amended the method claims to add the word "both" before the phrase "an antibody and methotrexate."  Because every word in a patent claim must be accorded meaning, *Merck,* 395 F.3d at 1372, the word "both" must be accorded meaning within the claims.  Thus, the amendment adding the term "both" to the method claims is critical to a proper claim construction.

When Abbott first introduced a claim to a method of treating rheumatoid arthritis in the patent application that issued as the 394 patent, the original claim read:

> 141. (New)   A method for treating a subject suffering from rheumatoid arthritis, comprising administering to the subject an antibody and methotrexate, such that the rheumatoid arthritis is treated . . . .

(Verrecchio Decl. Ex. 11, Response to Office Action dated 6/28/2004, at 21-22).  The Examiner indicated that claim 141 was allowable (Verrecchio Decl. Ex. 12, Office Action dated 6/13/2005, at 2).  Nonetheless, in the next paper it filed with the Patent Office, Abbott amended claim 141 to add the word "both" before "an antibody and methotrexate":

> 141 (amended).  A method for treating a subject suffering from rheumatoid arthritis, comprising administering to the subject both an antibody and methotrexate, such that the rheumatoid arthritis is treated . . . .

(Verrecchio Decl. Ex. 13, Amendment and Response dated 12/9/05, at 5 (emphasis in original)).

Abbott stated that this amendment to the method claims was made "for clarity."  (*Id*. at 12).

10

Thereafter, the word "both" was included in all of the method of treatment claims that ultimately issued in the asserted patents.

Because a goal of claim construction is to give effect to all terms in the claim, the word "both" must be given meaning. *See Merck*, 395 F.3d at 1372; *Mangosoft*, 525 F.3d at 1330-31. In other words, "administering . . . *both* an antibody and methotrexate" must have a different meaning than simply "administering . . . an antibody and methotrexate." Accordingly, it is necessary to determine the meaning of the word "both," and how it impacts the meaning of the claim as a whole.

The specifications of the patents do not provide an express definition of the claim term "both." Thus, the term takes on its "ordinary and accepted meaning." *See Merck*, 395 F.3d at 1372 (citing *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning.")). The "both . . . and" terminology in the patent claims is not a term of art (i.e., it is not a term having special scientific meaning). Therefore, it is proper to refer to dictionaries to understand the meaning of such plain English terms. *Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1378 (Fed. Cir. 2002).

Various dictionary definitions for the word "both," when used as a conjunction (as it used in this case), are provided below:

> As well; equally; not only; together; alike; used correlatively with and; as, I am both tired and hungry. (Verrecchio Decl. Ex. 14, Webster's New Universal Unabridged Dictionary, 2d Ed. (1983) at 213).

> Used as a function word to indicate and stress the inclusion of each of two or more things specified by coordinated words, phrases, or clauses. (Verrecchio Decl. Ex. 15, Webster's Ninth New Collegiate Dictionary (1990) at 170).

These definitions stress the inclusionary nature of the term "both" and support Centocor's construction requiring administration of an antibody and methotrexate *together*.

Abbott's proposed construction, however, ascribes no meaning to the word "both" as the construction would be the same whether the word "both" was present or not. The phrase "administering . . . an antibody and methotrexate" requires these two drugs to be administered. The phrase "administering . . . both an antibody and methotrexate" must require more than just administering these two drugs. The law is clear that a claim construction giving meaning to the term "both" is preferred over a claim construction that does not. *See Merck*, 395 F.3d at 1372; *see also Bicon*, 441 F.3d at 950. Moreover, a claim construction that does not require administration of the antibody and methotrexate *together* would render the word "both" superfluous, and that is contrary to established claim construction tenets. *See Mangosoft*, 525 F.3d 1330 (construing the claim term "local" in accordance with the ordinary meaning because "the broader construction . . . would render the claim term . . . superfluous"). Finally, because Abbott added the term "both" to the method claims during prosecution, it cannot be ignored. *See id.* at 1330-1331. Accordingly, the prosecution history supports Centocor's construction requiring that the antibody and methotrexate be administered *together*.

### 2. A Construction Requiring Administration of an Antibody and Methotrexate Together is Consistent with the Specification

Centocor's proposed construction is also consistent with the patents' specifications. The patents disclose two methods of administrating an antibody and methotrexate together — i.e., through co-formulation and/or co-administration of an antibody and methotrexate. For example, the patents disclose:

> Supplementary active compounds can also be incorporated into the compositions. In certain embodiments, an antibody or antibody portion of the invention is *co-formulated* with and/or *co-administered* with one or more additional therapeutic agents that

are useful for treating disorders in which TNFα activity is
detrimental.

(Verrecchio Decl. Ex. 1, the 394 patent, at 23:4-9, emphasis added; Verrecchio Decl. Ex. 2, the

031 patent, at 22:43-48).  The term co-formulation is used to describe two drugs that are

combined together to make one pharmaceutical formulation.[1]  "Co-administration" has similarly

been defined as "the administration of two or more drugs together" (Verrecchio Decl. Ex. 19,

Merriam-Webster Online Dictionary; Verrecchio Decl. Ex. 20, Dictionary.com).  The term "both,"

as its construction has been proposed by Centocor, would encompass both co-formulation and

co-administration where the antibody and additional therapeutic agent are administered together,

as described in the patents' specifications.

Notably, there is no alternative disclosure in the patents of how the specific combination

of antibody and methotrexate should otherwise be administered.  Indeed, the only mention of

"methotrexate" in the patents' specifications appears in a long laundry list of therapeutic agents

with which anti-TNF antibodies "can be combined" (Verrecchio Decl. Ex. 1 at 23:25-24:41; *see*

*also* 23:55; Verrecchio Decl. Ex. 2 at 22:63-24:10; *see also* 23:26).[2]  This passage immediately

follows the patents' description of co-formulation and co-administration of antibodies with an

additional therapeutic agent.

The sections of the patent that expressly discuss treatment of autoimmune diseases, such

as rheumatoid arthritis, state that:

---

[1]  For example, the drug PERCOCET® is co-formulated to include the drugs oxycodone and acetaminophen
(Verrecchio Decl. Ex. 16, PERCOCET® Prescribing Information), the drug KALETRA® is co-formulated to
include the drugs lopinavir and ritonavir (Verrecchio Decl. Ex. 17, KALETRA® Prescribing Information), and the
drug ADVICOR® is co-formulated to include the drugs niacin and lovastatin (Verrecchio Decl. Ex. 18,
ADVICOR® Prescribing Information).
[2]  The patent application Abbott originally filed in 1996 did not disclose methotrexate as an agent with which the
anti-TNF antibodies could be co-administered.  Abbott disclosed methotrexate for the first time in the 1997
continuation-in-part application, the earliest application from which the patents-in-suit can possibly claim priority
benefit.

> An antibody, or antibody portion, of the invention also can be *administered with one or more additional therapeutic agents* useful in the treatment of autoimmune diseases . . . .

(*Id.* at 29:25-28; 28:55-59 (emphasis added)).   All of the relevant discussion in the patents about co-administration of an antibody and another therapeutic agent, including methotrexate, is consistent with the plain meaning of administering an antibody and methotrexate *together*.

Accordingly, when Abbott's amendment adding the word "both" before "an antibody and methotrexate" is read in light of the specification, it is evident that the amendment was meant to clarify that an antibody and methotrexate are to be administered *together* in these particular method of treatment claims.

Abbott's purported "plain meaning" construction of "administering to the subject both an antibody and methotrexate" – that it "merely requires that the two drugs (i.e., both drugs) be administered such that rheumatoid arthritis is treated by the combination" (Verrecchio Decl. Ex. 10) – is indefinite and finds no support in the specification.   As Centocor understands Abbott's position, from counsel's meet-and-confer, Abbott even contends that it is not necessary that "both" the antibody and the methotrexate cause the treatment of the rheumatoid arthritis in the patient to whom the drugs are administered.   Thus, under Abbott's construction, the anti-TNF antibody could be entirely ineffective in treating a patient's disease, and all of the treatment effect could result from the co-administered methotrexate – an admittedly old drug known for potentially treating rheumatoid arthritis long before Abbott's 1997 patent application was filed – and this could still be covered by Abbott's patent claims.   That is not the invention disclosed in the patents-in-suit.   The patents do not disclose an invention of treating rheumatoid arthritis with the known drug methotrexate so long as it is co-administered with an ineffective anti-TNF antibody.

14

The patents-in-suit are also silent about any dosage regimen for antibody-plus-methotrexate that would permit the methotrexate and the antibody to be taken at different times. A patient could take methotrexate which treats his rheumatoid arthritis but then, because of adverse side effects, discontinue the methotrexate treatment before starting any anti-TNF antibody. Both drugs have been administered to the patient and, under Abbott's construction, Abbott could content that this would be covered by its patent claims. But this is clearly not what is contemplated by the patents and is not within the disclosure in the patents. *See, e.g., On Demand Mach. Corp. v. Ingram Indus. Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[C]laims cannot be of broader scope than the invention set forth in the specification" because "the role of the specification is to describe and enable the invention").

Centocor respectfully requests that its construction of "administering to the subject both an antibody and methotrexate" be adopted, as the construction is supported by the intrinsic and extrinsic evidence.

### C.      Construction of Claim Terms on Which the Parties Agree

The parties have agreed on the following constructions, and request that the Court adopt them:

| Claim Term | Agreed Construction |
|---|---|
| $K_d$ | The dissociation constant of a particular antibody-antigen interaction |
| $K_{off}$ | The off rate constant for dissociation of an antibody from the antibody/antigen complex |
| surface plasmon resonance | An optical phenomenon that allows for the analysis of real-time biospecific interactions by detection of alterations in protein concentrations within a biosensor matrix |
| recombinant antibody | Antibody that is prepared, expressed, created, or isolated by recombinant means |
| isolated human antibody | An antibody having variable and constant regions derived from human germline |

15

| | |
|---|---|
| | immunoglobulin sequences (which may include mutations introduced in vitro or in vivo) that is substantially free of other antibodies having different antigenic specificities (e.g., an isolated antibody that specifically binds hTNFα is substantially free of antibodies that specifically bind antigens other than hTNFα). An isolated human antibody is not intended to include antibodies in which CDR sequences derived from the germline of another mammalian species, such as a mouse, have been grafted onto human framework sequences. An isolated human antibody that specifically binds hTNFα may, however, have cross-reactivity to other antigens, such as TNFα molecules from other species |

## IV.   CONCLUSION

Centocor respectfully requests that the following claim construction be adopted:

| Claim Term | Centocor's Construction |
|---|---|
| administering to the subject both an antibody and methotrexate | Introducing to the body of the subject an antibody and methotrexate together |

Furthermore, Centocor respectfully requests that the following agreed upon claim

constructions be adopted:

| Claim Term | Agreed Construction |
|---|---|
| $K_d$ | The dissociation constant of a particular antibody-antigen interaction |
| $K_{off}$ | The off rate constant for dissociation of an antibody from the antibody/antigen complex |
| surface plasmon resonance | An optical phenomenon that allows for the analysis of real-time biospecific interactions by detection of alterations in protein concentrations within a biosensor matrix |
| recombinant antibody | Antibody that is prepared, expressed, created, or isolated by recombinant means |

| isolated human antibody | An antibody having variable and constant regions derived from human germline immunoglobulin sequences (which may include mutations introduced in vitro or in vivo) that is substantially free of other antibodies having different antigenic specificities (e.g., an isolated antibody that specifically binds hTNFα is substantially free of antibodies that specifically bind antigens other than hTNFα).  An isolated human antibody is not intended to include antibodies in which CDR sequences derived from the germline of another mammalian species, such as a mouse, have been grafted onto human framework sequences.  An isolated human antibody that specifically binds hTNFα may, however, have cross-reactivity to other antigens, such as TNFα molecules from other species |
|---|---|

Dated:  January 21, 2011

CENTOCOR ORTHO BIOTECH, INC.

By its attorneys,

*Dianne Elderkin*

Dianne B. Elderkin (*pro hac vice*)
delderkin@akingump.com
Barbara L. Mullin (*pro hac vice*)
bmullin@akingump.com
Steven D. Maslowski (*pro hac vice*)
smaslowski@akingump.com
Angela Verrecchio (*pro hac vice*)
averrecchio@akingump.com
Matthew A. Pearson (*pro hac vice*)
mpearson@akingump.com
Rubén H. Muñoz (*pro hac vice*)
rmunoz@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103-7013
215-965-1200
FAX: 215-965-1210

Heather P. Repicky (BBO# 663347)
NUTTER MCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
617-439-2000
FAX: 617-310-9000

**Attorneys for Defendant**
CENTOCOR ORTHO BIOTECH, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on January 21, 2011, the foregoing **DEFENDANT CENTOCOR ORTHO BIOTECH, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** (filed through the ECF system) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>/Angela Verrecchio/</u>
Angela Verrecchio