**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | |
|---|---|
| ABBOTT BIOTECHNOLOGY LTD., <br><br> and <br><br> ABBOTT LABORATORIES, <br><br>            Plaintiffs, <br><br>       v. <br><br> CENTOCOR ORTHO BIOTECH INC., <br><br>           Defendant. | CIVIL ACTION NO. 09-40089-FDS <br><br> **DEMAND FOR JURY TRIAL** <br><br><br> `REDACTED VERSION` |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

**Table of Contents**

I.   INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ......................................................................................................... 2

    A.   Treatment of Rheumatoid Arthritis............................................................................ 2

        1.   Arthritis Treatments in the 1990's ................................................................ 2

    B.   Abbott's Salfeld Patents For Treating Rheumatoid Arthritis with a Human
        Anti-TNFα Antibody and Methotrexate ...................................................................... 6

        1.   Development of the First High-Affinity Human Antibodies
            Against TNFα .............................................................................................. 6

        2.   Abbott's Humira Patent Filings, including the Patents-in-Suit ................. 7

        3.   Abbott's Humira, the First FDA-Approved Human Antibody ................. 10

        4.   Centocor's Simponi Product and Its Co-administration
            Requirement............................................................................................... 10

    C.   ███████████████████████████████████████████████
        ███████████████████████████████████████ ........................ 11

III. ARGUMENT .............................................................................................................. 13

    A.   Principles of Claim Construction.............................................................................. 13

    B.   "administering to the subject both an antibody and methotrexate" ...................... 15

        1.   The Claim Language Does Not Require Simultaneous
            Administration. ......................................................................................... 17

        2.   The Specification and Prosecution History Support Abbott's
            Interpretation of "administer both . . . such that rheumatoid arthritis
            is treated" ................................................................................................. 18

        3.   The Standard Practice for Treating Rheumatoid Arthritis Supports
            Abbott's Interpretation of "administer both . . . such that
            rheumatoid arthritis is treated"................................................................. 21

IV.  Agreed Upon Constructions...................................................................................... 23

V.   Conclusion ................................................................................................................. 23

## Table of Authorities

**Page(s)**

**CASES**

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010).......................................................................................6

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)..............................................................................14, 5

*Jang v. Boston Sci. Corp.*,
    532 F.3d 1330 (Fed. Cir. 2008).....................................................................................10

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 (Fed. Cir. 2009).....................................................................................14

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
    545 F.3d 1340 (Fed. Cir. 2008).....................................................................................17

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*,
    445 F.3d 1348 (Fed. Cir. 2006).....................................................................................10

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009).....................................................................................14

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................................13, 14, 15

*Tap Pharm. Prods., Inc. v. Owl Pharm., L.L.C.*,
    419 F.3d 1346 (Fed. Cir. 2005).....................................................................................21

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997).....................................................................................16

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)................................................................................14, 19

Pursuant to the Court's June 30, 2010, Scheduling Order (D.E. 42), Plaintiffs Abbott Biotechnology Ltd. and Abbott Laboratories (collectively, "Abbott") submit this opening claim construction brief in support of Abbott's proposed constructions of disputed claim terms.  As seen below, the parties' dispute is limited to the meaning of the phrase "administering to the subject both an antibody and methotrexate."

## I.   INTRODUCTION

This patent infringement action relates to Abbott's Humira® ("Humira"), the first fully human, high-affinity, neutralizing, anti-tumor necrosis factor alpha ("TNFα") antibody approved by the U.S. Food and Drug Administration ("FDA").  Humira was approved in late 2002 to treat rheumatoid arthritis, either alone or in combination with methotrexate or other disease-modifying anti-rheumatic drugs ("DMARDs").

Abbott's asserted patents, U.S. Patent Nos. 7,223,394 ("the '394 patent," Ex. 1)[1] and 7,541,031 ("the '031 patent," Ex. 2) claim methods of treating rheumatoid arthritis by co-administering high-affinity, fully human antibodies (such as Humira) with methotrexate.  By the time these applications were filed, methotrexate was already a well-known arthritis therapy that, like many therapies, was used in combination with other drugs for the treatment of rheumatoid arthritis.  While methotrexate was typically given once a week, the drugs with which it was co-administered were typically administered on a different schedule, such as daily or twice-a-day.

In late-April 2009, Defendant Centocor Ortho Biotech Inc. ("Centocor") began marketing its own version of Humira, a fully human, high-affinity, neutralizing anti-TNFα antibody sold commercially as Simponi® ("Simponi").  Simponi is sold with an FDA-approved drug label that *requires* co-administration with methotrexate when treating rheumatoid arthritis.

---

[1]   References to "Ex. __" refer to the appended exhibits attached to the Declaration of Michael Angelini.  As the specification of the two asserted patents are substantively identical, for consistency, the specification of the '394 patent (Ex. 1) is cited throughout.

The parties' claim construction dispute centers around the meaning of the phrase "*administering to the subject both an antibody and methotrexate*, such that rheumatoid arthritis is treated"—a phrase found in independent claim 1 of each asserted patent.  Recognizing that Simponi *must* be co-administered with methotrexate, Centocor apparently attempts to avoid infringement by proposing an unduly narrow construction of "administering to the subject both an antibody and methotrexate" that is limited to administering the two drugs *simultaneously or at the same time*.  Centocor's proposed construction lacks support in the plain language of the claims, the patent specification, and the file history, and is entirely inconsistent with the standard practice for treating rheumatoid arthritis at the time of the invention.  In the end, the disputed claim limitation simply means what it says, namely, that the two drugs must be given to a patient such that the rheumatoid arthritis is treated by the combination, without regard to any specific time limitation that Centocor apparently seeks to write into the claims.

## II.     BACKGROUND

### A.     Treatment of Rheumatoid Arthritis

#### 1.     Arthritis Treatments in the 1990's

Moderate to severe rheumatoid arthritis is a debilitating disease affecting approximately 1.3 million adult Americans.  (Levesque Dec. ¶ 15.)  Widespread, chronic inflammation can result in joint destruction, deformity, and incapacity leading to reduced quality of life and potentially life-threatening complications.   (*Id.* ¶ 16.)  Although there is no known cure for rheumatoid arthritis, at the time of filing of the '394 and '031 priority application in February 1997, there were a number of therapies on the market or in clinical development to treat the disease and its symptoms.  (*Id.* ¶ 19.)  These therapies were diverse and included disease-modifying anti-rheumatic drugs ("DMARDs"); nonsteroidal anti-inflammatory drugs ("NSAIDs"); corticosteroids; monoclonal antibodies; and other agents.  (*Id.*)  The term

2

DMARDs (also known as "slow-acting anti-rheumatic drugs") broadly refers to a group of medications with different mechanisms of action and different frequencies of administration. (*Id.* ¶¶ 21-22.)  One of the most commonly prescribed DMARDs was methotrexate.  (*Id.* ¶ 24.) Originally developed as an anti-cancer drug, methotrexate was approved by the FDA in 1988 as a weekly treatment for rheumatoid arthritis. (*Id.*)

By 1996, multiple-drug (or "combination") therapy was developing as a common practice in the field.  (*Id.* ¶¶ 20-21.)  For example, a well-known treatise edited by Dr. Stephen Paget explained that "NSAIDs are often used in combination with one of the disease-modifying drugs (DMARDs) and at times with a DMARD and steroids."  Stephen Paget et al., Chapter 28 *in* MANUAL OF RHEUMATOLOGY AND OUTPATIENT ORTHOPEDIC DISORDERS, at 192 (Stephen Paget et al. eds., 1993) ("Paget Treatise 1993," Ex. 8); *see also* Bensen et al. 1994, Ex. 7 at 2034 ("Combination therapy with NSAID, [DMARD], and steroids has been the backbone of rheumatology practice for over 50 years.").

In addition, by the mid-1990s, it was increasingly common for more than one DMARD to be administered for the treatment of rheumatoid arthritis.  The Paget treatise noted, for example, that "[t]here are reports of almost all combinations of DMARDs, but many include the addition of hydroxy-chloroquine [one type of DMARD] to another DMARD."  (Paget Treatise 1993, Ex. 8 at 193.)   Other widely used rheumatology treatises also recognized this trend.  *See e.g.*, Borigini et al., Chapter 3 *in* TREATMENT OF THE RHEUMATIC  DISEASES, at 45 (Weisman et al., eds., 1995) ("Weisman Treatise 1995," Ex. 6) ("Some prospective and retrospective studies have suggested that combinations of DMARDs are adequately tolerated and may be more efficacious than high doses of a single agent."); Hilliquin et al., Chapter 17, PRACTICAL RHEUMATOLOGY, at 195 (Klippel et al., eds., 1995) ("Klippel Treatise 1995," Ex. 9) ("Combinations of [DMARDs]

are sometimes used in established RA, in an attempt to obtain better control of disease progression. . . . When one [DMARD] fails, it is possible to add a second drug to the first, while carefully monitoring for adverse effects.").

When multiple-drug therapy was prescribed for the treatment of rheumatoid arthritis, each drug was typically administered independently and according to its own independent dosing regimen. (Levesque Dec. ¶¶ 21-23.) For example, NSAIDs such as aspirin and ibuprofen were typically administered orally several times per day. (*Id.* ¶ 21.) Corticosteroids, such as prednisone, were typically administered orally one or more times per day, and other corticosteroids were administered intravenously once or several times per day. (*Id.*) In addition, corticosteroids were administered via intraarticular injection on a sporadic basis (often several months apart). (*Id.*) And DMARDs were administered on widely varying dosing frequencies, including once-a-day, more than once-a-day, weekly, and in some cases even less often (bi-weekly). (*Id.*) Commonly used DMARDs and their typical frequencies of administration included: methotrexate (weekly), sulfasalazine (twice daily), gold sodium thiomalate (weekly or bi-weekly), hydroxychloroquine (once or twice daily), azathioprine (once or twice daily), and auranofin (twice daily). (*Id.*) By 1993, the medical literature also reported that Centocor's chimeric anti-TNFα antibody, cA2 (later known as Remicade[®]), had been administered in a clinical study for the treatment of rheumatoid arthritis at a frequency of either once every two weeks or once every four days. (*Id.*) (citing Elliott et al. 1993, Ex. 10).

Methotrexate, in addition to its widespread use together with NSAIDs and/or corticosteroids, had been investigated in combination with a number of other DMARDs to treat rheumatoid arthritis. Weinblatt, Chapter 47 *in* TEXTBOOK OF RHEUMATOLOGY, at 772 (Kelley et

al., eds., 4th ed., 1993) ("Weinblatt 1993," Ex. 11) ("Methotrexate has been used in combination

with several other second-line therapies.").  These combinations included:

- sulfasalazine and hydroxychloroquine (O'Dell et al., 1996, Ex. 12 (combination therapy of *weekly methotrexate* and *twice-daily* sulfasazine and hydroxychloroquine);

- azathioprine (Willkens, et al., 1992, Ex. 13 (combination therapy of *weekly* methotrexate and *daily* azathioprine);

- auranofin (Williams et al., 1992, Ex. 14) (combination therapy of methotrexate administered *every* 12 hours and auranofin capsules taken *twice daily*); and

- cyclosporine (Tugwell et al., 1995, Ex. 15 (combination therapy of *weekly* methotrexate and *twice-daily* cyclosporine); Bensen et al., 1994, Ex. 7 (same)).  (Levesque Dec. ¶ 26.)

As reflected in the above-cited texts and other publications, it was the standard practice in the

field at the time (and to this day) to administer multiple drugs in combination for the treatment of

rheumatoid arthritis according to each drug's own independent dosing regimen—typically hours,

days, or even weeks apart.  And even if two drugs were both administered weekly, there was no

requirement that they be administered at the same time or even on the same day.  (*Id.* ¶ 28.)

Researchers at the Kennedy Institute in London were also investigating the use of

chimeric anti-TNFα antibodies together with methotrexate to treat rheumatoid arthritis.  (Ex. 16,

U.S. Pat. No. 6,270,766 ("the Kennedy patent") (cited on the front of the '031 patent).)  In these

studies patients taking weekly doses of methotrexate were given infusions of chimeric anti-TNFα

antibody at intervals of 2, 4, or 8 weeks.  (Levesque Dec. ¶ 27.)  Thus, consistent with other

methotrexate combinations, the Kennedy patent describes administration of two drugs according

to separate, independent dosing schedules.  (*Id.*)  Centocor is well aware of these studies as it is

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

**B.**   **Abbott's Salfeld Patents For Treating Rheumatoid Arthritis with a Human Anti-TNFα Antibody and Methotrexate**

    **1.**   **Development of the First High-Affinity Human Antibodies Against TNFα**

While normally part of a healthy immune system, an overabundance of TNFα in the joints of patients with rheumatoid arthritis is thought to play a role in the inflammation associated with the disease.  (Levesque Dec. ¶ 17.) [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]



### 2.     Abbott's Humira Patent Filings, including the Patents-in-Suit

The first patent application concerning Humira was filed on February 9, 1996, and issued as U.S. Patent No. 6,090,382 ("the '382 patent.") (Ex. 38.)  The '382 patent discloses a class of fully human, high-affinity, neutralizing, anti-TNFα antibodies as well as certain uses of these antibodies.  (*E.g.*, Ex. 38, '382 patent, col. 22, ll. 19-22.)  On February 10, 1997, the applicants filed PCT application[2] WO 97/29131 ("the PCT Application"), claiming priority to the '382 patent application.  The PCT Application contained all the subject matter disclosed in the '382 patent, but also added new subject matter directed to additional therapeutic agents that could be used with an antibody of the invention to treat specific conditions.  (Ex. 29, WO 97/29131.)  This PCT Application eventually matured into the Abbott '394 and '031 patents-in-suit.[3]  These '394 and '031 patents cover Abbott's Humira product and claim methods of treating rheumatoid arthritis by administering both a human antibody of the invention and methotrexate.  For

---

[2] The Patent Cooperation Treaty ("PCT") allows an applicant to file a single application that is recognized in all PCT member countries as entitled to a particular priority date.

[3] The '394 patent issued on May 29, 2007 from App. No. 09/801,185, filed on March 7, 2001, which is a continuation of App. No. 09/125,098, filed on March 16, 1999, which is the U.S. National Stage of the PCT Application, which is a continuation-in-part of App. No. 08/599,226. The '031 patent issued on June 2, 2009 from App. No. 11/781,901, filed on April 17, 2001, which is a continuation of App. No. 09/801,185.

purposes of the lone claim-construction dispute here, claim 1 of Abbott's '394 patent is representative:

> 1. A method for treating a subject suffering from rheumatoid arthritis, comprising *administering to the subject both an antibody and methotrexate*, such that the rheumatoid arthritis is treated, wherein the antibody is an isolated human antibody, or an antigen-binding portion thereof, t[h]at dissociates from human TNFα with a $K_d$ of 1 x $10^{-8}$ M or less and a $K_{off}$ rate constant of 1 x $10^{-3}$ s$^{-1}$ or less, both determined by surface plasmon resonance, and neutralizes human TNFα cytotoxicity in a standard in vitro L929 assay with an $IC_{50}$ of 1 x $10^{-7}$ M or less.

('394 patent, claim 1) (emphasis added).

The identical specifications of the '394 and '031 patents disclose a class of fully human, high-affinity, neutralizing anti-TNFα antibodies and describe co-administering an antibody of the invention with additional therapeutic agents. (*E.g.*, '394 patent, col. 23, ll. 5-9.) In fact, the '394 and '031 specification enumerates a large number of specific examples of such co-therapies for treating rheumatoid arthritis (*id*, col. 23, l. 25-col. 24, l. 41) as well as co-therapies for other conditions (*id.*, col. 24, l. 42-col. 25, l. 58). The co-therapies identified for treating rheumatoid arthritis include: methotrexate (*id.*, col. 23, l. 55), NSAIDs (*id.*, col. 23, l. 28), the chimeric anti-TNFα antibody cA2 (*id.*, col. 23, l. 31), sulfasalazine (*id.*, col. 24, l. 9), azathioprine (*id.*, col. 24, l. 11), gold (*id.*, col. 24, l. 24), hydroxychloroquine (*id.*, col. 24, l. 25), cyclosporine (*id.*, col. 24, l. 26), prednisone (*id.*, col. 24, l. 33), and auranofin (*id.*, col. 24. l. 37).

The specification further explains that a therapeutically effective amount of the claimed antibody may "vary according to factors such as the disease state, age, sex, and weight of the individual." (*Id.*, col. 26, ll. 1-3.) And it highlights the importance of tailoring a drug's dosage regimen to the needs of a particular patient:

> Dosage regimens may be adjusted to provide the optimum desired response (e.g., a therapeutic or prophylactic response). For example, a single bolus may be administered, several divided

> doses may be administered over time or the dose may be proportionally reduced or increased as indicated by the exigencies of the therapeutic situation.
>
> * * *
>
> It is to be further understood that for any particular subject, specific dosage regimens should be adjusted over time according to the individual need and the professional judgment of the person administering or supervising the administration of the compositions

(*Id.*, col. 26, ll. 15-20, 40-44.)  The specification refers to one embodiment in which the antibody of the invention and an additional therapeutic agent are "coformulated" as well as another embodiment in which the two therapies are "co-administered." (*id.*, col. 23, ll. 5-9).  But like the '394 and '031 claim language, the specification does *not* suggest any temporal limitation for the *co-administration* of an antibody of the invention and methotrexate.

To the contrary, the intrinsic references cited by the applicants in their patent application and on the face of the patents reflect the standard practice in the art of administering multiple drugs for the treatment of rheumatoid arthritis according to their own independent dosing regimens and without any requirement that the drugs be administered at the same time.  For example, the patents-in-suit cite Elliott et al. 1993 (*see* '394 patent, Other Publications, page 2), in which the authors investigate the effects of concomitant therapy with the chimeric anti-TNFα antibody cA2 administered *either 14 or 4 days* apart and *daily doses of a number of NSAIDs and corticosteroids*.  (Ex. 10.)  Similarly, the specification cites Elliott et al. 1994a (*see* '394 patent, col. 29, ll. 9-10) and Elliott et al. 1994b (*id.*, col. 29, ll. 8-9) describing treatments by a cA2 antibody with concurrent NSAID and/or corticosteroid therapies each according to its own schedule.  (Ex. 17; Ex. 18.)  Rankin et al., 1995, also cited in the specification ('394 patent, col. 29, ll. 10-11), describes the administration of a single infusion of the anti-TNFα antibody CDP571 and *daily* doses of oral prednisone or NSAIDs.  (Ex. 19.)

During prosecution of the '394 and '031 patents, there were no claim amendments or other discussions between the applicants and the patent examiner that would limit the otherwise broad language of "administering to the subject both an antibody and methotrexate," to an embodiment in which the two therapies are administered at the same time.

### 3.   Abbott's Humira, the First FDA-Approved Human Antibody

Humira was the first, and for many years only, fully human antibody approved by the FDA.  Since late 2002, Humira has been FDA-approved to treat rheumatoid arthritis either alone or in combination with methotrexate or other DMARDs.  (Ex. 3, FDA-Approved Humira Label (Rev. 11/2009), § 1.1.)  ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Humira was recognized in the field as an important advance and was awarded the prestigious Galen Prize, the equivalent of the Nobel Prize in the pharmaceutical and biomedical industry. (Ex. 24, ABT00341208-211.)  Rheumatoid arthritis patients using Humira with methotrexate typically take Humira once every two weeks and methotrexate weekly.  (Levesque Dec. ¶ 41.) Humira is also used with other DMARDs that are dosed one or more times a day.  (*Id.*)

### 4.   Centocor's Simponi Product and Its Co-administration Requirement

In late-April 2009, Centocor launched its accused Simponi product, a fully human, high-affinity, and neutralizing anti-TNFα antibody.[4]   Centocor's label directs that Simponi be administered with methotrexate:

---

[4]  The Federal Circuit has "emphasized the importance of the context provided by the accused device when ruling on claim construction and the problems presented by construing claims in the absence of such context."  *Jang v. Boston Sci. Corp.*, 532 F.3d 1330, 1337 (Fed. Cir. 2008); *see also Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350 (Fed. Cir. 2006).

- "*SIMPONI, in combination with methotrexate*, is indicated for the treatment of adult patients with moderately to severely active rheumatoid arthritis." (Ex. 4, *Indications and Usage*, § 1.1, at 2 (emphasis added).)

- "For the treatment of RA, SIMPONI should be *used with methotrexate* (MTX) [see Clinical Studies (14.1)]." (Ex. 4, Drug Interactions, § 7.1, at 11 (emphasis added).)

Such language in the Simponi label refers to the fact that during clinical trials Simponi was administered subcutaneously at doses of 50 mg or 100 mg every *four weeks*, while patients were administered *methotrexate on a weekly basis*. (Ex. 4, *Clinical Studies*, § 14.1, at 15-16.)  In other words, consistent with the above-described usage in the field, combination therapy with both drugs does not require simultaneous administration.

In addition, in a July 2009 publication, Centocor scientists reported that "[i]n a Phase II study, *golimumab plus methotrexate* (MTX) reduced RA signs and symptoms" and that "golimumab, a new anti-TNF-α antibody administered subcutaneously *in combination with [methotrexate]* effectively reduced the signs and symptoms of RA in patients inadequately responsive to [methotrexate]." (Visvanathan et al. 2009, Ex. 21, at 1372, 1375 (emphasis added).)  The patients in the study received 50-100 mg of *Simponi every 2 or 4 weeks* and stable doses of *methotrexate of at least 10 mg/week*.  (*Id.* at 1372); (*see also* Emery et al. 2009, Ex. 22 at 2272, 2281 (using "golimumab (with . . . [methotrexate])" or "golimumab plus [methotrexate]" to refer to combination of *monthly* golimumab and *weekly* methotrexate treatment).)

C.  ████████████████████████████████████████

Centocor has referred to this requirement that Simponi—and the antibody recited in Abbott's asserted patent claims—be administered with methotrexate in other contexts prior to this claim-construction dispute, ████████████████████████████████

████████████████████████████████████████████████████



## III.   ARGUMENT

### A.    Principles of Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted).   The words of a claim are to be given their "ordinary and customary meaning" as a person of ordinary skill in the art would understand them.   *Id.* at 1312-13 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).   When determining the meaning of disputed claim language, courts consider "those sources available to the public that show what a person of skill in the art would have understood

[the] disputed claim language to mean." *Id.* at 1314 (quotation omitted). Such sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quotation omitted). The Federal Circuit has established that "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (citation omitted).

The specification is the single best guide to the meaning of claim terms. Claims are to be read "in view of the specification," *Phillips*, 415 F.3d at 1315, and the Federal Circuit has explained that the "patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("embodiments appearing in the written description will not be used to limit claim language that has broader effect") (quotation omitted). "A patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning; however, a patentee must clearly express that intent in the written description." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).

In addition to the claims and specification, courts should also consider the prosecution history of the patent. *Phillips*, 415 F.3d at 1317. The Federal Circuit has recognized, however, that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* In addition, a "court

may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record." *Helmsderfer*, 527 F.3d at 1382. Although generally given less weight than the intrinsic evidence, such "extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Phillips*, 415 F.3d at 1319.

**B.** **"administering to the subject both an antibody and methotrexate"**

| Claim Terms | Abbott's Proposed Construction | Centocor's Proposed Construction |
|---|---|---|
| **"administering to the subject both an antibody and methotrexate such that rheumatoid arthritis is treated"** | Plain meaning. Alternatively, if the Court adopts Centocor's construction, Abbott requests that the Court clarify that introducing the drugs "together" does not require that they be delivered simultaneously or with identical dosing frequency, but only sufficiently together that rheumatoid arthritis is treated with the combination of both drugs, and that "introducing" is not limited to the first time the drug is administered. | Introducing to the body of the subject an antibody and methotrexate together |

Claim construction begins with an inquiry into the ordinary and customary meaning of the claim to a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13. The phrase "administering to the subject both an antibody and methotrexate such that rheumatoid arthritis is treated" is clear on its face and would have been understood by a skilled artisan to mean administering both drugs (namely, the antibody and methotrexate) to treat rheumatoid arthritis with the combination. The skilled artisan would have understood that *each*

*drug* could be administered according to its *own independent dosing regimen*, as that had been the longstanding practice in treating rheumatoid arthritis.  *See* section II.A.1, *supra*.

The Court need not search for synonyms where the plain meaning of the claim term is clear.  *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court.").  As the Federal Circuit explained in *Ethicon,* claim construction "is not an obligatory exercise in redundancy."  *Id.*  The Court need only resolve any dispute between the parties.  *See id.*  Indeed, the Federal Circuit has approved of a claim construction in which the district court adopted the "plain and ordinary meaning" of claim terms and thus resolved the parties' dispute by accepting the plain meaning and rejecting a contrary construction that would have improperly read a limitation into the claims.  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010). Assigning synonyms to words that are already clear also risks changing their meaning.  For example, unlike "administering," Centocor's "introducing" construction could erroneously refer to only the first time a drug is administered.  Because the words "administer" and "both" are easily understood, the Court need go no further than to affirm that they should be interpreted according to their plain meaning and reject Centocor's result-driven, narrow construction.

Specifically, Centocor proposes that "administering . . . both an antibody and methotrexate" should be rephrased as "introducing . . . an antibody and methotrexate together." According to Centocor, the operative words "introducing . . together" would require that the antibody and methotrexate be administered to patients simultaneously, or at the same time.  As set forth below, this construction is contrary to the claim language, the patent specification, and the way rheumatoid arthritis was treated at the time the patent was filed.  Accordingly, the Court

16

should reject Centocor's proposed construction or otherwise make explicit that simultaneous or near-simultaneous administration is *not* required and that administering "both" an antibody and methotrexate "such that rheumatoid arthritis is treated" requires only that the drugs be administered such that the subject is treated by the combination of both drugs.

### 1.   The Claim Language Does Not Require Simultaneous Administration.

The claims of the '394 and '031 patents contain no language limiting the administration of either the claimed antibody or methotrexate to a particular dosing frequency during the course of treatment.  It is significant that the claims of the '394 and '031 patents are explicitly directed to a "method for treating a subject suffering from rheumatoid arthritis."  Thus, although the antibody of the invention and methotrexate must be administered such that the subject is treated for rheumatoid arthritis with the combination of both drugs, the claim language permits that each drug can be administered according to its own independent dosing regimen.

By contrast, in advocating a construction that requires "simultaneous" administration, Centocor appears to focus on only a few words in the relevant phrase of the patent claim.  But these words cannot be read in a vacuum.  *See Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole.") (citing *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered . . . .")).  Here the phrase "such that rheumatoid arthritis is treated" offers critical context because it modifies "administering" to make clear that the two drugs are simply to be administered in a way that rheumatoid arthritis is treated by the combination.  More specifically, the phrase "such that

17

rheumatoid arthritis is treated" is "adverbial" in that it modifies the verb form "administering"—thus describing *how* that action should be performed.

The patent claims, to be sure, could have been drafted differently to include an adverb defining the *timing* of administration. For example, the claims could have been drafted to include a limitation requiring that both the antibody and methotrexate be administered to the subject "simultaneously," "at the same time," or even "on the same dosing schedule." But the drafters of the '394 and '031 patents instead chose to use broad language that merely requires administering to the subject both an antibody and methotrexate for the purpose of treating rheumatoid arthritis. While this language is broad enough to cover an embodiment in which the antibody and methotrexate are administered at the same time, it is in no way limited to such an embodiment. The plain language of the claim merely requires combination treatment with both drugs.

    2.       **The Specification and Prosecution History Support Abbott's Interpretation of "administer both . . . such that rheumatoid arthritis is treated"**

The specification also supports this plain reading of "administering to the subject both an antibody and methotrexate." The specification provides dozens of examples of "therapeutic agents for rheumatoid arthritis with which an antibody, or antibody portion of the invention can be combined." ('394 patent, col. 23, l. 25-col. 24, l. 41.) The specification's list of therapeutic agents that can be given with the antibody include agents typically administered *once-a-day*, *more than once-a-day*, *and less than once-a-day* (*e.g.*, weekly)—including methotrexate (*id.*, col. 23, l. 55), NSAIDs (*id.*, col. 23, l. 28), the chimeric anti-TNFα antibody cA2 (*id.*, col. 23, l. 31), sulfasalazine (*id.*, col. 24, l. 9), azathioprine (*id.*, col. 24, l. 11), gold (*id.*, col. 24, l. 24), hydroxychloroquine (*id.*, col. 24, l. 25), cyclosporine (*id.*, col. 24, l. 26), prednisone (*id.*, col. 24, l. 33), and auranofin (*id.*, col. 24. l. 37). As discussed above, it was well known in the art that

each of these drugs had its own unique dosing regimen for the treatment of rheumatoid arthritis. (Weisman Treatise 1995, Ex. 6 at 37; Paget Treatise 1993, Ex. 8 at 195-207; Levesque Dec. ¶¶ 21-23).  The specification itself recognizes such unique dosing regimens.  (*See* '394 patent, col. 26, ll. 15-20) ("*Dosage regimens may be adjusted* to provide the optimum desired response (e.g., a therapeutic or prophylactic response).  For example, *a single bolus may be administered, several divided doses may be administered over time or* the dose may be proportionally reduced or increased as indicated by the exigencies of the therapeutic situation."); (*id.*, col. 26, ll. 40-44) ("It is to be further understood that for any particular subject, *specific dosage regimens should be adjusted over time according to the individual need* and the professional judgment of the person administering or supervising the administration of the compositions.") (emphases added). Unsurprisingly, then, nothing in the specification requires the antibody of the invention to be administered at the same time as any of the therapeutic agents listed, including methotrexate.  In fact, treatments that need to be administered several times a day would be rendered ineffective if given once every few days or weeks as would have been expected for a therapeutic antibody. (Levesque Dec. ¶ 32.)

The references cited in the patents weigh heavily in favor of Abbott's construction and against Centocor's.  These references, which are part of the intrinsic record, *see V-Formation*, 401 F.3d at 1311, reflect the standard practice in the art of administering multiple drugs to treat rheumatoid arthritis according to their own independent dosing regimens and without any requirement that the drugs be administered at the same time.  (*See e.g.,* Elliott et al. 1993, Ex. 10 ('394 patent, Other Publications, page 2) (concomitant therapy included administering both a chimeric anti-TNFα antibody *4 or 14 days apart* and *daily doses of NSAIDs or corticosteroids*); Elliott et al. 1994a, Ex. 17 (*id.*, col. 29, ll. 9-10) (treatment with a single infusion of cA2 and

concomitant corticosteroid and/or NSAID therapy); Elliott et al., 1994b, Ex. 18 (*id.*, col. 29, ll. 8-9) (concomitant therapy of intermittent cA2 infusion and daily prednisolone and/or simple analgesics); Rankin et al. 1995, Ex. 19 ('394 patent, col. 29, ll. 10-11) (administering single infusion of CDP571 anti-TNFα antibody and daily doses of oral prednisolone or NSAIDs).)  The explicit teaching in these references that treating rheumatoid arthritis with multiple drugs does *not* require simultaneous administration deeply undercuts Centocor's strained suggestion that "administering . . . both" *requires* that both drugs be given at the same time.

That the specification refers to an embodiment in which the antibody of the invention and an additional therapeutic agent would be "coformulated" changes nothing about the proper construction here.  (*See* '394 patent, col. 23, ll. 5-9.)  A "coformulated" embodiment, to be sure, would necessarily be administered at the same time.  But nothing in the specification suggests that the claims of the patents-in-suit should be restricted to such a "coformulated" embodiment. On top of that, "coformulated" is a *different* and narrower term than the language actually used in the claims here ("administering . . . both") and is thus presumed to have a *different* meaning than the actual claim text.

Finally, there were no events during prosecution of the '394 or '031 patents that suggest that the phrase "administering to the subject both an antibody and methotrexate," should be interpreted in any way other than according to its ordinary and customary usage as reflected in the patent specification and the references cited therein.  In sum, then, the intrinsic evidence requires only a reading of the phrase "administering to the subject both an antibody and methotrexate" that is consistent with its ordinary and customary usage.  There is nothing to suggest that the inventors intended to limit the claims of the '394 and '031 patents to an

embodiment in which the antibody and methotrexate would be administered "simultaneously" or on the same dosing regimen.

### 3. The Standard Practice for Treating Rheumatoid Arthritis Supports Abbott's Interpretation of "administer both . . . such that rheumatoid arthritis is treated"

The standard practice and experience of those working in the field is relevant to the determination of the ordinary meaning of claim terms. *See Tap Pharm. Prods., Inc. v. Owl Pharm., L.L.C.*, 419 F.3d 1346, 1354 (Fed. Cir. 2005) ("[I]t was appropriate for the district court not only to consider the intrinsic evidence, but also to consider Dr. Pitt's interpretation of that evidence, both in context and from the perspective of a person of ordinary skill in the art.").

In the mid-1990s, the standard practice for administering multiple drugs to treat rheumatoid arthritis was to administer each drug according to its own independent dosing regimen, a regimen determined by the prescribing physician based on a variety of factors. (Levesque Dec. ¶ 21.)  When multiple drugs were prescribed to treat rheumatoid arthritis, they could be administered hours, days, or even weeks apart.  (*Id.*)  For example, O'Dell et al., 1996 describes combination therapy of weekly methotrexate and twice-daily sulfasazine and hydroxychloriquine for the treatment of rheumatoid arthritis.  (Ex. 12 at 1287-88.)  Elliott et al., 1993 describes concomitant therapy in which the anti-TNFα antibody cA2 was administered either two weeks or 4 days apart and a number of NSAIDs and/or corticosteroids were administered daily.  (Ex. 10 at 1682, 1683.)

Likewise, the texts and publications of the day used language such as "concomitant" and "in combination with" interchangeably in order to refer to the administration of multiple drugs, each according to its own independent dosing regimen.  *E.g.,* Weisman Treatise 1993, Ex. 6 at 45 ("Methotrexate, azathioprine, and hydroxychloroquine *in combination* were found to be well tolerated and more effective than any one agent alone in uncontrolled studies."); Weinblatt 1993,

Ex. 11 at 772 ("Methotrexate has been used *in combination with* several other second-line therapies."); Paget Treatise 1993, Ex. 8 at 192 ("NSAIDs are often used *in combination with* one of the disease-modifying drugs (DMARDs)"); Elliott et al. 1993, Ex. 10 at 1682, Table 1 ("Concomitant therapy") (all emphases added).

Centocor's own characterization of multi-drug therapy is consistent with this practice, even to this day. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████  Even more, Centocor consistently described the administration of its Simponi product in the same or similar terms as these asserted claims, saying its Simponi antibody was given "*in combination with*" or "*co-administered with methotrexate*" to describe treatment for rheumatoid arthritis where Simpoini is administered on a *monthly* basis and methotrexate on a *weekly* basis.  (*See* Simponi Label, Ex. 4, *Indications and Usage*, § 1.1, at 2 ("SIMPONI, in combination with methotrexate"); *id.*, Visvanathan et al. 2009, Ex. 21, at 1372, 1375 ("golimumab plus methotrexate"); █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████  Emery et al. 2009, Ex. 22 at 2272, 2281 ("golimumab [Simponi] (with . . . [methotrexate])" or "golimumab plus [methotrexate]").  In short, Centocor itself plainly understood the claims as *not* requiring "simultaneous" administration.

## IV.    Agreed Upon Constructions[5]

The following are agreed upon constructions:

| Claim Term | Agreed Upon Construction |
|---|---|
| "isolated human antibody" | An antibody having variable and constant regions derived from human germline immunoglobulin sequences (which may include mutations introduced in vitro or in vivo) that is substantially free of other antibodies having different antigenic specificities (e.g., an isolated antibody that specifically binds hTNFα is substantially free of antibodies that specifically bind antigens other than hTNFα).  An isolated human antibody is not intended to include antibodies in which CDR sequences derived from the germline of another mammalian species, such as a mouse, have been grafted onto human framework sequences.  An isolated human antibody that specifically binds hTNFα may, however, have cross-reactivity to other antigens, such as TNFα molecules from other species. |
| "Kd" | the dissociation constant of a particular antibody-antigen interaction |
| "koff" | the off rate constant for dissociation of an antibody from the antibody/antigen complex |
| "surface plasmon resonance" | an optical phenomenon that allows for the analysis of real-time biospecific interactions by detection of alterations in protein concentrations within a biosensor matrix |
| "recombinant antibody" | antibody that is prepared, expressed, created or isolated by recombinant means |

## V.    Conclusion

For the foregoing reasons, Abbott requests that the Court construe "administering to the subject both an antibody and methotrexate" according to its plain meaning in the manner proposed by Abbott.  Alternatively, if the Court otherwise adopts Centocor's definition, Abbott

---

[5] The agreed-upon definitions of "Kd," "koff," "surface plasmon resonance," and "recombinant antibody" are identical to the agreed-upon constructions submitted in *Abbott GmbH & Co., KG et al. v. Centocor Ortho Biotech, Inc.* et al., No. 4:09-cv-11340-FDS (D. Mass).

requests that the Court make clear that "together" does not require simultaneous or near-simultaneous dosing and that "introducing" is not limited to the first administration of the drugs.

DATED: January 21, 2011                    Respectfully submitted,


                                           /s/Michael P. Angelini
                                           _____
                                           Michael P. Angelini (BBO# 019340)
                                           Douglas T. Radigan (BBO# 657938)
                                           BOWDITCH & DEWEY LLP
                                           311 Main Street
                                           P.O. Box 15156
                                           Worcester, MA 01615-0156
                                           (508) 926-3400
                                           mangelini@bowditch.com
                                           dradigan@bowditch.com

                                           Michael A. Morin (admitted *pro hac vice*)
                                           David P. Frazier, Ph.D (admitted *pro hac vice*)
                                           D. Brian Kacedon (admitted *pro hac vice*)
                                           John T. Battaglia (admitted *pro hac vice*)
                                           FINNEGAN, HENDERSON, FARABOW,
                                             GARRETT & DUNNER, L.L.P.
                                           901 New York Avenue, N.W.
                                           Washington, D.C. 20001
                                           (202) 408-4000
                                           michael.morin@finnegan.com
                                           david.frazier@finnegan.com
                                           brian.kacedon@finnegan.com
                                           john.battaglia@finnegan.com

                                           **Attorneys for Plaintiffs**
                                           ABBOTT BIOTECHNOLOGY, LTD.
                                           ABBOTT LABORATORIES

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed though the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 21, 2011.


_/s/ Michael P. Angelini_____