1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4     ABBOTT BIOTECHNOLOGY LTD.        )
       and ABBVIE, INC.,               )
 5                          Plaintiffs, )
       vs.                             )
 6                                     )  No. 09-40089-FDS
       CENTOCOR ORTHO BIOTECH, INC.,   )
 7                          Defendant.  )
                                       )
 8                                     )

 9

10     BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11              `

12                        MOTION HEARING

13

14

                          October 16, 2014
15                          2:03 p.m.

16

17

                       United States District Court
18                         Courtroom No. 2
                          One Courthouse Way
19                     Boston, Massachusetts  02210

20

21

22

23                      Valerie A. O'Hara, FCRR, RPR
                          Official Court Reporter
24            John Joseph Moakley United States Courthouse
                      One Courthouse Way, Room 3204
25                        Boston, MA 02210
                       E-mail: vaohara@gmail.com
```

2

1 | APPEARANCES:

2

3 | For The Plaintiffs:

4 | Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, by
D. BRIAN KACEDON, ESQ., CASEY L. DWYER, ATTORNEY, and
5 | MICHAEL A. MORIN, ESQ., 901 New York Avenue, NW, Washington,
D.C. 20001-4413;

6 | For The Defendants:

7 | Akin, Gump, Strauss, Hauer & Feld, LLP, by
BARBARA L. MULLIN, ATTORNEY, STEVEN D. MASLOWSKI, ESQ.,
8 | Two Commerce Square, Suite 4100, 2001 Market Street,
Philadelphia, Pennsylvania 19103-7013;

9

10 | Johnson & Johnson, by Michael J. Timmons, Senior Counsel
One Johnson & Johnson Plaza WHQ-4122, New Brunswick, NJ 08933.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2         THE CLERK:  All rise.  Court is in session.  Would

3   counsel please identify themselves for the record.

4         MR. KACEDON:  Good afternoon, your Honor, on behalf of

5   AbbVie, I'm Mike Morin, and I have with me my colleague,

6   Brian Kacedon, and my colleague, Casey Dwyer.

7         THE COURT:  All right.  Good afternoon.

8         MS. MULLIN:  Good afternoon, your Honor, on behalf of

9   Centocor, Barbara Mullin, and with me is Steve Maslowski from

02:01PM 10   Akin, Gump, and we also have here Mike Timmons from Johnson &

11   Johnson Legal Department.

12         MR. TIMMONS:  Good afternoon, your Honor.

13         THE COURT:  Good afternoon, all.  Please be seated.

14   I'm having a sense of déjà vu every time I have one of these

15   cases.  I have a number of motions pending.  Have counsel

16   talked about what makes sense in terms of how to proceed?  Yes,

17   Mr. Morin.

18         MR. MORIN:  Yes.  Subject to your approval, your

19   Honor, the parties have agreed that we'd start with Centocor's

02:01PM 20   two motions, first the motion on willfulness and bifurcation

21   followed by their Daubert motion on Mr. Jarosz, then we'd go to

22   AbbVie's three motions starting with Mr. Gering and then

23   followed by Ms. Knowles, and what was the last one?  Dr. Doyle,

24   which I'm not doing.  I would remember her name if I were doing

25   it.  Pardon me for that, but subject to the Court's approval,

4

1    that's what we had agreed upon.

2           THE COURT:  That's fine.  There ought to be a rule

3    though, if you can't remember what the motion is, that ought to

4    be the end of it, right?

5           MR. MORIN:  Is this all on the record?  My client is

6    not going to be happy with that one.

7           THE COURT:  We'll seal that sentence, although I'm

8    always making comments about things like the Eagles and the

9    Red Skins that I later regret when I see the record.

02:02PM 10           MR. MORIN:  The Red Skins, we were from Washington.

11           THE COURT:  Can I say that word out loud?  I'm not

12    sure I can.  All right.  That sounds fine to me, so it's

13    Centocor's motion, Centocor will go first.  I'm sorry, which

14    one are you taking up, Ms. Mullin?

15           MS. MULLIN:  It will be the Renewed Motion For Summary

16    Judgment of No Willfulness or, if denied, Bifurcation.

17           THE COURT:  All right.

18           MR. MASLOWSKI:  Your Honor, we have a slide deck to

19    hand up.

02:02PM 20           THE COURT:  All right.

21           MS. MULLIN:  So the first motion to be argued today

22    has two parts, Centocor's Renewed Motion For Summary Judgment

23    of No Willful Infringement, and if that's denied, then the

24    Motion of the Bifurcation of the Willfulness Issue, and just to

25    put this into procedural context, if the motion for summary

5

1    judgment of no willfulness is granted, that will moot the

2    bifurcation motion, but it also moots Abbott's or AbbVie's --

3    pardon me, sorry, I'm going to do that all day.

4              THE COURT:  You can say Abbott, that's fine with me.

5              MS. MULLIN:  Their daubert motion directed to the

6    testimony of Sherry Knowles because that testimony is only

7    directed to the willfulness issue.

8              So the context for this motion is that there are two

9    prongs to the willfulness inquiry.  One is an objective prong,

02:04PM 10   and the other is subjective, and both must be proven by Abbott

11   by clear and convincing evidence, so if they fail to prove

12   either one, it's fatal to this claim.

13             We're focusing on the objective prong, which is the

14   issue the Court has to decide, which is has Centocor's conduct

15   been objectively reckless, and in the context of putting this

16   in two, it's Abbott's burden to prove this by clear and

17   convincing evidence.

18             When the Court has looked at this issue, they've

19   justified finding no willfulness, they've used words like the

02:04PM 20   defenses were reasonable, the defenses were credible, the

21   defenses were substantial, and when they find these things,

22   they find that then the plaintiff cannot meet the clear and

23   convincing burden of proving objective recklessness.

24             So the claims we have here are method claims for

25   treating a subject that has rheumatoid arthritis that involves

6

1        administering both an antibody and methotrexate.  The antibody

2        is described in the claim as an isolated human antibody that

3        has certain functional characteristics that relate to binding,

4        that's the $K_{off}$ and $K_D$ limitation and also to neutralizing

5        ability, which is the L929 assay.

6              The question that is raised by Centocor here and the

7        underlying premise is whether or not Abbott's patents have

8        adequate written description to support the genus of antibodies

9        that are encompassed by these claims.

02:05PM 10             This might sound a little bit familiar because we've

11       done this before.  The purpose of the written description

12       requirement is to make sure that the right to exclude, the

13       right to exclude others from using the invention does not

14       overreach the invention.

15             When you have claims that are directed to a genus,

16       like the genus of human antibodies that are encompassed by the

17       claims here, they're more susceptible to attack for lack of

18       written description, and that's because when you have

19       limitations like we want it to bind really well, we want to

02:06PM 20       have a certain binding affinity, we want it to neutralize it

21       really well as measured in a particular assay.

22             You're really talking about a desired result, and the

23       question is, did the Abbott inventors invent the entire genus

24       of antibodies that accomplishes that result, not just some of

25       the species but the entire genus.

1            So what the Federal Circuit has said is that when

2     you're looking at these genus claims, the patent specification

3     has to disclose either a representative number of species

4     falling within the scope of the genus or structural features

5     common to the members of the genus so that one skilled in the

6     art can visualize or recognize the members of the genus.

7            And when we're talking about whether or not there are

8     representative species described in the specifications, you

9     look at how much variation there is within the species, and if

02:07PM 10    there's substantial variation within the species, then the

11    species that are actually described in the patent specification

12    have to represent or reflect that variation.

13            So what has changed?  We filed a motion, Centocor

14    filed a motion for summary judgment over six months ago, I'm

15    sorry, I don't remember the date, but what has changed since

16    then is that we now have a Federal Circuit decision that

17    validates the approach that Centocor is taking to its written

18    description defense in this case is reasonable.

19            You may recall from the prior trial, when you say

02:07PM 20    déjà vu, when it was the same two parties in the Stelara case

21    that was tried before this Court, the Abbott patent

22    specification described a family of antibodies that were all

23    variants of Joe-9.

24            We have a very similar circumstance here, the patents

25    describe a family of antibodies that are variants of D2E7.  The

8

1    claims are directed to instead of the genus of human IL-12

2    antibodies, now it's a genus of human anti-TNF alpha

3    antibodies.  In both cases, the way the genus was described in

4    the claims was through limitations on binding affinity and

5    limitations on neutralizing ability, so this is very similar to

6    the way the Stelara case claims were.

7         So what we did in the prior trial, what Centocor did

8    in the prior trial was we said, look, we see that there are

9    literally hundreds, if not thousands, of variations of Joe-9

02:08PM 10   that are described in the patents, but that doesn't really

11   accurately represent the diversity within the genus.

12        And what we used as an example in that case was the

13   structure of the Stelara antibody, and we compared that to the

14   structure of the Joe-9 antibody.  We looked at things like the

15   amino acid sequence, the binding region sequences, the length

16   of the binding regions, how many amino acids there were in the

17   binding regions.

18        We looked at those structural features, and we said

19   that the patents did not describe or did not reflect the

02:09PM 20   differences in structure as exemplified by comparing the

21   Stelara antibody to the Joe-9 family, so we've done the same

22   thing here.

23        We've looked at the D2E7 family of antibodies, and

24   this time we have three other antibodies that have the same

25   functional limitations that meet all the functional limitations

9

1    of the claims but have very different structures, and we've

2    said, look, when you look at the amino acid sequences, when you

3    look at the binding region sequences, when you look at the

4    length or number of amino acids in the binding region, we have

5    a lot of diversity here in the antibodies that meet the

6    functional limitations, but the diversity and structure is not

7    reflected in the patents.

8        So when we finished the last case, we actually had a

9    fundamental dispute with Abbott about whether or not that

02:10PM 10   approach was correct.  Abbott took the position during trial

11   and actually to the Federal Circuit that it was inappropriate

12   to look at the diversity and structure because the claims don't

13   have any limitations on structure.  It's human antibodies that

14   have certain binding affinity and certain neutralizing ability.

15       There is nothing in the claim language that says it's

16   got to be certain amino acid sequence or a certain number of

17   amino acids or have certain properties in the binding region,

18   and Abbott said that's wrong, you shouldn't be looking at

19   things that are not actual limitations in the claims.

02:10PM 20       And they took that issue directly up to the Federal

21   Circuit, and the Federal Circuit said no, you do look at that.

22   They note that AbbVie had argued that structural differences

23   are illegally irrelevant, and the Federal Circuit said that's

24   wrong, they are relevant, so although there may have been some

25   dispute before this Federal Circuit decision, which only came

1   out in July of this year, about whether Centocor's approach on

2   the written description defense here is sound, that issue has

3   now been put to rest.

4        The Court of Appeals has now validated that the kind

5   of claims at issue here are particularly susceptible to attack

6   because they don't place limits on the structure.  They don't

7   place limits on the structure of the human antibodies that are

8   encompassed.

9        Getting back then to the issue that's presented here,

02:11PM 10   is Centocor's written description defense reasonable because

11   that's the issue?  Now, AbbVie has argued that there are

12   factual disputes, there are general factual disputes that

13   preclude granting summary judgment of lack of written

14   description, but the fact that there may be disputes about

15   whether or not there's sufficient written description doesn't

16   mean that there's a dispute about whether or not Centocor's

17   defense is reasonable.

18        It doesn't mean that there's a genuine dispute about

19   whether or not Centocor's defense is credible or substantial,

02:12PM 20   and, frankly, if there are really these legitimate genuine

21   disputes about Centocor's written description defense, that

22   evidences that it's reasonable.  If we have these genuine

23   disputes, it's not objectively reckless.

24        So lacking a genuine dispute about whether or not

25   Centocor's defense is reasonable or credible or substantial,

1   lacking a genuine dispute on that, Centocor's motion for

2   summary judgment of no willfulness should be granted.

3        And by doing that, you avoid the second part of this,

4   which is the bifurcation issue.  So if willfulness remains in

5   the case, then that issue should be bifurcated for trial.  This

6   is the best way to avoid jury confusion, prejudice and wasting

7   time, so the easiest answer is if Centocor wins in the

8   liability phase, then we're done.  The jury never hears

9   anything about Centocor's subjective intent, opinions of

02:13PM 10   counsel and things like that.

11        The second thing that could happen is that even if the

12   Court is not comfortable entering summary judgment now, the

13   Court could decide at the close of the evidence at trial on the

14   liability issues that Centocor has not been objectively

15   reckless, that the defenses are reasonable.

16        Again, if we had set it out so it was bifurcated at

17   that point, the Court could issue that ruling, and there would

18   be no reason to present any of the information about

19   willfulness, the evidence, the arguments, the witnesses to the

02:14PM 20   jury.

21        So even if -- and I anticipate that Abbott is going to

22   argue that there's nothing in the case law that compels the

23   Court to bifurcate, there's nothing in the case law that would

24   compel the Court to actually issue a ruling on the objective

25   prong before evidence about the subjective wrong goes to the

1    jury, and they're right about that, but there are compelling

2    reasons to bifurcate here, and it is within the Court's

3    discretion to do that.

4          The first, we have the potential for real jury

5    confusion here.  We have on the one hand the liability or

6    validity defenses that will be presented at trial, and they are

7    simply written description and enablement.

8          In terms of Centocor's subjective intent, what people

9    thought, what they knew, what they should have known, one of

02:15PM 10    the things that Centocor did was have an outside counsel give

11    an opinion where he reached the reasoned conclusion that the

12    patent claims were invalid as obvious.

13          Now, obviousness never has to be presented to the jury

14    during the liability phase, and if it is somehow intermingled,

15    then we have the issue of trying to teach the jury how to

16    separate what of the liability issues that should be considered

17    in the context of determining whether or not the AbbVie patents

18    are valid vs. what are the liability issues that they should

19    consider when they're determining what Centocor's subjective

02:15PM 20    intent was, so these are two separate things.

21          The evidence about what Centocor thought, when it

22    thought it, what it did is just not relevant to any of the

23    issues of written description, enablement and damages, and,

24    frankly, the real potential for prejudice is not only with jury

25    confusion but also once you start getting to subjective intent,

1 it's getting personal, and to the extent that someone in the

2 jury believes that they want to punish the infringer, that

3 happens sometimes when the subjective intent information is

4 intermingled with the liability issues.

5    If there really is willfulness here, then it is within

6 the Court's discretion to enhance damages, but the jury is not

7 going to know that, and sometimes jurors like to take those

8 matters into their own hands, so to the extent there's a risk

9 that some juror or some jurors might be persuaded that they

02:16PM 10 should punish the infringer for what they believe were bad

11 actions or bad intent or bad faith or someone who didn't do

12 their job right, whatever that might be, there's a real

13 potential for prejudice, that that would influence their damage

14 award or maybe even infect the liability determination, and so

15 for the same reasons that I think persuaded this Court to

16 trifurcate the last trial, and we would have if we had gotten

17 there so that damages were going to be tried second and

18 willfulness was going to be tried third, for the same reasons

19 this case should be bifurcated if willfulness is going to be

02:17PM 20 tried at all.

21    THE COURT:  Okay.  Who's going to respond?  Mr. Morin.

22    MR. MORIN:  Thank you, your Honor.  May it please the

23 Court.

24    THE COURT:  I'm sorry, do you also have a paper copy

25 of that?

1          MR. MORIN:  Yes, sorry, yes, of course.  May I

2     approach, your Honor?

3          THE COURT:  Yes, of course.

4          MR. MORIN:  Copies for your clerk as well, one for

5     counsel.  I'll start at Slide 3, your Honor.

6          THE COURT:  All right.

7          MR. MORIN:  May it please the Court, this Court should

8     deny Centocor's Renewed Motion for Summary Judgment because the

9     bottom line is nothing has changed.  The facts remain the same

02:18PM 10    as the last time that you heard from us and these arguments and

11    you issued your decision.

12         I'm going to show you that the law remains the same,

13    and, finally, an issue that Centocor has never really addressed

14    is the motion is procedurally improper under the Federal Rules,

15    in any event.

16         Now, talking about why the Court denied their motions

17    for willful infringement in the first place, we have an excerpt

18    from the Court's decision back in April after considering full

19    briefing and argument on the issue, and this Court denied the

02:18PM 20    motion because the underlying issues of disputed fact that were

21    involved in the parties did not only counsel against summary

22    judgment of invalidity, but it also meant that the

23    reasonableness of the invalidity defenses had not yet been

24    determined.

25         It would only be by trying to weigh the evidence

15

1    between the two parties that you could determine at this stage

2    where these heavily factual latent issues, whether or not the

3    defenses are reasonable, because we will establish in the

4    trial, both through cross-examination and through the testimony

5    of our own experts, that not only are the positions that

6    they're taking factually wrong, but they're undermined

7    completely.

8           Now, Centocor spent a lot of its time doing the same

9    thing that it did the first time around, and I would suggest to

02:19PM 10   you that if there's déjà vu, it's because this is the exact

11   same motion that you heard the first time around on

12   willfulness.

13          They rely on the same similarities between the IL-12

14   case and this case about last time.  They don't identify any

15   prior undisputed facts that have since been resolved since your

16   last decision, they don't identify any new evidence, and they

17   even admit that there's these disputes of fact for the purposes

18   of the motion.

19          But the issues that they point to are very much in

02:20PM 20   dispute and in fact contradicted by the evidence that we will

21   present at trial, which is why you denied it the first time

22   around.  They make arguments about the fact, and they put a

23   Venn diagram, and they say this is just like the IL-12 case,

24   your Honor, and they have a yellow portion of that Venn diagram

25   indicating the IL-12 antibodies, and they say, look, it's the

1      same thing for TNF-*alpha*, but as you recognized in your

2      decisions the first time around on summary judgment, these are

3      very different antibodies.  This is not the same Venn diagram.

4            We brought to you evidence, and we will put on

5      evidence at trial that there are substantial structural

6      similarities between these antibodies, that the Venn diagram is

7      nothing like the Venn diagram on IL-12, that they can't just

8      say this is one antibody and this is also another antibody, so

9      it's the same case as last time, and we presented a lot of

02:21PM 10     evidence to you the first time around that established that

11     which led to your decision in the first place.  The bottom line

12     is no facts have changed since you denied their motion on

13     willfulness in the first place, so that cannot be a basis for

14     changing your decision.

15           How about the law?  Well, as we pointed out in our

16     briefs, the Federal Circuit's affirmance of this Court's was

17     not a change in the law.  Your Honor in your decision in 2013

18     in the IL-12 case, you relied on the *Ariad* case, and the *Ariad*

19     case is still very good guidance for everything that is at

02:21PM 20     issue in this case.

21           And you've already considered all of this, your Honor.

22     If you take a look at the slides that Ms. Mullin put up, your

23     Honor, if you have that slide deck still in front of you,

24     you'll notice that the cases she relied on in her Renewed

25     Motion For Summary Judgment, if you look at slide 7, that's the

1    District Court's decision, you already considered that decision

2    in ruling on your summary judgment decision the first time

3    around.

4         On slide 8, the *Ariad* case and the *Carnegie Mellon*

5    case that she uses to present her argument, you already

6    considered and relied on these cases the first time around when

7    you rightfully denied their motion for willful infringement.

8         The only new argument that they make and the only

9    argument that they make to say that and to suggest that you

02:22PM 10   should for some reason revisit your decision is on slide 10 of

11   their slide deck, and what she says is the whole reason you

12   should revisit the willful infringement, this is their only

13   reason that you should revisit your decision on willful

14   infringement, that the Federal Circuit affirmed this Court's

15   finding that the unclaimed features are relevant for written

16   description.

17        That's the only basis, but what they ignore is that we

18   have been treating it that way throughout this entire case.  We

19   have been acting as if we were bound by your 2013 decision, and

02:23PM 20   we have been treating the unclaimed features, the so-called

21   unclaimed features, the structure, as relevant the entire time.

22        In fact, if you look at our summary judgment briefs

23   that you already ruled on, not only did we accept that as true,

24   but we used those structural similarities to show why summary

25   judgment should be denied, why the patents are, in fact, valid,

18

1    and so if you look at the slide we have up on the screen, the

2    bottom line is while the Federal Circuit may have affirmed this

3    District Court's decision, in this case we never asserted

4    anything to the contrary.

5            In this case, we never asserted that unclaimed

6    features, such as structure, were not relevant to written

7    description.  We cited to your decision, Centocor cited to your

8    decision, and you cited to your prior decision in your

9    decisions on summary judgment.

02:23PM 10           We have never in this case argued that the unclaimed

11   features were irrelevant or that you were going to be reversed

12   in the IL-12 case.  In fact, we emphasized.  You recall a term

13   that you used in your own decision, "conical loops."  We

14   brought that to your Honor's attention to show the similarities

15   between all these antibodies.

16           The similarity of the structure, you recall my

17   colleague, Mr. Frazier, standing right here showing you that

18   all of these different antibodies are very structurally

19   similar, that if you look at their CDR-1, 2 and 3 regions, that

02:24PM 20   they have those similarities that make them very similar

21   between them.  We did not run away from that issue.  This is

22   not a change in the law.  This is application of the very same

23   law that you already considered and the parties already argued

24   to you the first time around.

25           The bottom line is nothing has changed in the law

1    since your first decision, so what we're left with is Centocor

2    repeating the same old arguments.  If you look at their

3    original motion on willful infringement, they made the exact

4    same argument.  They said, "Look how similar this is to IL-12."

5    They already briefed this to you, they already argued it to

6    you, and you already rejected it in the sense that you found

7    that you needed a full factual record before you could decide

8    the issue of objective baselessness because both parties will

9    present evidence, and when we present evidence that undermines

02:25PM 10    their position, that will go to the reasonableness of their

11    invalidity arguments, and as a procedural matter, all they've

12    done is repeat the same old arguments, and a renewed motion

13    that raises the same old arguments is not grounds for second

14    review.

15            The thing to keep in mind is written description is a

16    heavily fact-based defense, and even when speaking to the

17    objective prong, we've cited cases such as the *CSB* case and the

18    *Eaton* case that where these issues on liability are factually

19    intensive, then even the objective basis of them for

02:25PM 20    willfulness is something should be tried to the jury.

21            You see the quote from CSB Systems that, "At the

22    summary judgment stage, we need only establish an issue of fact

23    as to the objective reasonableness of the validity defenses,

24    particularly where the defenses themselves are factual in

25    nature."  Written description, as the *Ariad* case has said, and

20

1     as this Court has recognized, is very factual in nature, and

2     the *Eaton* case.

3          And, by the way, there is one fact that has changed,

4     your Honor.  Centocor has dropped its non-infringement argument

5     since then.  That was actually included in some of the briefing

6     the first time around, and you see the *Eaton* case where the

7     Court has already found infringement, and here they've conceded

8     infringement, and the jury has yet to address the defense of

9     invalidity.

02:26PM 10          The Court is unable to say that no jury could find

11    that there was an objectively high likelihood that the

12    defendant infringed a valid patent.  Now, of course, it's for

13    the Judge to decide now in view of *Bard*, it's for you to

14    decide, but the same principle holds true.

15          The final point in reconsideration, and I won't harp

16    on it, but I think it's a very strong reason to deny it

17    procedurally is that they essentially have a renewed motion

18    here.  95 percent, with respect to Ms. Mullin, 95 percent of

19    that argument was exactly the same as the last time around.

02:26PM 20          The only difference, like I said, was that she said

21    that the Federal Circuit affirmed what we had been doing all

22    along in terms of the law, and under Rules 59 and 60, there's

23    no dispute that they don't meet those standards for

24    reconsideration, so we think on the merits that there's no

25    basis to revisit your decision on willfulness, and we think

1    procedurally they're precluded from doing so.

2            In terms of the issue on bifurcation, the Court should

3    deny the motion to bifurcate because first bifurcation is an

4    exceptional procedure, and we're going to take a look at that;

5    and, second, and this is going to be an important one, and it's

6    undisputed there are many overlapping issues in this case,

7    there are many overlapping issues in this case, and those under

8    the law counsel against bifurcation, and the third point is

9    their arguments about prejudice and confusion fail.  They would

02:27PM 10   be applicable to any case.  You would always have bifurcation

11   if they were correct.

12           Starting with the core principal, I think it's

13   undisputed that bifurcation happens in the rare percentage of

14   cases, and the burden is on Centocor in terms of showing that

15   bifurcation is warranted.  We cite some studies to your Honor

16   that establish that in jury trials, only 4.5 percent of the

17   time is willfulness bifurcated from liability.  That was 3 in

18   63 cases.

19           Let me make something absolutely clear, your Honor.

02:28PM 20   Of course, the Court has discretion to bifurcate if it would

21   like to.  I think both parties are in agreement on that.  We're

22   just pointing out that it's the exception.  It has a very rare

23   percentage of the time rather than some high percentage of the

24   time.

25           Let me tell you what's undisputed that makes this

1    clear that we believe you should not bifurcate in this case.

2    There are substantial overlapping issues between the liability

3    issues and the validity and damages issue.  We established

4    that, I don't know, in five or six pages in our opposition

5    brief.  It is undisputed.  The reply brief did not take any

6    issue with any of that.  There are very heavy overlapping

7    issues between these three issues, and, quite frankly, they've

8    made it even more so than in the normal case, your Honor.

9              Their written description case, you saw it in

02:28PM 10   Ms. Mullin's slides, your Honor, has to do a lot with comparing

11   Humira with SIMPONI.  That's what the written description case

12   centers on, among two other antibodies, but, of course, that is

13   a central issue.  Those overlapping issues are going to overlap

14   with the damages, which are compared between Humira and SIMPONI

15   and with the willfulness case, which has to do with their

16   willful infringement in order to compete with SIMPONI, so

17   there's many overlapping issues.  These are undisputed between

18   the two parties.

19             They say, well, it doesn't mean that you can't have a

02:29PM 20   subsequent trial, as we've pointed out, that would require

21   recalling witnesses, recalling evidence and completing other

22   types of evidence, changing the context of things.  We think it

23   should all be presented together so that the story can be told

24   all at once because there's so many overlapping issues.

25             There's a suggestion, although Ms. Mullin certainly

23

1    recognized, to her credit, at the beginning of the argument,

2    that you have the discretion to bifurcate or not bifurcate, but

3    there's a suggestion in their briefs, your Honor, that after

4    *Bard,* it would be basically impossible not to bifurcate.

5         The Federal Circuit has rejected that.  If you look at

6    the *Bosch* case, which is an en banc decision, they made it

7    clear even after *Bard,* you have the discretion to do them all

8    together, and it says one reason that you might do that is due

9    to the commonality of witnesses or issues in any particular

02:30PM 10   case.

11        Well, here we've established, and it's undisputed,

12   that there's a commonality of witnesses and issues between the

13   issues that they seek to bifurcate.  This Court, by the way,

14   has already rejected something that they say in their reply

15   brief, they say in their reply brief that the Court should

16   always decide the objective prong before the subjective prong

17   goes to the jury, and your colleague, Judge Gorton, decided

18   directly to the contrary.

19        He says as an initial matter, the Court does not read

02:30PM 20   Bard as foreclosing it from deciding the objective prong after

21   submitting subjective willfulness to the jury, and there's a

22   number of other cases that we've cited from other Courts where

23   the Courts have done exactly that.

24        We've cited a number of these.  These are

25   representative cases that go to that conclusion, but even if

24

1   you want to instruct the jury on objective baselessness prior

2   to them taking this objective prong back to the jury room, it

3   doesn't mean you have to have two trials, you could simply

4   instruct them at the end of the case after briefing from the

5   parties, so either way is fine, but this Court has already

6   blessed the concept of sending the subjective issue to the jury

7   before deciding the objective issue itself.

8        As far as the issues of prejudice and confusion,

9   according to them, they say in their argument, they said

02:31PM 10   willfulness is very personal.  That is always true of

11   willfulness.  There's, quite frankly, a personal aspect to

12   damages anyway, and even to the rest of the case in the lawsuit

13   if the personality, if you will, of willfulness is the fact

14   that it got personal sometimes, and we'll be respectful, of

15   course, but the personal aspect of it were a reason to

16   bifurcate, all cases would be bifurcated, we see that it's only

17   in less than five percent of them that there are.  We're

18   confident that the Court can instruct the jury adequately to

19   minimize the aspects of that.

02:32PM 20       As far as the number of issues in the case, listen,

21   I'll grant you one thing, your Honor, the technology is

22   complicated, it's antibody technology, but as far as the issues

23   in the case go, this is not a complicated case.

24        Most patent cases involve claims of infringement, most

25   patent cases involve claims of anticipation, like there was in

25

1    IL-12, and obviousness, like there was in IL-12.  They've now

2    dropped infringement, they've now dropped obviousness, and they

3    never had anticipation, so all that is left is written

4    description and enablement, which are very related, damages and

5    willfulness, so as far as patent cases go, this isn't an

6    outlier in terms of its complication.  As a matter of fact,

7    it's an outlier in the sense that it has far fewer issues than

8    most patent cases that will be tried, so the issues of

9    confusion and prejudice are as low as in essentially every case

02:32PM 10   you'll ever see.

11            Many cases, of course, involve multiple defendants and

12   accused products and multiple patent families.  Here, we only

13   have one product, one defendant and one patent family, so we

14   would say that that counsels not to be the type of exceptional

15   case, that the rare case is actually bifurcated.

16            There's very few issues comparatively that are

17   involved in this case, and, as a matter of fact, if you don't

18   bifurcate, your Honor, I will say one thing.  I don't recall if

19   your Honor recalls the schedule, but right now we're scheduled

02:33PM 20   to start a trial at the end of January, go for three weeks,

21   then there's a week of school holidays, and then we come back

22   for a week.

23            If we don't bifurcate, we feel confident we can get

24   the trial done in those three weeks, which we think would be

25   the procedurally right way to go here, especially now that

1    they've dropped, and, essentially, because they've dropped

2    infringement and obviousness because of the limited number of

3    issues in the case, so let's get this all done and let the jury

4    go home before the school holidays and not have to bring them

5    back, and that's not only me being unanimous on that, I'd like

6    to go home, too, at that point in time.

7              In terms of any alleged prejudice, the one thing that

8    they raise is they say, boy, it would be prejudicial, your

9    Honor, they say it would be prejudicial for the jury to hear

02:34PM 10   about obviousness.  That's going to be confusing to them

11   because obviousness is no longer in the case, and, first of

12   all, like I've said, we don't think that's going to be terribly

13   prejudicial, you can explain to the jury these concepts, and

14   we'll be able to do it through the trial.

15             But we think that they shouldn't be heard to argue

16   about confusion based on the fact that obviousness is no longer

17   in the case.  It was Centocor who after the lawsuit was filed,

18   so they had full view of everything, chose to get an opinion of

19   counsel during the case.  They chose only to address

02:34PM 20   obviousness in that opinion.  They could have addressed written

21   description and enablement.  They didn't for their own reasons,

22   and then they chose to waive privilege and said here it is,

23   here's our defense, it's on obviousness, and then they chose to

24   drop obviousness now before trial so it's no longer in the

25   case.

1            So if there is some confusion, it's at Centocor's own

2    doing here, and it shouldn't be a reason to all of a sudden

3    say, hey, we should get two trials because we engaged in that

4    course of conduct.  AbbVie should be entitled to put on its

5    case.  There's a commonality of issues, and that would be the

6    way to do it.

7            And as far as the parade of horribles is considered in

8    terms of the jury being confused, as I said before, Courts do

9    this all the time.  We've cited the cases.  Your Brother here

02:35PM 10    on the Court has done the same thing.  Courts do this all the

11    time where they send the subjective issue to the jury and with

12    the appropriate jury instructions.  It shouldn't be a problem.

13            Like I mentioned earlier, you can issue a decision on

14    the objective prong based on briefing during the trial, or you

15    can withhold it until after the trial.  Of course, subjective

16    is a threshold issue for willfulness, but you can set that

17    aspect aside if you find objectively that the defenses are not

18    baseless.

19            We would emphasize to you that we think upon the

02:35PM 20    consideration and conclusion of the evidence that you'll find

21    in our favor on those issues.  Unless your Honor has any

22    additional questions, that's all I have for now.

23            THE COURT:  All right.  Any quick response,

24    Ms. Mullin?

25            MS. MULLIN:  Yes, your Honor.  First, in terms of

1    procedure, we ask the Court for permission to renew this motion

2    because we thought the Federal Circuit decision really was

3    significant to this case, and as reflected in the amicus

4    briefing, there was some uncertainty in this area of the law

5    that was clarified by the Stelara appeal decision.  In terms

6    of --

7         THE COURT:  I think I said at the time I was simply

8    taking no position as to whether or not reconsideration was

9    appropriate.  In other words, I gave you another round but

02:36PM 10    without prejudice to my ability to say, well, no, you haven't

11    met the standard for reconsideration, for example.

12         MS. MULLIN:  On the second issue, which is Mr. Morin's

13    suggestion that you would have to weigh the evidence here, I

14    mean, you don't need to weigh the evidence here.  That's the

15    whole point.  The fact that these facts are very much in

16    dispute is enough to find that defense is reasonable.  You

17    don't have to weigh the genuine disputes of fact.  The fact

18    that they exist is sufficient to show that the defense is

19    reasonable.

02:37PM 20         And on the bifurcation issue, as I said, you're not

21    compelled to bifurcate, you're not compelled to decide the

22    objective prong first.  There's no reason why, as we were going

23    to stage it in the last trial, the same jury couldn't hear the

24    evidence, reach their verdict on the liability issues and then

25    move into the second phase, which would be the willfulness

1    phase of the trial, so there should be no waste of time with

2    that.

3           And I think the argument at the end is the one that

4    really is the reason why bifurcation is warranted in this case,

5    and it's because AbbVie wants to get up and argue to the jury

6    during the liability phase that when our opinion counsel

7    decided what issue to write the opinion on, they chose

8    obviousness somehow suggesting that written description and

9    enablement are not valid defenses, and if they do that, then we

02:38PM 10    have to come in and explain how the law has changed and why you

11    might consider one issue for purposes of an opinion that was

12    written in 2011 and other issues as to what defenses you might

13    present at a trial in I guess it will be 2015 by then, right,

14    so this is exactly why we need bifurcation, because these

15    issues are going to get complicated, we're going to have to

16    sort out why obviousness is just being considered in connection

17    with the opinion and why that doesn't infect either the

18    liability determination or the damages.

19           THE COURT:  Okay.  Let's take up the next motion.  Is

02:38PM 20    this going to be the Centocor?

21           MR. MASLOWSKI:  Yes, your Honor, Centocor's motion to

22    exclude testimony of John Jarosz.

23           THE COURT:  Okay.  Mr. Maslowski.

24           MR. MASLOWSKI:  Thank you, your Honor.  As I

25    mentioned, Centocor's motion here is to exclude certain damages

1    testimony of John Jarosz, AbbVie's damages expert.  I just want

2    to take one second to explain a little background on the types

3    of damages that AbbVie and Mr. Jarosz are seeking in this case.

4    The first type of damages are lost profit damages.  With lost

5    profit damages, Mr. Jarosz' position is that those are damages

6    that AbbVie would have made but for Centocor's infringement.

7         The other types of damages, the other type of damages

8    that are at issue here are reasonable royalties, and what

9    reasonable royalties are are damages for basically everything

02:39PM 10   else that is left over.  The damages expert figures out an

11   appropriate royalty or lump sum amount and opines that that's

12   the appropriate reasonable amount.  In other words, there can't

13   be double-dipping.  For each infringing sale, there's one or

14   the other.

15        This slide is Mr. Jarosz' damages scenario, so he has

16   two separate scenarios.  In yellow, we have Scenario 1, and in

17   Scenario 1, Mr. Jarosz is seeking damages for all of SIMPONI RA

18   sales, so all of Centocor's sales for rheumatoid arthritis for

19   SIMPONI regardless of whether or not there is infringement.

02:40PM 20        Scenario 2, he appropriately limits the damages pool

21   to just infringing sales.  We'll dig into these in a little bit

22   more detail in a moment, but the two aspects of Mr. Jarosz'

23   opinions that are at issue for this motion are 1, Mr. Jarosz'

24   opinion seeking to award damages to AbbVie for non-infringing

25   use of SIMPONI.  That opinion flies in the face of black letter

1    Federal Circuit law, is unreliable and should be excluded.

2         The second part of Mr. Jarosz' opinion that should be

3    excluded is his reasonable royalty opinion where he improperly

4    calculated an inflated royalty by looking to irrelevant and

5    what are called non-comparable agreements.

6         So focusing first on the first issue with regards to

7    non-infringing uses.  So, the patents here, Abbott's '394 and

8    '031 patents, they're both method patents, and they are methods

9    of treating rheumatoid arthritis, which we'll call RA,

02:41PM 10  comprising administering both a human anti-TNF antibody and

11   methotrexate, so there's only infringement here when an RA

12   patient gets both, so when an RA patient gets both the anti-TNF

13   and the methotrexate, and in this case, Centocor is an alleged

14   induced infringer, so Centocor doesn't actually do the

15   administration of the antibodies in the methotrexate, Centocor

16   sells a product with a label that has that indication, and

17   doctors prescribe the anti-TNF antibody and the methotrexate,

18   and the patient will take both.

19        Well, sometimes doctors prescribe the product

02:42PM 20  differently than the label states, so some doctors prescribe

21   SIMPONI, which, for purposes of damages, we'll assume is a

22   product that falls within the scope of the claims.  They'll

23   prescribe that product, but they won't prescribe the

24   methotrexate or the patient won't use the methotrexate.

25        In that case, there's no infringement.  The patient

32

1    has not followed or has not performed a method that falls

2    within the scope of the claims, and looking at the last bullet

3    point here, it's horn-book law that liability for either active

4    inducement of infringement, which is what Centocor's alleged to

5    have done here, or contributory infringement, which is another

6    type of direct infringement is dependent upon the existence of

7    direct infringement, so, in other words, you work backwards.

8    You look at the direct infringement, has there been direct

9    infringement?  Okay, was there indirect infringement?  Did

02:42PM 10    Centocor induce that direct infringement?

11         So going back to Mr. Jarosz' two scenarios, again, his

12    first scenario, it doesn't matter whether or not patients use

13    the SIMPONI product with methotrexate or not, AbbVie gets

14    damages for all of those sales regardless.  Scenario 2, if he

15    appropriately limits it to just the infringement.

16         When asked at his deposition whether he was including

17    non-infringing sales in his so-called Scenario 1, he fully

18    admitted it.  He fully admitted it.  That, your Honor, flies in

19    the face of cases like *Cardiac Pacemakers vs. St. Jude*.  In

02:43PM 20    this case, the only claim that was asserted was a method claim.

21    The District Court appropriately limited damages to only those

22    uses that actually infringed the asserted method claim, and the

23    Federal Circuit affirmed.

24         The Court was clear.  The law is unequivocal that the

25    sale of equipment to perform a process is not a sale of the

1    process.  *Cardiac* can only receive infringement damages on

2    those devices that actually performed the patented method

3    during the relevant infringement period.  It's black and white.

4    They can only get damages for sales where there has been an

5    infringement.

6           Another case that I briefly want to mention is

7    *Standard Havens*.  In *Standard Havens*, the jury awarded damages

8    for a method patent on account of ten manufacturing plants, but

9    three of the plants did not practice the infringing method.

02:44PM 10   The patentee's *Standard Havens* nonetheless argued that you

11   still get damages for those because the only reason that

12   *Gencor*, the accused infringer, was able to make the sale of the

13   equipment to build a plant was because it offered the

14   infringing method first and then installed different equipment

15   that didn't infringe.

16          So, in other words, Abbott's argument here, the only

17   way you were able to make non-infringing sales was to offer the

18   infringing product and then have something else that was used.

19          The Court here said it didn't matter, it didn't

01:46PM 20   matter.  The Federal Circuit disagreed that the damages were

21   appropriate for the nones-infringement and found that the

22   damages were limited to only the extent of direct infringement,

23   in other words, when there had been actual infringement.

24          So turning to AbbVie's argument, AbbVie says in none

25   of Centocor's cases was the infringer precluded by government

1    regulation for marketing its product for use in a

2    non-infringing manner.  That's a red herring, your Honor,

3    because Centocor is not allowed to do that now.  Centocor

4    doesn't market its product for use as a monotherapy.  So in a

5    but-for-world, it's not going to market its product as a

6    monotherapy either, but the bottom line is that doctors still

7    use it off-label.  They use it off-label now, they would use it

8    off-label in a but-for-world.

9         There's no dispute that even in the so-called

01:46PM 10   but-for-world, Centocor would still sell SIMPONI to

11   rheumatologists.  Centocor's label allows it to sell SIMPONI

12   for uses other than rheumatoid arthritis.  It can sell it for

13   psoriatic arthritis, it can sell it for ankylosing spondylitis,

14   and doctors are free to use it as they wish.

15        So, in conclusion, your Honor, Federal Circuit law

16   requires that Mr. Jarosz' scenario would be excluded.  He's

17   seeking to award lost profits and reasonable royalty damages to

18   AbbVie on account of uses of SIMPONI that do not infringe

19   Abbott's patents, so that opinion should be excluded.

01:47PM 20        Turning to the second point of our motion, your Honor,

21   the second point is that Mr. Jarosz' reasonable royalty

22   opinions were improperly inflated by looking to agreements that

23   have no relevance at all to the issues to be decided here.

24        So, again, taking a step back and giving a little bit

25   of background on reasonable royalties, the analysis that

1    Mr. Jarosz provided with regards to determining reasonable

2    royalties was a so-called hypothetical negotiation, and what

3    the hypothetical negotiation is it attempts to understand if

4    AbbVie and Centocor sat down just prior to the launch of the

5    product what royalty would they have agreed to, what amount of

6    money would they have agreed to in an arm's length negotiation?

7    And there's a case, a Georgia-Pacific case that lays out a

8    number of factors that damages experts look at to determine

9    what the appropriate reasonable royalty would be.

01:48PM 10          One of the factors that's considered is the rates paid

11   by the licensee for the use of other patents comparable to the

12   patent-in-suit.  Those words right there are the important

13   words for the purposes of this motion, "comparable to the

14   patent-in-suit."

15          Before we get into whether or not the licenses here

16   were comparable, it's important to understand that AbbVie has

17   the burden here.  The patent plaintiff has the burden to prove

18   that the licenses were sufficiently comparable to support its

19   damages theory.  Mr. Jarosz has made no attempt to prove

01:48PM 20   comparability here.

21          Now, your Honor, beginning with the *Lucent* decision in

22   2009, the Federal Circuit has issued a number of cases making

23   it clear that damages opinions built on the use of

24   non-comparable license agreements cannot stand.

25          I want to very briefly run through a couple of these

1    cases.  With each of the cases, it's important to understand

2    two things.  One is the patented technology, and then, second,

3    what is the technology related to in the license agreement?   In

4    other words, why are they comparable?

5            Let's look at the patents, let's look at the

6    agreements.  Are they comparable or are they not, and has

7    sufficient testimony, an opinion, been put forward to make that

8    link?  So in *Lucent* in 2009, the Federal Circuit vacated a

9    $358 million jury verdict because the patentee relied on

02:48PM 10    non-comparable license agreements.

11            Again, focusing on what the technology is versus what

12    the licenses cover, the asserted patents in this case cover a

13    datepicker feature in certain software.  The damages expert

14    took a generalized approach and said, well, the licenses are

15    comparable because they relate to PC-related patents.  It's

16    important to remember this phrase, "PC-related patents,"

17    because you're going to see it's very similar to the approach

18    that Mr. Jarosz took here.  The Court found that broad

19    characterizations like this of PC-related patents, that's not

02:49PM 20    sufficient.

21            Quoting the Court here in the last bullet point,

22    "Lucent's brief characterizes the four agreements as covering

23    "PC-related patents" as if personal computer kinship imparts

24    enough comparability to import the damages award."

25            Turning to the second case and the Federal Circuit

1    lineage that's important on this non-comparable issue is

2    *ResQNet*.  So, again, in *ResQNet*, the Federal Circuit again

3    vacated the damages award because the expert relied on

4    non-comparable licenses, licenses with no relationship to the

5    claimed invention which were used for no other reason than to

6    drive up the royalty rate.

7          The experts sought to rely on licenses that did not

8    even mention the patents-in-suit or show any other link to the

9    claimed technology.  Importantly here, because I think

02:49PM 10   Mr. Jarosz did the exact same thing in our case, the

11   inescapable conclusion was that the expert was using these

12   unrelated licenses to push the royalty up into double figures.

13         Now, third in the lineage is *Laser Dynamics*.  In *Laser*

14   *Dynamics*, the Federal Circuit reversed the failure of the

15   District Court to grant a Daubert motion on this exact issue.

16   Again, the Court here says, "Alleging a loose or vague

17   comparability between different technologies or licenses does

18   not suffice to show comparability."  "Does not suffice to show

19   comparability."

02:50PM 20         There has to be specific testimony, specific reasons

21   showing why licenses that are sought to be relied on are

22   comparable to the patents-in-suit, and it didn't exist in the

23   *Laser Dynamics* case either, and the District Court's ruling on

24   Daubert was reversed, the Court should have granted the Daubert

25   motion.

38

1        So now let's look at Mr. Jarosz' analysis. ███████

2    ████████████████████████████████  ███████████████

3    ██████████████████████████████████████████████████

4    ██████████████████████████████████████████

5    █████████████████████████████████████   ██

6    ████████████████████████████████████████████

7    ████████████████████████████████████████

8    █████████████████████████████████████████

9        ████████████████████████████████████

02:51PM 10  █████████████████████████████████████████.

11  ████  ███████████████████████████████████.

12  ███████████████████████████████████████████████

13  ███████████████████████████████████

14      ████████████████████████████████████████

15  ███████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████

18  █████████████████████████████████████

19  █████████████  ████████.   None of these relate to antibodies,

02:51PM 20  none of these relate to biologics, none of these have anything

21  to do with RA methods of treatment, methotrexate, anything like

22  that.

23      When asked at his deposition how these agreements were

24  comparable, Mr. Jarosz' response was they are health and

25  medical-related.  It's not a pharmaceutical product, I realize

1    that, they're health and medical related.  Just like in the

2    Lucent case with PC-related license agreements being

3    insufficient, Mr. Jarosz' contention that health and medical

4    related licenses are somehow sufficient to show comparability

5    is incorrect.

6         Again, we went through the litany of questions with

7    Mr. Jarosz, are these related to antibodies, no; biologics, no;

8    treatment, RA, no; all he could say was, well, they're

9    generally health-related.  The agreements are generally

02:52PM 10   health-related.  It's insufficient under the Court's law, the

11   Federal Circuit's law, and in its briefing on this issue,

12   AbbVie has tried to downplay the extent to which Mr. Jarosz

13   relied on these agreements.  That's counter to his testimony.

14        He was asked in this deposition regardless of whether

15   you picked it up, considered it and put it down, ▬▬▬▬▬▬

16   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

18   ▬▬▬▬  ▬▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19   ▬▬▬▬▬▬▬▬▬▬▬   It's not that he just looked at

02:53PM 20   these and put them down and said they were not comparable, they

21   are specifically baked into his answer that he came up with in

22   this case for reasonable royalty damages.

23        So taking a step back, your Honor, and looking at --

24        THE COURT:  You said baked in like a chocolate chip or

25   a raisin?

1           MR. MASLOWSKI:  Exactly, something that can't be

2      pulled back out by itself without having to do redo the whole

3      thing.

4           THE COURT:  Okay.  It's a bad analogy then.  Go ahead.

5           MR. MASLOWSKI:  So taking a step back, your Honor,

6      looking at the cases and the technology, so, again, *Lucent* with

7      a datepicker software feature, PC-related patents, not

8      comparable.  In *ResQnet*, the patents were directed to screen

9      recognition and terminal emulation processes.  The damages

02:54PM 10     experts, so while I have re-branding or re-bundling license

11     related to software products and source code, not sufficient,

12     not comparable.

13           *Laser Dynamics*, method of optical disc discrimination

14     to identify types of disc, so is it a CD, is it a DVD?  Expert

15     came in, had DVD related-patent licensing programs.  No, not

16     comparable.

17           Here, a method of treating rheumatoid arthritis with

18     an anti-TNF antibody and methotrexate.  The best that

19     Mr. Jarosz can say is that, well, I have health and medical

02:54PM 20     patent licenses.  Your Honor, that's not comparable under the

21     Federal Circuit's law.

22           So under cases like *Lucent*, *ResQNet*, *Laser Dynamics*,

23     Mr. Jarosz' reasonable royalty opinion should be excluded.  It

24     fails to meet a minimal level of evidentiary relevance from the

25     reliability, and the appropriate ruling here is exclusion.  So

1    as we just talked about with regard to the baked-in comment,

2    Mr. Jarosz' ultimate conclusion on reasonable royalties was

3    based on these agreements. ███████████████

4    ███████████████████████████████████████

5    ███████████████████████████████████████

6    ████████████

7            There's no way to extract those and allow him to

8    testify anyway, and that's AbbVie's approach.  AbbVie in its

9    brief says, well, your Honor, if you're inclined to grant the

02:55PM 10   motion, what you should do is just not let him talk about those

11   three agreements, but that's not enough because he used those

12   agreements to get to his answer.  He should not be allowed to

13   talk about his answer, so in conclusion, your Honor,

14   Mr. Jarosz' opinion fails to meet the sufficient level of

15   reliability, and it should be excluded.

16           THE COURT:  All right.

17           MR. MASLOWSKI:  Just actually one last slide before I

18   sit down, and I won't talk about the facts of these cases, but

19   these are just a couple of District Court cases that have

02:55PM 20   issued since the briefing was completed on this motion that do

21   exactly what we're asking for here, they exclude experts based

22   on non-comparable license agreements.

23           THE COURT:  All right.  Mr. Kacedon.

24           MR. KACEDON:  May it please, the Court, your Honor,

25   I'd like to start by talking about the two main reasons why we

1    believe Centocor's motion to preclude the testimony of

2    Mr. Jarosz should be denied, and I would first like to start

3    with the reasons why we believe and we would assert that

4    Mr. Jarosz' lost profit analysis is both legally and

5    economically sound, and then I'll move onto discussing why I

6    believe his reasonable royalty analysis is also legally and

7    economically sound.

8            Now, to start with the lost profits analysis, I think

9    it's important to go back to the statute for patent damages and

02:57PM 10   Section 284 and how the Supreme Court has interpreted that, and

11   the Supreme Court I guess it's almost 50 years ago now in the

12   *Aro* case made clear that in order to determine what harm a

13   patent owner has suffered based on infringement, the question

14   to be asked is if the infringer had not infringed, what

15   additional profits would the patentholder have made?

16           And as the Federal Circuit has further explained, as

17   pointed out in our brief, this is a but for test for damages.

18   We're looking at reasonable foreseeability.  If the damages --

19   if the harm was reasonably foreseeable, it is compensable under

02:57PM 20   the patent laws, and we think that's the case here.

21           Now, going back to that question then, the issue of

22   what profits would AbbVie have made if Centocor had not

23   infringed, we have to start by asking, well, what is the

24   infringement here, and was discussed in Mr. Maslowski's

25   presentation, Centocor has now stipulated that they have

43

1    actively induced infringement, the treatment, by selling

2    SIMPONI for the treatment of rheumatoid arthritis in

3    combination with mexotrexate.

4         Now, what makes this case unique and what I believe

5    we'll talk about in a few minutes I believe distinguishes it

6    from many of the other cases that were talked about already is

7    that in this instance, Centocor is only permitted to market and

8    sell SIMPONI for the treatment of RA in combination with

9    methotrexate.  They are legally precluded from offering SIMPONI

02:58PM 10   for sale as a monotherapy, so now why we don't dispute that

11   there are doctors who, having been sold and marketed SIMPONI in

12   this manner, may choose to use it without methotrexate,

13   Centocor itself is only allowed to offer the product for sale

14   in an infringing manner, essentially telling doctors and

15   patients to infringe the patents by using it in combination

16   with methotrexate to treat rheumatoid arthritis.

17        And so from our perspective, your Honor, our view is

18   that in this context, the only reason that Centocor is even

19   able to have access to those monotherapy sales is through its

02:59PM 20   ability to actively infringement.  If it cannot actively induce

21   infringement and tell people to use their product in an

22   infringing manner, the doctors are not going to have access to

23   this product at all, and this is demonstrated by the testimony

24   of Centocor's own president who when asked the question as to

25   whether or not or what effect would it have on SIMPONI if

1  Centocor did not have this indication to be able to treat RA in

2  combination with methotrexate, his response was I wouldn't have

3  a product.  He says I would not have a product.

4        What this shows you is that the importance of this

5  infringing indication that Centocor has here, this ability to

6  actively induce infringement is what gets it onto the RA market

7  in the first place.  Without that ability to actively induce

8  infringement, Centocor is not going to be able to make either

9  its infringing sales or its monotherapy sales, and that is what

03:00PM 10  Mr. Jarosz has done here in his analysis.

11        He has looked at this, as he's supposed to, going back

12  to the *Aro* case in a but-for-world.  If Centocor doesn't

13  infringe, if they can't actively induce infringement, what is

14  the likely scenario, what is the market likely to look like,

15  and as Mr. Jarosz determined, what the market is likely to look

16  like is that Centocor is not going to have access to that RA

17  market at all, and, so, therefore, in determining lost profits,

18  it was appropriate for him to pull out all of Centocor's RA

19  sales and allocate a percentage of those sales to AbbVie as

03:00PM 20  harm that had been suffered due to Centocor's infringement.

21        Now, if you'll allow me, your Honor, I'm going to

22  digress for a moment into our motion, our motion on Dr. Gering

23  simply because I think it's very relevant to discuss it in this

24  context and will save us some time later on when I get to my

25  motion, but I think this also highlights the reasonableness of

45

1    what Mr. Jarosz did is that the flip side, the alternative of

2    doing what Mr. Jarosz did is to do what Dr. Gering did, and

3    what Dr. Gering did was he made essentially two contradictory

4    assumptions.

5         He assumes that there are no patients on the market

6    who are going to use SIMPONI in an infringing manner, but at

7    the same time, he also assumes that Centocor is out there only

8    selling SIMPONI and instructing people only to use it in an

9    infringing manner because, again, that's the only way in which

03:01PM 10   they're allowed to sell and market their product, and we would

11   submit that as a likely result of what the but-for-world would

12   look like, this is just too incompatible, and so for that

13   reason, this is one of the bases why we believe Dr. Gering's

14   report or Dr. Gering's opinion on lost profits should be struck

15   because we believe this is both economically and legally

16   unsound, but I think it also highlights why when you look at

17   these two next to each other, what is the more likely scenario

18   in the but for world, is the more likely scenario that if

19   Centocor can no longer tell people to infringe by combining

03:02PM 20   methotrexate and an antibody together that the net result is

21   they're not going to be able to sell for the treatment of RA at

22   all, or is the more likely result the scenario here where we

23   have a situation where they market only in one way but

24   everybody uses it in a completely different way?

25         And, your Honor, on that point of Dr. Gering's

```
 1    analysis, one thing that we heard in Mr. Maslowski's argument
 2    was that, well, Centocor wouldn't be completely off the market
 3    because Centocor has other indications, excuse me, SIMPONI has
 4    other indications.  It's approved for psoriatic arthritis and
 5    for ankylosing spondylitis, but when asked whether or not
 6    Dr. Gering actually analyzed whether if Centocor did not have
 7    an approved RA indication, whether they only had these other
 8    two indications, whether they could make these monotherapy
 9    sales, make further RA sales, Dr. Gering admitted he didn't do
10    that analysis, so we don't have an analysis from Dr. Gering on
11    that point, and, moreover, I think even if he had done that
12    analysis, it would not be reasonable to assume that if your
13    only indications were non-RA indications that your level of
14    sales of monotherapy in RA would stay the same, that those
15    wouldn't change at all, which is what Dr. Gering did.  So I've
16    tried to cover the economic aspects of things.  I now want to
17    turn a little bit more closely to the case law and why I
18    believe the approach that Mr. Jarosz took is legally sound.
19               As we pointed out in our briefs, the test for damages
20    is a flexible one, it is a but for reasonable foreseeability
21    test, and the Federal Circuit has awarded damages in scenarios
22    where there is not a 1-to-1 correspondence with infringement,
23    and while that's not the situation here, we pointed out other
24    scenarios where this has happened, such as convoyed sales,
25    unpatented products made with patented methods, and, in
```

1    particular, the *Stryker* case here is instructive.

2           Now, the *Stryker* case involved a system patent, it

3    didn't involve a method patent, like what we have here, but in

4    the *Stryker* case what we had was a patent directed to a system

5    for a hip prosthesis, and to grossly simplify things, it was

6    basically two components that were required to make the

7    infringing combination, and what the Court had found in that

8    case was that while the infringer had sold some 22,000 of one

9    of those pieces, only 5,000 or 6,000 of those devices were

03:04PM 10   actually implanted with both pieces in a patient, so over

11   16,000 of them were never put together in a patient in an

12   infringing manner.

13          And the question was, well, is the patent owner

14   entitled to damages on all 20 some odd thousand that were sold

15   or just those that were actually implanted in a manner that

16   formed the infringing combination, and what the Federal Circuit

17   found in saying that they could get lost profits on all of

18   those sales was in looking at the way in which the infringer

19   marketed the product, which was always marketing it as a

03:05PM 20   combination, marketing it together, trying to sell it together,

21   that in addition that by making this available in this manner

22   to doctors, it was the doctors who were ultimately making the

23   decision whether or not to use the two components together or

24   not, even though the person who was selling the product, the

25   infringer, was insisting or marketing that they should use it

1    together, and at the end of the day, the patent owner lost the

2    opportunity to make that sale due to how that product was

3    supplied, and so we would submit that this is similar to the

4    situation we have here.

5           Now, granted, we have a method claim, but, again, here

6    we have Centocor, who not only markets SIMPONI for the

7    treatment of RA in an infringing manner, they're required to do

8    it that way.  They can't market it in a different way.  They

9    provide the product to the doctor with the instruction to use

03:06PM 10   it in that manner.  Yes, the doctor ultimately may make the

11   decision whether or not to treat a patient with methotrexate or

12   not, but, again, Centocor is telling them to use it with

13   methotrexate, and by doing that, AbbVie is losing the

14   opportunity to make those sales.

15          Now, with respect to the cases that Centocor relied on

16   and the ones Mr. Maslowski talked about, as we've said in our

17   briefs, we do think they're all distinguishable, and we think

18   they're distinguishable on one key ground, a ground that I'm

19   probably sounding like a broken record because I've said it so

03:07PM 20   many times now, but that is that Centocor is legally prohibited

21   from marketing SIMPONI for the treatment of RA as a

22   monotherapy.

23          They cannot do that, and in none of these cases that

24   were cited by Centocor, the *Cardiac Pacemakers'* case, the

25   *Standard Havens'* case was it a situation where the accused

1    infringer was going to be legally prohibited from offering

2    their product for sale to be used in a non-infringing manner,

3    and so we think that's an important distinction because, as I

4    talked about earlier, it's only by being able to offer the

5    product for sale in an infringing manner that they even get

6    access to this market at all.

7        Now, these cases are also distinguishable on other

8    grounds, and the *Cardiac Pacemakers'* case, which specifically

9    discussed *Stryker* and distinguished it, I would note that that

03:07PM 10   case did not involve a lost profits analysis, it only involved

11   a reasonable royalty analysis, and as we'll talk about in the

12   reasonable royalty context, there is evidence here of a total

13   sales license that Centocor has entered into, but I think the

14   key point of distinction for all of these cases is that one

15   fact, that in none of these cases was the infringer legally

16   precluded from offering its product for sale in a

17   non-infringing manner, so that's the lost profits analysis.

18       I'd now like to move on to a response on the

19   reasonable royalty issue, and I first want to start where we

03:08PM 20   left off with respect to this idea of Mr. Jarosz supplying

21   damages for all sales of SIMPONI and how that occurs in the

22   reasonable royalty context.

23       I talked about why we believed that's appropriate from

24   a lost profits perspective.  From the licensing perspective,

25   there's an additional fact here, and that additional fact is



11       What this shows is that there are real world examples

12   where Centocor would agree to that type of structure as an

13   appropriate royalty.  Now, whether that was done because it was

14   for convenience of the parties, it still shows a real world

15   example, and in this case, what Mr. Jarosz did is he said,

16   well, we would think that in that particular scenario or

17   looking in the real world scenario of a hypothetical

18   negotiation here, what would the parties do that they would

19   take that into account, and so they would probably negotiate

03:09PM 20   for a rate, a lower rate, perhaps, as Mr. Jarosz postulated,

21   that would cover all sales, but if not, he did also put forth a

22   royalty that would be higher if, in fact, the parties were to

23   limit it to just those infringing uses.

24       We think this is supported by the case law as well,

25   your Honor.  The *Lucent* case, for example, makes clear that the

1    Courts do not require a 1-to-1 correspondence with respect to a

2    royalty analysis.  Particularly of doing so would ignore real

3    world evidence.  Now, this isn't to say that you can completely

4    divorce the royalty analysis from use, and the Lucent Court

5    makes that clear, but that's not what we're doing here.  What

6    we're doing here is looking at real world evidence of the way

7    that the parties might negotiate a reasonable royalty license

8    to cover all sales.  We think there's sufficient evidence to

9    support Mr. Jarosz' opinion in that regard.

03:10PM 10        With respect to his royalty rate calculation, I think

11   it's important for your Honor to understand exactly what

12   Mr. Jarosz did to arrive at his reasonable royalty opinion

13   because from the presentation we just heard, ████████████████

14   ████████████████████████████████████████████████████████████

15   ██████████████████ but Mr. Jarosz' analysis was way more

16   complicated than that.  He looked at three different

17   quantitative methods.

18        One of them was a market approach, and the market

19   approach was looking at license agreements, much like we look

03:11PM 20   at comparables for houses, and that included approximately 60

21   agreements that Mr. Jarosz looked at, three or four of which

22   are the ones that Centocor is complaining about, but in

23   addition to that, he also did an income approach where he

24   analyzed essentially the profits that Centocor would obtain by

25   virtue of the license and from that approach came to a

52

1    conclusion of essentially a sealing on the royalty rate that

2    based on the profits that Centocor would realize, they would

3    agree to a royalty no larger than ███████ then he also

4    performed a cost approach which looked at potential costs for

5    design around.

6            Now, here Mr. Jarosz noted, and the evidence showed,

7    that there really was no design around alternative, but

8    Mr. Jarosz looked at potential costs for doing new clinical

9    trials to try to get approval for a monotherapy and calculated

03:12PM 10   that at a floor, at a minimum.  We might have a royalty rate of

11   ████████ but that it would likely be significantly higher than

12   that since there was no evidence of a true design-around, so we

13   have those three quantitative methods.

14           And then on top of that, Mr. Jarosz performed a

15   Georgia-Pacific analysis.  He looked at the 15 Georgia-Pacific

16   factors, some of which, as Mr. Maslowski pointed out, may be

17   impacted by the license agreements, but the vast majority of

18   which are not, and so at the end of the day, what we have here

19   is an analysis that includes an income approach and a cost

03:12PM 20   approach, and the vast majority of his Georgia-Pacific analysis

21   that is not at all objected to.  None of that has been objected

22   to.  It's just within his market approach and one

23   Georgia-Pacific factor, his analysis of 4 out of 60 agreements.

24           And with respect to the agreements themselves, your

25   Honor, what I'd say is Mr. Jarosz testified at his deposition

1    that when he looked at all the agreements, he did consider them

2    all in terms of the technology, the circumstances and the terms

3    of the license, and what we've heard is that, well, Mr. Jarosz

4    said he considered these agreements, he factored them into his

5    analysis.

6         Well, sure he did, he looked at all of the agreements,

7    and he does consider them and he does factor them, but there's

8    no evidence that this is the sole basis of his opinion, as

9    Mr. Maslowski would suggest.

03:13PM 10        In fact, the evidence would show otherwise.  There are

11   plenty of other agreements that Mr. Jarosz had looked at, and

12   so we would dispute that point, but, regardless, I think the

13   primary point here, your Honor, is that those three agreements

14   are not the primary basis of Mr. Jarosz' opinion.

15        They are a very small piece of it.  They are two pages

16   of a 120-page report, of which 50 some odd pages are directed

17   to reasonable royalty, and I am confident that even if we took

18   away those three agreements from Mr. Jarosz' analysis, his

19   conclusion would likely be the same.

03:14PM 20        I don't think there would be any difference here, and

21   so to try to pretend like these three agreements are the

22   cornerstone of Mr. Jarosz' opinion I think is just improper and

23   not true.

24        Now, with respect to the degree of comparability of

25   these licenses, one important fact that I don't believe got

54

1    emphasized was that all of these agreements that are complained

2    about agreements between Abbott and J & J subsidiaries like

3    Centocor, and so they have relevance in the fact that they

4    demonstrate the relationship between the parties with respect

5    to license agreements, and so from that perspective, they do

6    have relevance, and the fact that they are in the health --

7.           THE COURT:  That's a point I'm not sure I understand.

8    What difference does it make what the parties are?  I mean, if

9    they relate to the marketing of Band-Aids or something, why

03:14PM 10   even though the parties might be the same, why would it be

11   comparable here?

12          MR. KACEDON:  Well, your Honor, one of the

13   Georgia-Pacific factors actually talks about the commercial

14   relationship between the parties, and so in this respect, the

15   agreements could be relevant from that perspective.  It also

16   shows that if there is a degree of competition there, perhaps

17   the rates are going to be higher in their licenses than they

18   would be otherwise if the companies are strong competitors, so

19   there is still some relevance to that fact, I believe, your

03:15PM 20   Honor.

21          THE COURT:  Okay.

22          MR. KACEDON:  And I think ultimately what we would

23   suggest is that this dispute comes down to a dispute over

24   comparability, how comparable are the agreements, and as the

25   Federal Circuit pointed out in the *ActiveVideo* case, that's

1    something that can be addressed in front of the jury.  That can

2    be addressed through cross-examination, it's a factual issue,

3    and does not require exclusion but can be addressed in that

4    manner.

5              So with that, your Honor, if there aren't any other

6    questions.

7              THE COURT:  All right.  Mr. Maslowski.

8              MR. MASLOWSKI:  Your Honor, I'd like to start off with

9    where Mr. Kacedon left off, which is on the issue about the

03:16PM 10   extent to which Mr. Jarosz used these licenses in his agreement

11   or in his opinion.

12             I was sort of expecting that 60 agreements, the issue

13   to come up that he considered 60 agreements.  As we addressed

14   on page 7 of our brief, Mr. Jarosz testified that the

15   agreements behind tab 51 of his report, which include 42 of the

16   60 agreements, are less relevant than the ones he actually

17   discussed in his report, and three of the ones he discussed in

18   his report, or four of them really, are the four we're talking

19   about for the purposes of this motion.

03:16PM 20            Mr. Kacedon also tried to downplay the extent to which

21   he used these.  We ████████████████████████████████████████

22   ██████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████████

24   ██████████  ████████████████████  ████████████████████████

25   ██████████████████████████████████████████████████████████

56

1

2

3

4  That testimony is said on page 8 of our reply brief.  There's

5  no question at all that the reason that Mr. Jarosz arrived at

6  the numbers he arrived at were because of these agreements,

7  and, in fact, the presentation from opposing counsel, there is

8  nothing there to show comparability.

9          Instead f showing comparability or how Mr. Jarosz

03:17PM 10  showed comparability, instead, as I sort of previewed in my

11  opening argument, I thought they were going to try to downplay

12  his reliance on those agreements, but that's just not what

13  happened.

14          Also, Mr. Kacedon mentioned or pointed to I guess

15  another agreement that the Abbott, or, sorry, Centocor has

16  another agreement where they rely on all sales, this

17

18

19

03:18PM 20  I don't know what that has to do with whether or not the

21  agreements that Mr. Jarosz used that are technologically not

22  comparable, whether those should be used or not.  I mean,

23  that's a completely separate issue.  There is no argument that

24  the reason Mr. Jarosz used these non-comparable agreements was

25  something related to that.  I think that's a red herring.

1          The bottom line here is in both parties' expert

2     reports, there are licenses that are very much close to the

3     technology here.  The ███████████████████████████

4     ███████████████████████████████████████████████.

5               ████████████████████████████████████

6     ███████████████████████████████████████

7     Instead of pointing to those agreements, Mr. Jarosz points to

8     agreements with, as you mentioned, unrelated J & J entities on

9     products that are unrelated.  The law requires technology

03:19PM 10    comparability, technological comparability that hasn't been

11    shown or even attempted to be shown with regard to Mr. Jarosz'

12    reasonable royalty agreements and the non-comparable agreements

13    that he relied on.  So unless there are any questions on that,

14    I just want to briefly turn to the first point.

15         There was a comment made by opposing counsel,

16    something about stipulating to infringement or something.  I'm

17    not sure if that was meant to say that I was somehow

18    stipulating to something in my argument.  Just to make it

19    clear, I wasn't.  The damages analysis requires that we assume

03:19PM 20    that there's infringement, so if there was a misstatement

21    there, I just wanted to make that clear.

22         Last but not least, the *Stryker* case, with all due

23    respect to my opposing counsel, I'm stunned that we're still

24    talking about the *Stryker* case.  In *Cardiac Pacemaker*, they

25    explicitly say why the *Stryker* case has no relevance to a

58

1    patent, a method patent, so the Court in *Cardiac Pacemaker* said

2    the holding in *Stryker* is distinguishable from this case by the

3    type of damages being sought and the type of patent being

4    asserted.

5         In the present case, *Cardiac* is not seeking lost

6    profits on an apparatus, therefore, it cannot rely on the

7    reasoning in *Stryker*.  *Cardiac* can only receive infringement

8    damages on those devices that actually performed the patented

9    method.  That's exactly the point, the first point of our

03:20PM 10    motion.  Unless there are further questions, I'll sit.

11         THE COURT:  All right.  Thank you.

12         MR. MASLOWSKI:  Thank you.

13         THE COURT:  Let's take up the next motion, but I want

14    to break at whatever is the right breaking point but around

15    3:30 to give the stenographer and you all a brief break.

16         I'm sorry, is this Gering?

17         MR. KACEDON:  Yes, this is AbbVie's motion to exclude

18    the lost profits testimony of Centocor's expert, Dr. Gering.

19         THE COURT:  Mr. Kacedon.

03:21PM 20         MR. KACEDON:  Thank you, your Honor.  As explained in

21    our brief, your Honor, there are three bases why we believe

22    Dr. Gering's lost profits analysis was improper.  Specifically

23    we believe he relied on speculative and unsupported assumptions

24    with respect to his determination of whether SIMPONI users had

25    previously been on Humira.  We also believe that his method of

1    determining line of use was unreliable, and, finally, that his

2    market reconstruction relied on a flawed premise.

3    Now, with respect to that third point, I think we've

4    gone over that a lot already, so I don't think we need to

5    necessarily rehash that again other than to say that our bases

6    for that are similar to what I talked about earlier in my

7    argument, so I'd like to start kind of with the first two

8    points, and in order to do that, I think it's just important to

9    understand what Dr. Gering did here in his lost profits

03:21PM 10   analysis.

11   Now, in your normal lost profits case that I'm sure

12   your Honor has seen, typically you have a market where you

13   remove the infringer and then you just allocate those

14   infringing sales to the other competitors based on market

15   shares.   That's a kind of standard way of doing lost profits.

16   In this case, what Dr. Gering did was instead he

17   worked on a line of use approach, and this was based on the

18   fact that in this particular industry, what can happen is that

19   a patient may first be prescribed a biologic, and that would be

03:22PM 20   their first line, so in this case, you see Remicade, and then

21   they switch to another biologic, in this case, Enbrel, so that

22   would be second line, and then the third line would be SIMPONI,

23   and the fourth biologic in this example is Humira.

24   Now, why this is important is that in Dr. Gering's

25   analysis, he looked at each line of use individually to try to

1   determine what AbbVie's lost profits would be at each

2   particular line of use, and so as part of that analysis, he not

3   only took into account what the market shares were at

4   particular lines of use, he also took into account the fact

5   that in this opinion if a patient had previously been on a

6   biologic, that would not be eligible to be put back on that

7   biologic later on, so, for example, under his scenario, if a

8   patient had been on first line, in this case, let's say,

9   Remicade, and then we removed third line SIMPONI from the

03:23PM 10   market, Remicade wouldn't be available as an alternative, you

11   couldn't include that in there.

12        But for our purposes, he focused on Humira, so if a

13   SIMPONI patient had previously been on Humira, he was going to

14   say Humira can't get that lost sale for Humira.  That wouldn't

15   be a lost sale for Humira.

16        So why is this a problem?  Well, on its face it may

17   not -- it doesn't sound like a problem, but the issue here is

18   that doing the analysis in this way required Dr. Gering to have

19   two additional data points.

03:23PM 20        The first of these was that he had to figure out for

21   each line of use what percentage of these SIMPONI patients had

22   previously been on Humira.  That was a fact he had to be able

23   to determine, and the second was that he had to be able to

24   determine how much SIMPONI fell within each line of use, and

25   it's within those two areas where we think there are real

1    methodological problems with his analysis.

2          And I'll start with the first point, your Honor, with

3    respect to how Mr. Gering went about determining whether a

4    patient had previously been on Humira or not, and there was a

5    problem here for Dr. Gering in his analysis, and the problem

6    was, as he admits in this report and at his deposition, which

7    was that after first and second line, there wasn't any data to

8    show him as a third line what a patient might have been on in

9    the first line, or if they were a fourth line patient, what

03:24PM 10   they might have been on as a first or second line patient.

11          That data just didn't exist.  The parties didn't track

12   that data, and he didn't have that data to look at, so what did

13   he do?  Well, instead he made two what we believe are

14   unsupported assumptions as to the number of SIMPONI patients

15   that were previously on Humira.

16          With respect to third line users, he assumed that 95

17   percent of third line SIMPONI users had previously been

18   prescribed Humira, so, in other words, he excluded 95 percent

19   of those SIMPONI sales from his lost profits analysis for

03:25PM 20   Humira, and for fourth line SIMPONI users, he assumed that

21   every SIMPONI user had previously been on Humira, and, as such,

22   none of those were going to be available to AbbVie as lost

23   profits.

24          But now, of course, as I said, there is no data that

25   shows this, so how does Dr. Gering get there?  Well, that's the

1    real problem, and the crux of our motion is it's not clear at

2    all how he gets here.  Dr. Gering, if you look at his report,

3    he does not put forth any detailed methodology, he doesn't put

4    forth any hard data of how he gets here.  In his deposition, he

5    just issues conclusory statements that I've looked at the data,

6    and these assumptions seem correct to me.

7         The speculative nature of these assumptions is

8    illustrated by the fact that with respect to those third line

9    estimates, Dr. Gering admitted at his deposition even though he

03:26PM 10   only assumed 5 percent of SIMPONI patients at third line might

11   not have been on Humira, it could be as high as 10 percent.  It

12   could be double what he thought.

13        Now, in their opposition, Centocor said, well, he also

14   said it could be zero, but, frankly, that just further

15   highlights how speculative this number is.  It's somewhere

16   between 0 and 10, and I'll just pick one in the middle and say

17   it's conservative.  That's not proper methodology.  I don't

18   think that's proper for damages analysis.

19        With respect to fourth line use, we think the number

03:26PM 20   here is even more incorrect because, again, Dr. Gering is

21   assuming that not a single fourth line SIMPONI patient may not

22   have been on Humira before that, and the reason why we know

23   that's incorrect is because the data doesn't support it.

24        Now, as I said, there isn't data showing directly what

25   patients were on at the fourth line, what they were on first or

1    second line.  What we do have data showing, and Dr. Gering

2    admits this, that ███████████████████████████████

3    ████████████████ and he admits that he's seen that data.  Now,

4    two to three percent may not sound like very much, but keep in

5    mind that Humira's sales for RA are on the order of $1 to $2

6    billion a year, and so 3 to 4 percent is still a fairly big

7    number.

8             But Dr. Gering ignores that and says, well, no, I have

9    not seen evidence that any of those could be attributed to

03:27PM 10   SIMPONI, and, therefore, says it's okay to exclude them when,

11   in fact, the only evidence shows that Humira is used as a

12   fourth line treatment and would be available as an alternative

13   for the lost profits analysis, so that's the first point.

14            The second point, your Honor, this goes to

15   Dr. Gering's determination of the percentage of SIMPONI

16   patients in each line of use, and, in particular, the issue

17   here is with respect to his calculation in the year 2009.  Now,

18   with respect to the year 2009, Dr. Gering looked at seven

19   different surveys to try to determine the percentage of SIMPONI

03:27PM 20   at each individual line of use.

21            Now, as you can hopefully see from looking at this

22   chart, the seven surveys don't all report data in the same way.

23   Some appear only to have first and second line and have NAs for

24   several fields, others have first, second and third line, and

25   then instead of NAs, there's zeros for other fields and then

64

1    numbers in an other category, so obviously there's some

2    problems in terms of putting all this data together.

3              Now, what did Dr. Gering do?  Did he try to figure

4    out, well, maybe I can parse out the numbers in here to make

5    them match up with each other?  Can I look at this and

6    determine whether certain surveys are more reliable than others

7    so as to rely on them?  He didn't do that.  Instead what he did

8    was he just added all these up and just divided by the number

9    of data points that he had, and so what's the problem with

03:28PM 10    that?

11              The problem is evident from the result that he gets,

12    and if you look in the blow-up, the first column, the 2009

13    average, when you add up all these percentages, what are you

14    left with?  You're left with 115 percent.  That's obviously

15    mathematically impossible.  You can't have 115 percent, so his

16    solution to reaching a mathematically impossible number is to

17    say, well, I'll just force it to equal 100, I'll just divide by

18    115 and force all these numbers down to 100 percent.  And so

19    instead we get artificially changed numbers here with the ▇▇▇▇

03:29PM 20    ▇▇▇▇▇▇

21              All those numbers just get artificially decreased.

22    This is somewhat evidenced by if you look at the figure for the

23    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ what we have

24    in the chart for fourth line is we have ▇▇▇▇▇▇▇▇▇▇▇

25    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1        ████████  It's readily apparent that the two data points we

2    have there, ████████████████████████████████

3    percent, that there's some problems here with this methodology.

4            THE COURT:  Well, there's four data points, aren't

5    there, ████████████████████████?

6            MR. KACEDON:  Yes, your Honor, but the 0 percent

7    figures, I mean, what we see here is that in some instances if

8    you look at the other Wolters Kluwer survey, right, where there

9    is nothing for those, they put in NAs, and for some of them,

03:30PM 10   they arbitrarily put in 0s in here.

11           THE COURT:  Okay.

12           MR. KACEDON:  So for that reason, your Honor, we

13   believe that the methodology that Dr. Gering used to calculate

14   his market share percentages with respect to each individual

15   line of use are improper and also reflect a problem with his

16   methodology, and when this is taken together with his approach

17   on third and fourth line use and taken further together with

18   his reconstruction of a market in which SIMPONI is only

19   marketed for use in an infringing manner but everybody uses it

03:30PM 20   in a non-infringing manner.  For all those reasons, we believe

21   that Dr. Gering's lost profit analyses should be excluded.  If

22   there are no further questions...

23           THE COURT:  All right.  Why don't we take a quick

24   break, and we'll come back with Centocor's response.

25           THE CLERK:  All rise.

1              (A recess was taken.)

2              THE CLERK:  All rise.  Court is back in session.

3              THE COURT:  Mr. Maslowski.

4              MR. MASLOWSKI:  As Mr. Kacedon, what I call, quibbles

5    with Dr. Gering's report, in their quibbles, because as we'll

6    see in the next slide, AbbVie doesn't disagree with

7    Dr. Gering's methodology.  This is a footnote from their reply

8    brief.  This is irrelevant.  "AbbVie does not claim that a line

9    use approach is necessarily speculative."  In other words, his

03:41PM 10   overall methodology is not speculative.

11             As this Court stated in the *Clark vs. Edison* case,

12   "The focus of the Rule 702 inquiry is on the principles and

13   methodologies employed by the expert, not the ultimate

14   conclusions."

15             I submit the issues, these quibbles that we're talking

16   about, certainly numbers 1 and 2, are nothing more than

17   quibbles with calculations that were made in answers that were

18   reached and not with the overall methodology, as they've stated

19   in the footnote.

03:42PM 20             And, quite frankly, they can't really dispute

21   Dr. Gering's methodology because they had an expert that in a

22   case before this very Court used the exact same methodology.

23   So turning to what I'll call the third and fourth line battle

24   or the third and fourth line calculation, so it's important to

25   recognize AbbVie doesn't challenge Dr. Gering's calculation of

          1    the percent of first line SIMPONI users previously on Humira,

          2    nor do they dispute or challenge the percent of second line

          3    SIMPONI users that were previously on Humira.  Instead they say

          4    his entire lost profits analysis should be thrown out the

          5    window because he made errors in his third and fourth line

          6    calculations.

          7            But taking a step back, the question to be answered

          8    for purposes of the point that AbbVie complains about is what

          9    is the likelihood Humira was used before SIMPONI in the third

03:42PM 10    or fourth line?  So looking at this chart right here, which

         11    shows the market shares, which shows the market shares of their

         12    products from 2009 to 2012, you have Humira at the top, and

         13    they're at the top because they're the relevant product here.

         14    Really they're kind of in a second place position with Enbrel,

         15    but the key point here is Humira and Enbrel are the dominant

         16    players in this area.

         17            If you look at 2012, you add those two up, they had

         18    greater than half of the market.  You have SIMPONI running at

         19    about seventh or eighth place.  In 2012, they have a whopping

03:43PM 20    ███████ of the market.  Humira has ███████, so the

         21    question again is what is the likelihood that a patient who

         22    takes SIMPONI in the third or fourth line, that they would have

         23    used one of the two market leading products at some point

         24    previously?  What's the likelihood of that?

         25            I think common sense tells you that it's very

68

1    unlikely, but Dr. Gering relied on more than that.  Here we

2    have AbbVie consultant, Dr. Weinblatt.  I'm not going to read

3    the testimony.  Dr. Weinblatt's testimony here is in most

4    situations, what happens is you give a patient Enbrel, they

5    fail, they go to Humira; you give a patient, Humira, they fail,

6    you go to Enbrel.  In other words, it's a 1-2 punch,

7    Enbrel-Humira, Humira-Enbrel.  That's what he says.

8         In fact, another AbbVie witness, James Cianci, and

9    this is all cited in our brief, testified to essentially the

03:44PM 10   same thing, so this idea that this is all sort of pulled out of

11   thin air, it's just not accurate.  The testimony shows that

12   first and second line is filled almost all the time with Humira

13   and Enbrel and, in fact, Dr. Gering, when asked in his

14   deposition, I realize I probably have too much highlight on

15   this, maybe we should focus on this, kind of the beginning and

16   the end.  Question:  "Where did the 5 percent come from?"

17   "That's an estimate, as I say, and it's really looking at the

18   data set."

19        So in jumping now to the very end, "So, primarily

03:44PM 20   people start with Enbrel or Humira, and then they go to Humira

21   or Enbrel."  That's what the data shows, the first and second

22   line, so in the third line position, Dr. Gering said that

23   5 percent of SIMPONI users would have not been on Humira

24   previously, even though he testified in his deposition that it

25   could even be lower than that.  It was probably closer to zero.

1       THE COURT:  Naive or bio-naive in this context means

2    you haven't tried anything before?

3       MR. MASLOWSKI:  Correct, first line, so if you were a

4    first line user, that would be a bio-naive patient.  The first

5    time you tried a biologic would be SIMPONI.  Glad it's all

6    coming back.

7       So with regards to Dr. Gering's fourth line testimony,

8    what does he say, he said that he looked at the data.  The data

9    that I've seen would actually point to the answer that the

03:45PM 10    likelihood of it happening is very, very low and so the 0 is an

11    appropriate calculation or answer.  So this idea that he's

12    pulling numbers out of thin air somehow is unsupported by the

13    record.

14       So turning to the second of the so-called quibbles,

15    Dr. Gering's calculation for line use of SIMPONI in 2009, so,

16    again, here we're not talking about all years, we're talking

17    only about 2009, so based on what AbbVie contends are

18    inaccurate calculations for that year, the entire analysis

19    should be thrown out the window.

03:46PM 20       Here's the chart that I think opposing counsel

21    discussed.  The key point here is on the top, you have all of

22    the data from 2009 and all of the Centocor and AbbVie data that

23    Dr. Gering calculated the appropriate adjusted, what we'll call

24    an adjusted average for the source of SIMPONI patients, so

25    AbbVie is now attacking Dr. Gering for having used both

1    parties' data.  So he factored in both parties' data.  He tried
2    to reconcile that data, and he got an answer.
3         Now, he's being dinged for that.  I submit to you if
4    Dr. Gering would have just used Centocor data, I would be
5    standing here defending the reason that he did that and didn't
6    use AbbVie data, so I think we're kind of in a lose-lose
7    situation here.  The bottom line, Dr. Gering made a
8    calculation, he shows the numbers here, he shows how he got to
9    the 100 percent, and he explained it in his deposition.
03:47PM 10        Another point is that AbbVie has no problem with 2010,
11   2011, 2012.  He basically applied the same idea there.  He took
12   all the data, calculated an average for the year and used that
13   in his calculation.  AbbVie now wants to throw out his whole
14   opinion again based on what they say are inaccurate
15   calculations for 2009.
16        In the end, your Honor, these are not appropriate
17   arguments for Daubert, for Rule 702.  These are better served
18   for cross-examination.  I submit that it is weak
19   cross-examination, but it is, in any event.  This is not
03:47PM 20   an overall challenge to Dr. Gering's methodology.  It's the
21   same methodology their expert has used.  They've admitted in
22   their reply brief, in their footnote that they don't have a
23   problem with the methodology.  The motion should be denied.
24        As Mr. Kacedon stated, I'll skip the third point since
25   I think we've covered that adequately before.

1          THE COURT:  All right.

2          MR. MASLOWSKI:  Thank you.

3          THE COURT:  Anything further, Mr. Kacedon?

4          MR. KACEDON:  Just a few quick points, your Honor.

5     Just a couple quick responses.  Your Honor, Mr. Maslowski

6     suggested that we are not actually disputing that his

7     methodology is appropriate, and we obviously disagree.  The

8     determination of what the correct percentage of third and

9     fourth line SIMPONI patients who were previously on Humira is

03:48PM 10    absolutely part of his methodology and a part of his

11    methodology that we believe was speculative and improper, so we

12    are certainly disputing whether or not his methodology is

13    proper or not.

14          The other point, your Honor, we heard that these were

15    all called quibbles.  I would say with respect to that third

16    line data, the fact that his figure may be twice as high as

17    what he actually said it was is not a quibble.  That's a

18    significant error, but, more importantly, what I find ironic is

19    that we saw a lot of information on Mr. Maslowski's slides

03:49PM 20    about how this is just one piece of his lost profits analysis

21    that's problematic.  It shouldn't shade the whole analysis.

22          We just heard a whole lot of argument with respect to

23    Mr. Jarosz about how one portion of his analysis should somehow

24    take out his entire analysis, so I think there's a little bit

25    of inconsistency there, but in particular here with respect to

1    Dr. Gering's analysis of that third and fourth line use, I

2    mean, that's a fundamental part of his analysis.

3         If you look at Dr. Gering's data anywhere from ████

4    ████████████████████████████████████████████████████,

5    so this isn't a small portion of his analysis, this is a very

6    significant part of his analysis and obviously impacts his

7    entire lost profits calculation, so if there are no further

8    questions...

9              THE COURT:  All right.  Next up.

03:49PM 10         MS. DWYER:  Apparently I'm talking about Mike's family

11   today.  The next motion we have, your Honor, is AbbVie's motion

12   to exclude the expert testimony of Centocor's expert,

13   Ms. Sherry Knowles, and Ms. Knowles is a patent attorney.

14   She's currently a legal consultant.

15         She was in private practice for many years, for 20

16   years, and she spent four years as the chief patent counsel at

17   Glaxo SmithKline, and she offers opinions in this case on the

18   objective and the subjective prongs of willful infringement,

19   and AbbVie moves to exclude Ms. Knowles' opinions in their

03:50PM 20   entirety as they are unqualified and unreliable, and they fail

21   to provide any helpful insight and really amount to advocacy

22   from the witness stand, and I think the best way to understand

23   Ms. Knowles' opinions are to walk through the report and see

24   what she actually says and why it's improper, and the

25   substantive section of her report begins with the long section

1    on the law of willful infringement.

2         Now, Centocor agrees, Centocor says this is just in

3    there for background and that Ms. Knowles will not be allowed

4    to testify on the law at trial.  That's the province for the

5    Court on the objective prong and for the Court to instruct the

6    jury on the subjective prong.

7         Next, Ms. Knowles gives an opinion that Centocor's

8    written description and enablement defenses were objectively

9    reasonable, and, again, here she starts with a long recitation

03:51PM 10    of the law which relies primarily on the amicus brief that she

11    filed in her role at GSK and that AbbVie filed, and, of course,

12    amicus briefs are not the law, but everyone is in agreement

13    that she cannot testify on this.

14         So the first dispute comes on the substantive analysis

15    in her objective prong on written description and enablement,

16    and what this consists of mostly is her paraphrasing large

17    chunks of Dr. Siegel's report.  Now, Dr. Siegel, you'll recall,

18    is Centocor's expert on written description and enablement.

19         There's no question that Ms. Knowles herself is not a

03:52PM 20    person of ordinary skill in the art with respect to these

21    patents.  She was asked at her deposition that do you meet the

22    definition of someone skilled in the art, and she says, "I do

23    not," and Centocor concedes this.  Centocor says because that

24    they are not offering her up on opinions of validity and that

25    Ms. Knowles should not be allowed to opine on the validity of

74

 1    AbbVie patent claims asserted here, and they conceded this

 2    because they must.

 3              There's clear Federal Circuit law that says patent

 4    experts are not allowed to testify to issues of infringement

 5    and invalidity if they don't ultimately meet the requirement

 6    for want of ordinary skill in the art, and the Federal Circuit

 7    said in *Sundance*, "Allowing a patent law expert without any

 8    technical expertise to testify on the issues of infringement

 9    and validity amounts to nothing more than advocacy from the

03:53PM 10   witness stand."

11              Now, we've taken here a paragraph from Ms. Knowles'

12    report, we've absolutely blocked out a few words, but this

13    slide shows that she's dealing with the technical properties of

14    the antibodies disclosed in the specification, and since

15    everyone agrees Ms. Knowles is not a person of ordinary skill

16    in the art and cannot testify about validity, everyone agrees

17    that she cannot give the testimony in this paragraph as

18    depicted here on the screen.

19              Now, what Centocor has done is they've added the

03:53PM 20   words, Dr. Siegel shows that, Dr. Siegel shows that scientific

21    opinion, and they say now that she's couched it in this

22    language that it's Dr. Siegel's opinion that she should be able

23    to testify to all this technical information, which she is not

24    qualified to give an opinion on, and we would submit, your

25    Honor, that this cannot be the case, that this is an end run on

1    the Federal Circuit's decision in *Sundance* holding that only

2    persons of ordinary skill in the art can testify about

3    validity.  If this were allowed, you could easily get around

4    the rule by merely having the patent expert parrot another

5    expert's report, and the example we showed on the previous case

6    is not an isolated case.

7           We've excerpted here just the first line or the first

8    few lines from numerous paragraphs which cover numerous pages

9    of her report and the vast majority of her analysis on

03:54PM 10  objective reasonableness, and it all starts with "Dr. Siegel

11   shows," "Dr. Siegel's shows," "Dr. Siegel also analyzes it,"

12   and the same thing, we won't go through all of these, but she

13   does the exact same thing on the enablement prong as well.

14   After long recitations of what Dr. Siegel's opinions are,

15   Ms. Knowles concludes that Dr. Siegel's opinions are

16   objectively reasonable and credible.

17          As Courts in this district have held, this is just not

18   an appropriate subject for expert testimony.  Experts cannot

19   opine as to what other witness' testimony means or which

03:55PM 20  aspects of such other testimony should be credited.  Other than

21   repeating Dr. Siegel's testimony and stating that it's

22   credible, Ms. Knowles does state the results that she thinks

23   that should be reached.

24          She states that Centocor's opinions are objectively

25   reasonable, and as the Court held in *Goldsworth*, quoting the

76

1    advisory committee notes to Rule 704(a), an expert opinion must

2    be helpful to the trier of fact and should not be admitted

3    where it would merely tell the jury what result to reach, and

4    other than parroting Dr. Siegel's testimony, that's all

5    Ms. Knowles is doing is telling the jury what result to reach

6    or in this case, not the jury but the Court on the objective

7    prong.

8              So for these reasons, we believe that Ms. Knowles'

9    opinion on the objective prong should be excluded.  The

03:56PM 10   objective prong is obviously something that's for the Court to

11   decide, and we don't think it's helpful to the Court to have

12   recitation of what Dr. Siegel will already testify in front of

13   in the court.

14             Ms. Knowles' opinions are disguised opinions on

15   validity that are improper under *Sundance* in allowing the

16   patent attorney to testify that another expert's opinions are

17   reasonable is essentially the same as allowing them to testify

18   about validity.

19             In addition, Ms. Knowles did not have the opportunity

03:56PM 20   to hear AbbVie's expert, Dr. Garcia.  She didn't have the

21   opportunity to examine his report because of the timing of the

22   expert report, and she did not do so before her deposition, and

23   she did not have the opportunity to hear Dr. Garcia's

24   deposition or Dr. Siegel's deposition to see how he performed

25   on cross, and so the Court will have the opportunity to hear

77

1    both Dr. Siegel and Dr. Garcia and all of AbbVie and Centocor's

2    evidence on written description in person and then make the

3    decision for itself on whether that is objectively reasonable.

4         And in denying Centocor's summary judgment of no

5    willful infringement the first time around, the Court found

6    that there were disputes of material fact as to the objective

7    reasonableness of Centocor's written description and enablement

8    defenses, and this was after having access to Dr. Siegel's

9    report, which is all Ms. Knowles had to review, and, so,

03:57PM 10    therefore, at this point, Ms. Knowles offers nothing new to

11    this dispute.

12         So the next part of Ms. Knowles' report is she says

13    that Centocor's implied license defense is objectively

14    reasonable, and Centocor's implied license defense says that

15    ████████████████████████████████████████████████████████████

16    ████████ and so that defense stops in 2010, and that they

17    believe there's no willful infringement prior to 2010.

18         And, again, she starts with the summary of the case

19    law on implied license, which everybody agrees she will not

03:58PM 20    testify to at trial, and then she proceeds to give a summary of

21    the arbitration testimony crediting Centocor's witnesses over

22    AbbVie's witnesses and commenting on the state of mind of

23    Centocor's witnesses, and her recitation of the facts here is

24    very colorful.

25         She calls Centocor, she says they displayed the

1    highest level of professionalism, that they had the highest

2    level of commercial integrity and that they had a spirit of

3    great cooperation while calling AbbVie's explanations misguided

4    explanations, calling AbbVie callous and saying AbbVie's

5    practices smacked of sharp practices.

6           We submit that there's absolutely nothing objective

7    about Ms. Knowles' report, and this was shown in her deposition

8    where she slipped in and out of first person when referring to

9    Centocor.

03:59PM 10          So the Court will have the chance to hear from AbbVie

11   and Centocor's witnesses who were involved in the licensing

12   negotiation that underlies Centocor's implied license defense,

13   and it does not need, we would submit, Ms. Knowles' colorful

14   and prejudicial recounting of the facts that led up to the

15   license agreement.

16          Furthermore, the case law precludes an expert from

17   simply recounting his own summary of the facts underlying the

18   case, and it's for exactly this reason, so that the expert

19   can't interject their own color and their own credibility

03:59PM 20   determinations.

21          Ms. Knowles' opinion is also based very heavily on one

22   fact which is highly disputed by the parties but which she

23   credits Ken Dow, Centocor's patent counsel, version of the

24   facts, and that is that Ken Dow testified▇▇▇▇▇▇▇▇▇▇▇

25   that he had a vague recollection that▇▇▇▇▇▇▇▇▇▇▇

1 ████████████████████████████████████████████

2 ███████████████████████████

3      Now, Ken Dow was vigorously crossed on this point, and

4 you will not hear anyone from AbbVie that that phrase was ever

5 uttered, and Ms.  Knowles relies very heavily in her

6 conclusions that their implied defense was objectively

7 reasonable on the fact that this representation by Ken Dow was

8 true.

9      She's never talked to Ken Dow, never seen Ken Dow

04:00PM 10 testify in person, never seen him crossed, so she is making a

11 credibility determination to determine that Ken Dow's

12 recitation of the facts is credible in order to conclude that

13 the implied license defense is objectively reasonable, and,

14 therefore, we would submit, your Honor, that her entire opinion

15 on the objective prong should be thrown out.

16      On this objective prong, Ms. Knowles testifies as to

17 or gives opinions as to two facts.  First she says that

18 Centocor's subjective opinions that the patents are invalid was

19 reasonable and that Centocor believed that the patents were

04:01PM 20 invalid and that Centocor had an understanding that it was

21 licensed, again, ██████████████████████████████████.

22      In her report, she has many paragraphs that say things

23 like Ken Dow, Centocor's in-house counsel, had to have been

24 subjectively convinced that the '394 and '031 patents are

25 invalid and that Ms. McGinn, a business development person at

1    Centocor, believed that Centocor obtained full freedom to

2    operate for SIMPONI through the Salfeld license, and she

3    summarized her opinions at her deposition saying that what she

4    was looking at was the state of mind of Ken Dow and the state

5    of mind of Centocor.

6           This testimony, Courts in this district have already

7    found, is completely improper.  The Court in the *Holmes* case

8    said that no level of experience or expertise will make an

9    expert witness a mind reader, and we submit Ms. Knowles is not

04:02PM 10   one, and in the *Dyer* case, similarly, the Court said it is well

11   settled that an expert cannot bring any scientific, technical

12   or specialized knowledge to bear on another person's knowledge.

13          And, interestingly, recently the parties exchanged

14   lists of motions in limine, and Centocor stated that it would

15   be filing a motion in limine to preclude Dr. Linck, who was

16   AbbVie's patent expert, from testifying about Centocor's state

17   of mind, and AbbVie assured Centocor that Dr. Linck would in no

18   way be testifying about AbbVie's state of mind, so I don't

19   think you will be seeing that motion because it's a moot point,

04:03PM 20   but it seems from that motion that the parties should be in

21   agreement that it is improper for experts to testify about

22   state of mind, but, again, if we look at what Ms. Knowles' own

23   recitation of what she's doing here, it's looking at the state

24   of mind of Ken Dow and the state of mind of Centocor.

25          And Ms. Knowles' deposition shows why such state of

1    mind testimony should not be admissible.  Although Ms. Knowles

2    gave opinions on what Ken Dow and Centocor thought when she was

3    cross-examined on the subject, when she was asked questions

4    that were tough, showed potentially documents that were

5    inconsistent, she backed off and said I can't speak for

6    Ken Dow, I don't know what is behind Ms. McGinn's statement.

7            And this shows exactly why it should be Ken Dow, it

8    should be Centocor's own witnesses testifying about what they

9    think and what they believe because they're the ones who can

04:04PM 10   defend it on cross-examination.

11           Centocor's main response to AbbVie's motion is that

12   Ms. Knowles is allowed to testify to establish the corporate

13   reasonableness of Centocor's actions, and in Ms. Knowles'

14   report, however, corporate reasonableness is a conclusion she

15   reaches based on all of the improper testimony and opinions

16   that we've already discussed.

17           For example, there's no section in her report that

18   discusses standards on licensing practices in the industry, so

19   her corporate reasonableness is not something that she

04:04PM 20   discusses in the report, it is merely her opinion that she

21   gives that Centocor's actions were corporate reasonable from

22   that standpoint.  And Centocor cites no case law as to why

23   Ms. Knowles should be allowed to testify about the objective

24   prong and only cases relating to the subjective prong, and

25   these cases don't support their position.

82

1          In *Tyco*, the Court actually granted in part the

2      defendant's motion to strike the report of the plaintiff patent

3      expert on the subjective prong of willfulness and excluded

4      exactly the type of testimony we're trying to get rid of here.

5          And in *Toshiba*, the expert at issue was actually a

6      technical expert, and the technical expert, the offering party

7      made very clear that the technical expert was not going to

8      testify on legal issues or what the defendant knew or should

9      have known, and so the Court allowed this expert to testify

04:05PM 10      only as to DVD specifications and how they work, and Centocor

11      also did not address any of the cases that AbbVie cited in its

12      brief, the *Pioneer* case, the *RSI* case which holds that

13      Ms. Knowles' testimony would be improper.

14          Centocor says that the Court can solve any infirmities

15      with Ms. Knowles' report by either bifurcating the trial or by

16      hearing Ms. Knowles outside the jury on the objective prong.

17      We do not believe these are adequate solutions.  We believe

18      Ms. Knowles' testimony is improper, whether it's a one-phase

19      trial, a two-phrase trial.  It's improper no matter what.

04:06PM 20          And in some ways actually if the trial were

21      bifurcated, it would make it even more improper because

22      Ms. Knowles' testimony would be even further in time from the

23      Centocor witnesses who should actually be giving the opinions,

24      which are the underlying factual opinions.

25          And to the extent that there are sentences or phrases

1   of Ms. Knowles' report, that could be properly admissible under

2   Centocor's proposed solution.  The First Circuit has held that

3   the Court does not have to sort through all the inadmissible

4   testimony in order to save the remaining portions however

5   small.  The First Circuit continues that this would shift the

6   burden of proof and reward experts who fill testimony with as

7   much borderline material as possible.

8          So, in sum, AbbVie requests that Ms. Knowles' report

9   be excluded in whole, and there's nothing admissible or proper

04:07PM 10   in her report.  Her testimony on the objective prong with

11   respect to written description and enablement is cumulative of

12   Dr. Siegel and an improper end run around the Federal Circuit's

13   opinion in *Sundance,* and her opinions on the implied license

14   defense are merely advocacy from the witness stand.  Her

15   subjective prong opinion is unreliable mind reading, and it

16   should not be allowed in front of the jury.

17          Unless there's any questions, I will turn it over to

18   Centocor.

19          THE COURT:  All right.  Thank you.  Ms. Mullin.

04:07PM 20          MS. MULLIN:  Thank you, your Honor.  So, again, this

21   motion is mooted if Centocor's Motion For Summary Judgment of

22   No Willfulness is granted, and as Ms. Dwyer mentioned, we have

23   proposed that Ms. Knowles would testify on both the objective

24   and subjective prongs.

25          Just responding to some of the points made by

1    Ms. Dwyer, I mean, all of the experts, even technical experts,

2    include legal premises in their reports as part of the kind of

3    framework for the opinions they give.

4           None of them are permitted to testify either to your

5    Honor or to the jury about what the law is.  That is obviously

6    something that's left for the Court to do, so we don't intend

7    to have Ms. Knowles do that.  It is in her report, as it is in

8    all of the experts' reports, as well as the technical reports.

9           We also don't intend to have Ms. Knowles testify about

04:08PM 10   validity.  We understand that that is not appropriate.  She

11   said it during her deposition.  There's never been any dispute

12   about that, but what Ms. Knowles does bring to the table that

13   could assist the trier of fact is her experience as an

14   intellectual property attorney and also senior vice-president

15   and chief patent counsel at GSK where she was responsible for

16   providing legal and business judgments to a large

17   pharmaceutical company.

18          So, again, with respect to the two different kinds of

19   testimony that she would give, one would relate to the

04:09PM 20   objective prong, and that, again, is a decision that would be

21   made by the Court as to whether there's an objectively high

22   likelihood that Centocor's actions constituted infringement of

23   a valid patent, and I think Ms. Dwyer in her presentation

24   pulled up Slide 6 and seemed to suggest that what Ms. Knowles

25   would be doing would be simply saying, well, this is what

1    Dr. Siegel said, and this is what Dr. Siegel said, and this is

2    what Dr. Siegel said, and that's not quite it.

3          What actually precedes all of those paragraphs is her

4    conclusion that Centocor's defenses are reasonable, that they

5    have not been acting objectively recklessly, and so under

6    Federal Rule of Civil Procedure 26, she has to give the bases

7    or some basis for that opinion, and so the basis for that

8    opinion in part is looking at what Dr. Siegel has said and

9    saying, look, I have worked in this industry for a lot of

04:10PM 10   years, I have to make this kind of call about whether or not

11   there's infringement or what the risk is of infringing a valid

12   patent claim, and based on my experience and putting it into my

13   context, here's my opinion, so that's really an issue for the

14   Court, in any event.

15         You can listen to her testimony. If it's helpful, you

16   can disregard it, if it's not helpful, and we have proposed

17   this, and I'm not sure why it doesn't solve many of these

18   issues if we do this outside the presence of the jury. There's

19   no reason for the jury to hear any of this. We can certainly

04:11PM 20   do it outside the presence of the jury.

21         If we do that, then there's no concern that she's

22   trying to validate any invalidity opinions. There's no chance

23   that the Court's going to be mislead into believing that she's

24   testifying as to validity, and she's not telling the jury or

25   anybody else what to decide about the objective prong.

1        So we suggested, and I'm not sure why it doesn't

2    ameliorate many of the concerns here, that if she's going to

3    testify on the objective prong, it would be outside the

4    presence of the jury, and I think the concerns that AbbVie has

5    raised all the way through slide 15 of their presentation

6    really go to whether or not somebody is going to be confused

7    into believing that she's trying to kind of bolster Centocor's

8    positions, and, again, the Court will not be confused, so I'm

9    not sure why having her testify outside the presence of the

04:12PM 10    jury doesn't solve those problems.

11        The kind of testimony that she would be giving to the

12    jury on the subjective prong would be, again, whether a risk

13    was so obvious that it should have been known to Centocor, and

14    there's really a difference here between what Ken Dow or

15    Denise McGinn or anybody else in particular was thinking, and

16    when you get to this part of the subjective prong of the

17    willfulness test when they're talking about was it so obvious

18    that it should have been known to Centocor.

19        Now you're talking about a corporate entity, and I

04:12PM 20    think it was in Judge Newman's concurrence in the Seagate case

21    where she talked about things like standards of fair commerce

22    and the reasonableness of actions in particular circumstances,

23    and that's where Ms. Knowles can really help the jury here.

24        She can testify about how corporations undertake

25    analyzing third-party patents, what they do, what's reasonable

1    to rely upon and not.  And this is appropriate under Federal

2    Rule of Evidence 702(a), and this is where her testimony would

3    be particularly valuable to the jury because she has particular

4    experience that they are unlikely to have.

5          What do you do when you're a big pharmaceutical

6    company, and there are third-party patents that you have to

7    analyze, what's reasonable to rely upon, and I'll tell you that

8    it's anticipated that at trial, part of what Abbott is going to

9    want to argue is, for example, that the analysis that was

04:13PM 10    undertaken by Centocor's in-house counsel when he reached a

11    conclusion that the claims were not valid, that wasn't

12    sufficient because he didn't do certain things.

13          What Ms. Knowles can bring to the table is to say but

14    that's what companies do.  We don't always have the time or the

15    need or find it necessary to write out a detailed analysis or

16    do a particular claim chart or something else.  There are

17    certain things that we do in the ordinary course of business

18    that are acceptable, in the ordinary course of business in this

19    industry.

04:14PM 20          It also is anticipated that Abbott's going to want to

21    suggest that the fact that Centocor got an opinion from outside

22    counsel somehow means that they really couldn't rely on their

23    in-house counsel's opinion, and, again, that's just contrary to

24    industry practice.  That's not what it means at all, and

25    Ms. Knowles can come in, and this is where she can really help

1       the jury, and testify based on her experience which will be

2       experience that the average juror doesn't have, so under the

3       Federal Rule of Evidence 702(a), her opinion should be

4       admitted.

5              Now, one last comment.  I think Ms. Dwyer mentioned

6       the *Pioneer* and *RSI* cases.  They're a little bit different

7       because I think in those cases, they were talking about

8       proposed testimony about the sufficiency of evidence on willful

9       infringement, and that was excluded, but that's not what we're

04:15PM 10     talking about here, we're talking about Ms. Knowles providing

11      context, context that the jurors won't have for making

12      decisions about whether or not some objectively-defined risk

13      was so obvious that it should have been known to Centocor.

14             THE COURT:  Okay.  Thank you.  I think in light of the

15      hour, why don't we proceed to the last motion, which is the

16      Motion To Exclude Kathryn Doyle.  Ms. Dwyer.

17             MS. DWYER:  Thank you, your Honor.  The last motion is

18      AbbVie's motion to exclude certain testimony of Centocor's

19      other patent expert, Dr. Kathryn Doyle, and Centocor's second

04:16PM 20     patent expert, Dr. Doyle, has been a patent lawyer for about 18

21      years solely in a private law firm setting, and she does have a

22      Ph.D., she is Dr. Doyle, but there is no dispute that she is

23      not a person of ordinary skill in the art.

24             THE COURT:  All of us have J.D.s, we're all doctors,

25      right?

1          MS. DWYER:   That's true, that's true.   She's I guess a

2     double doctor, but there's no dispute that in this case, she's

3     not being offered up as a technical expert or one who is of

4     ordinary skill in the art and that she's being offered up

5     solely as a patent expert.

6          Dr. Doyle opines, she states that the buttress of her

7     opinion or the overall opinion is that there are deficiencies

8     in the prosecution of the patents-in-suit, and AbbVie seeks to

9     exclude her opinions in this respect because they are based not

04:16PM 10  on any violation of a rule or a statute but on Dr. Doyle's

11     interpretation of what silence in the record may mean, what she

12     interprets the examiner was thinking because he didn't write it

13     down, and this is contrary to Federal Circuit law that holds

14     that an examiner is presumed to do his job and that it's

15     improper to make inferences based on silence in the record.

16          And to exacerbate matters further, Dr. Doyle has

17     effectively barred cross-examination on any of her opinions by

18     claiming privilege, and as we'll look at later on, we would

19     argue that it's an unwarranted claim of privilege even as to

04:17PM 20  discussing public documents that contradict her positions in

21     this case.

22          And given that her opinions are based solely on her

23     own experiences, which she claims privilege on, there's no way

24     to examine these opinions.   Thus, we would move to exclude

25     Dr. Doyle's opinions on the deficiencies and prosecution based

1    on her experience and reading into the silence.

2         To be clear, we're not trying to exclude Dr. Doyle in

3    whole, she has some sections in her report where she walks

4    through where patent practice is and others where she walks

5    through what is in the prosecution history without giving these

6    improper opinions, and we would not be moving to exclude those.

7         So specifically when Dr. Doyle was asked at her

8    deposition, she said that her general opinion is that there

9    were deficiencies in the prosecution, but when she was asked

04:18PM 10    why is it deficient, when she was asked can you point to any

11   specific rule or statute that was violated in the prosecution

12   of the patents in this report, she said no, and there's

13   numerous statutes, and there's numerous rules, there's the

14   manual of patent examining procedure, which is hundreds and

15   hundreds of pages that patent examiners must follow, and she

16   couldn't point to a single rule or a single statute that had

17   been violated in the patents-in-suit here.

18        But what she doesn't say is she looks at the examiner

19   silence, and she says the examiner silence as to the

04:19PM 20   disposition of the Section 112 rejection suggests to me that

21   the examiner was not paying full attention to the prosecution

22   of the application, and she says the third one, there is no

23   discussion by the examiner of whether or not the specification

24   satisfies Section 112, first paragraph with respect to the

25   written description and enablement requirements.

1          She then concludes, "I am led to the conclusion that

2     the examination of the claims of this application conducted by

3     this examiner was at best cursory and superficial."

4          Now, there's black letter Federal Circuit case law

5     that says, "An examiner is presumed to have done its job," and

6     this comes and stems from the presumption of validity, and the

7     presumption of validity carries with it a presumption that the

8     examiner did his duty and knows what claims he was allowing,

9     and there's also Federal Circuit law that says, "Without any

04:20PM 10    record support, an argument alleging dereliction of duty by a

11    patent examiner is without merit."

12         So what the laws are here is that the examiner must

13    examine each application for each statutory requirement of

14    patentability, and the MPEP says, "Each claim should be

15    reviewed for compliance with every statutory requirement for

16    patentability in the initial review of the application," so

17    this would include the written description requirement, it

18    would include the enablement requirement, the obviousness

19    requirement, all of the statutory requirements, and then what

04:20PM 20    the MPEP says is that deficiencies should be explained clearly,

21    particularly when they serve as a basis for rejection.

22         Now, there's no parallel requirement.  There's no

23    requirement that says if there isn't a deficiency, if you find

24    that the application meets the written description requirement,

25    you must write that in the record.  There's no requirement,

1    only for deficiencies must you write that down.

2            So under the law, the examiner is presumed to do their

3    job, which means that they're presumed to have examined every

4    statutory requirement for patentability and enablement, and

5    they have no duty to write down if they find those requirements

6    met.

7            Now, the case law goes even further and in different

8    context has held that drawing inferences from the silence of

9    the record by the examiner silence is an improper basis, in

04:21PM 10    this case on which to construe patent claims, and this goes

11    back to what we talked about in the motion to exclude

12    Ms. Knowles that this results in mind reading, and Dr. Doyle

13    admitted this.  If it's not written in the record, there's no

14    way to tell what the examiner was thinking.

15            There is actually a way, there's a way that you can

16    request to depose an examiner, but Centocor and Dr. Doyle did

17    not do that, so in this case, we don't know what the examiner

18    was thinking.

19            Centocor fails to cite to a single case that allowed a

04:22PM 20    patent law expert to opine on what an examiner should have done

21    during the prosecution of a patent.  Centocor, AbbVie cites

22    cases that say the examiner is presumed to do their job, and

23    under that, Dr. Doyle's opinions are incorrect, but Centocor's

24    only cases are in the context of inequitable conduct, and those

25    cases say that a patent law expert is allowed to testify on

1    specific PTO errors, specific PTO errors in the prosecution of

2    the patents that are admissible to show inequitable claim.

3         Now, there's no inequitable conduct claim in this

4    case, and also Dr. Doyle admits that she can't point to any

5    specific errors.  She can't point to any violations of rules or

6    statutes.  The other case that Centocor cites allows the patent

7    law experts to testify on certain facts from the file history

8    to support an inference that the applicants, so not the patent

9    office, but the applicants, the patentee acted with an intent

04:23PM 10   to deceive, and that, of course, is not the case here, there's

11   no inequitable conduct claim.

12        Centocor also says in their opposition brief that

13   Dr. Doyle -- that all of AbbVie cases state that you can't

14   criticize the patent office and that that's not what Dr. Doyle

15   is doing, but, in fact, if you look at her report, she does do

16   this.

17        She says that something in the record was surprising

18   to her because it would be highly unusual that an examiner

19   would have the time available to properly search the prior art

04:23PM 20   with respect to the differences and breadth of the antibodies

21   recited in the claims.  This is exactly what the case law says

22   you can't do.  You can't say that the patent office is a bad

23   actor unless you have specific support in the record for that

24   allegation.

25        Centocor's refrain is, well, the cases talk about you

1     can't attack the patent office generally, but we're attacking

2     it with respect to this specific patent, and there's no

3     difference, and there's a District Court case, the *Wright*

4     *Asphalt* case which we cite in our reply brief which makes clear

5     that this type of testimony is not allowable whether it's about

6     the patent office in general or as applied to the patents at

7     issue.

8             The next reason that we seek to exclude Dr. Doyle is

9     because she prevented any cross-examination of her opinions,

04:24PM 10     and this came up because Dr. Doyle disputes Dr. Linck, AbbVie's

11     patent expert's testimony because she said that Dr. Linck is

12     talking about the law and the rules, and Dr. Linck is the

13     former solicitor of the patent office, the highest ranking

14     lawyer at the patent office, and so she talks about what the

15     patent office does and what their rules and procedures are, and

16     Dr. Doyle says, "I'm not talking about the laws and the rules,"

17     and she was asked, "You're talking about anecdotal experience

18     that you've had in your own practice, correct?" And she says,

19     "Right."

04:25PM 20             And that is the only basis for her opinions, and she

21     can't point us to any laws, any statutes, any written documents

22     that show something that's wrong. Her opinions are based

23     solely on her experience.

24             But when asked about her experience, when asked about

25     public documents, documents that you can download from the

95

1    Internet that reflect patents that she's prosecuted in front of

2    the exact same examiners that she's criticizing in her report,

3    she refused to talk about it on the grounds of privilege, and

4    she was asked, "You can't discuss public information of a

5    patent you prosecuted without violating the attorney-client

6    privilege?"  And she said she could not.

7         So then she was asked in a hypothetical, "What if the

8    claim says an isolated antibody that is specific to Antigen X

9    and the claim goes on to fully describe Antigen X?"  And she

04:26PM 10    refused to answer the question on the grounds of privilege.

11         We would submit this is not privilege but whether it

12    is a privilege or not.  The issue here is that there's no way

13    to cross-examine her experience if she wouldn't talk about it

14    at all, even public documents about it, and Centocor says in

15    their opposition that if this were the case, if you were

16    allowed to exclude an expert on this ground, no expert could

17    testify because even technical experts, they have confidential

18    information that they can't talk about, we have patent law

19    experts all of the time, and they can testify without revealing

04:26PM 20    privileged information, and to use Centocor's favorite term, I

21    think that argument is a "red herring."

22         The issue here in those cases is that the experts are

23    relying on, for example, in the case of Dr. Garcia or

24    Dr. Siegel, the technical experts, they're relying on published

25    scientific literature, scientific principles, and the only

96

1    thing that their experience contributes, even the confidential

2    experience, is it gives them the basis as one of skilled in the

3    art to interpret those documents that they can be

4    cross-examined on.

5         Here, Dr. Doyle's opinions are based solely on her

6    experience, and since she can't be cross-examined on her

7    experience, we believe that that is a second reason that she

8    should be excluded.

9         Unless there's any questions, I don't have anything

04:27PM 10   further.

11        THE COURT:  Ms. Mullin.

12        MS. MULLIN:  Thank you, your Honor.  So getting to

13   this point about first are there any rules or statutes

14   violated, if examiners always did everything that they were

15   supposed do, if they always made sure that the claims were

16   fully enabled, that the claims had full written descriptions

17   support, that they weren't obvious, that they weren't

18   anticipated, then we could never challenge a patent once it

19   issued.

04:27PM 20        What happens in the patent office and what happens

21   when a patent issues, there is a presumption of validity, but

22   that presumption is rebuttable, so there is a presumption that

23   the PTO did its job right, but what the cases say is that if

24   you can point, if there is evidence that there are specific

25   defects in the prosecution, that there are mistakes, that there

1     are omissions, that these are the kind of things that are

2     properly considered and presented to the jury, so we have on

3     the one side these cases that say you can't come in and you

4     can't say patent examiners are generally overworked, they

5     generally don't have the right resources, you can't do that

6     because that's just inviting the jury to speculate about

7     whether or not there were mistakes made in this prosecution.

8              You can't come in and you can't say, look, there's

9     nothing in here about written description or enablement ever

04:28PM 10    said on that topic in this prosecution, and, therefore, the

11    examiner couldn't have considered it.  That's not right either

12    because there's a presumption that the examiner did consider

13    it.

14             What's different here is that Dr. Doyle has looked at

15    the exchange in connection with the prosecution of these

16    particular applications and said when I look at this, I see

17    mistakes, I see omissions, I see defects, so, for example, one

18    thing that she looks at is that there's a rejection of certain

19    claims that include D2E7, and there's other claims grouped in

04:29PM 20    there with them that would expand the genus of antibodies

21    beyond just D2E7 itself.

22             And the patent office and examiner are focused on is

23    there written description and enablement support for D2E7, and

24    when she looks at that, she can say even though they haven't

25    said anything about all the other antibodies beyond D2E7 that

1  are encompassed by the claims, she can look at that with her

2  experience and say but that's the point, they're not talking

3  about all these other antibodies, and if the examiner is

4  questioning support for this really narrow scope of antibody

5  and not saying anything about the broader scope of antibodies,

6  then I understand from that that there was a mistake or there

7  was an omission to actually examine the broader scope of

8  antibodies in this case.

9          So this is something that is actually tied to the

04:30PM 10  specific prosecution in this case.  It's not inviting the jury

11  to speculate about what the examiner missed, it's saying this

12  is what the examiner missed.  I can look at the words, I can

13  look at the back and forth and say this is what the examiner

14  missed, so I think it falls into a different category than the

15  cases that generally exclude just saying to the jury lots of

16  stuff can go wrong, figure out what might have gone wrong

17  here.

18          So, you know, this may not be the kind of motion

19  that's really subject to a good bright line ruling right now.

04:31PM 20  Maybe we need to take this on more of a case-by-case basis, but

21  I think in general, there's a premise that if you are not

22  tieing something to the prosecution history, if you are just

23  inviting pure speculation about what might have gone wrong,

24  that's not allowed, but when you are actually tieing it to the

25  prosecution history and saying I'm looking at this, and based

1    on what I see, there was a defect in this examination, that

2    seems to fall into the category of the specific defects or

3    omissions or mistakes that should be admitted.

4         Your Honor, in fairness, the patentee, AbbVie, will no

5    doubt come in here saying presumption of validity, you have to

6    assume that the patent office already looked at written

7    description and enablement, and here's Centocor now challenging

8    that again, and to the extent that they're going to come in and

9    do that, in all fairness, there should be some ability for

04:31PM 10   Centocor to rebut, the presumption is rebuttable, or to put in

11   evidence that that presumption should be rebutted in this case.

12        The public document, I want to get to this issue of

13   privilege and Dr. Doyle not answering questions, the public

14   documents that she refused to answer questions about, that's

15   where she was the attorney of record prosecuting.  They were

16   pulled off the Internet, sure, but there were questions being

17   asked at her deposition about specific applications that she is

18   prosecuting where she has an attorney-client privilege, and

19   when was asked specifics about do you think the examiner did a

04:32PM 20   thorough job here, how would you categorize this claim in this

21   application that you're prosecuting, she said I can't answer

22   those, you're asking for my legal conclusion about an

23   application that I'm prosecuting, and I can't answer that

24   because that would violate the attorney-client privilege.

25        And if you look actually at, for example, Slide 12

1    that was used in Ms. Dwyer's presentation, when she refused to

2    answer the "hypothetical," it's because it's clearly linked

3    right above that to something that she was actually doing, and

4    so if you look at her answer carefully, what she's saying is I

5    hear what you're saying, but if you're trying to link that, to

6    the extent that you're linking that to this particular

7    application that I'm prosecuting, I can't answer that.

8            I think that's what I have to say in response unless

9    you have further questions.

04:33PM 10        THE COURT:  All right.  Why don't we pause there, and

11   I'll take the motions under advisement.  What do I have in the

12   calendar for the next event?  Do I have a status conference in

13   the calendar?

14           MR. MORIN:  December 12th, your Honor, I have a status

15   conference on my cheat sheet.

16           THE COURT:  Okay.  That's for a trial that begins in

17   January?

18           MR. MORIN:  January 26th, your Honor.

19           THE COURT:  I think what I need to do, today is

04:34PM 20   October 16th.  I think what I would like to do is to put

21   something in the calendar in about say the second week of

22   November.  Am I around then?  This may be something of a

23   placeholder.  Obviously, I don't know the timing of this, what

24   I do here may affect, you know, what the trial looks like and

25   so forth, and obviously I permit appearances by telephone, so

1    how about Thursday, November 13th at ten minutes after ten,

2    does that work?

3             MR. MORIN:   We believe so, your Honor, on behalf of

4    AbbVie.

5             MS. MULLIN:   Yes, your Honor.

6             THE COURT:   There's nothing special about that date.

7    If it's a problem, we can move it around.   I would just like to

8    have something in the calendar so that I'm checking in with

9    you, seeing where we are.   If we're going to try this case in

04:35PM 10   January, one way or the other, I'd like to see you roughly at

11   least every 30 days from here on out or talk to you about where

12   we're going.

13            All right.   November 13th, ten minutes after ten,

14   further status, and at present the group of motions will be

15   taken under advisement.

16            MR. MORIN:   Thank you.   Nothing further from us, your

17   Honor.

18            THE COURT:   Ms. Mullin.

19            MS. DWYER:   Thank you, your Honor, and if I could ask

04:35PM 20   the Court, we've always appreciated your thoughtful

21   consideration of all the motions.   The motion to bifurcate in

22   particular implicates a lot of things that are coming up,

23   motions in limine.

24            THE COURT:   I understand that it's first on the list

25   for a variety of reasons, so obviously I will turn to it first

1   and then see where the chips fall from there.  All right.

2   We'll take it from there.  Thank you.  It was well argued and

3   safe travels.

4           MR. MORIN:  Thank you, your Honor.

5           THE CLERK:  All rise.

6           (Whereupon, the proceedings were concluded at

7   4:36 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS ) ss.

6    CITY OF BOSTON )

7

8

9         I do hereby certify that the foregoing transcript,

10   Pages 1 through 103 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 08-40089-FDS-FDS, ABBOTT BIOTECHNOLOGY LTD. And

13   ABBVIE, INC. vs. CENTOCOR ORTHO BIOTECHN, INC. and thereafter

14   by me reduced to typewriting and is a true and accurate record

15   of the proceedings.

16         Dated this November 5, 2014.

17

18                        s/s Valerie A. O'Hara

19                        _____

20                        VALERIE A. O'HARA

21                        OFFICIAL COURT REPORTER

22

23

24

25