# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

ABBOTT BIOTECHNOLOGY LTD. and )
ABBVIE INC., )
                                           )
          **Plaintiffs,** )         **Civil Action No.**
                                             )         **09-40089-FDS**
          **v.** )
                                             )
CENTOCOR ORTHO BIOTECH, INC., )
                                             )
          **Defendant.** )

———————————————————————

## MEMORANDUM AND ORDER ON
## MOTIONS TO EXCLUDE EXPERT TESTIMONY

This is a patent dispute involving pharmaceutical products used to treat certain autoimmune diseases. Plaintiffs Abbott Biotechnology Ltd. and AbbVie Inc. (collectively "Abbott") seek a judgment that the drug Simponi, manufactured by defendant Centocor Ortho Biotech, Inc., infringes its patents to the extent that it is used with the drug methotrexate to treat rheumatoid arthritis.[1] Centocor seeks declarations of non-infringement and invalidity of Abbott's patents.

Both parties have moved under Fed. R. Evid. 702 to exclude certain expert testimony from the trial. Centocor has moved to exclude portions of the testimony of Abbott expert John Jarosz, and Abbott has moved to exclude portions of the testimony of Centocor experts Dr. Kathryn Doyle and Dr. Richard Gering and all testimony by Centocor expert Sherry Knowles.

For the reasons set forth below, all of the motions will be granted in part and denied in part.

---

[1] During the pendency of this litigation, Abbott Laboratories changed its name to AbbVie Inc. Accordingly, the case caption has been altered.

## I.    Background

The following facts are undisputed, unless otherwise noted.

U.S. Patents No. 7,223,394 (the "'394 patent") and No. 7,541,031 (the "'031 patent") are part of a family of patents owned by Abbott.  The parent patent, U.S. Patent No. 6,090,382 (the "'382 patent"), was filed in 1996 and issued in 2000.  It is directed to certain human antibodies designed to attach to a naturally-occurring protein in the human body called tumor necrosis factor alpha ("hTNFα").

### A.    Development of Anti-hTNFα Antibodies

Human TNFα is involved in regulation of the immune system, a role it performs by triggering inflammation in response to invasion by a foreign entity.  Overproduction of hTNFα can lead to excessive inflammation that can result in tissue damage.  This occurs in diseases such as rheumatoid arthritis, Crohn's disease, ankylosing spondylitis, and psoriasis.  Such diseases are known as autoimmune diseases because of the way the body's own immune system—in this case, through hTNFα—targets healthy human tissue instead of foreign contaminants.

Antibodies are proteins that bind with harmful foreign substances, or "antigens," such as viruses or bacteria.  An antibody attaches itself to an antigen by binding with a portion of the antigen called an "epitope."  By occupying the antigen's epitope, the antibody diminishes the antigen's ability to bind with other receptors in the body, and therefore minimizes the harmful effect.

The human immune system rarely produces antibodies that target hTNFα, because hTNFα is a protein that the body itself produces, not a foreign contaminant.  To prevent an

overabundance of hTNFα from causing tissue damage, researchers have sought to develop an antibody that binds to hTNFα. The process of binding is known as "neutralization" of hTNFα. In order for an antibody to neutralize hTNFα effectively, it must attach to it with sufficient strength. The strength of an antibody's interaction with hTNFα is called its "affinity" for hTNFα. Affinity is expressed in term of $K_d$—the propensity that the objects will dissociate—and a lesser $K_d$ indicates a higher affinity.[2] Also, the longer that the antibody attaches to hTNFα, the more effective it is at neutralizing the antigen. The rate at which the antibody and antigen dissociate is expressed in terms of $K_{off}$, with a lower number indicating that the objects bind for a longer period of time.[3]

Researchers have long sought to develop antibodies that neutralize hTNFα and bind to it with high affinity. An antibody that inhibits hTNFα in this manner could become a treatment for, among other things, autoimmune diseases. In the 1980s, researchers invented a high-affinity, neutralizing anti-hTNFα antibody that derived from mouse DNA. It could not effectively treat human autoimmune diseases, however, because humans often exhibit adverse reactions to non-human antibodies.

The development of chimeric antibodies, or antibodies with components that derive from both mouse and human DNA, advanced treatment options for autoimmune diseases. Centocor, together with the Kennedy Institute, obtained a patent in 2001 that disclosed a method for treating arthritis by co-administering chimeric anti-hTNFα antibodies with a pre-existing drug

---

[2] For the purposes of the patents-in-suit, $K_d$ is defined as "the dissociation constant of a particular antibody-antigen interaction."

[3] For the purposes of the patents-in-suit, $K_{off}$ is defined as "the off rate constant for dissociation of an antibody from the antibody/antigen complex."

called methotrexate. (*See* U.S. Patent No. 6,270,766).[4]  In 1999, the FDA approved Remicade, a drug manufactured by Centocor and based on chimeric antibodies, for treatment of rheumatoid arthritis.

During the same time period, Abbott was also seeking to develop effective antibodies.  In 1993, BASF Bioresearch Corporation, later acquired by Abbott, and Cambridge Antibody Technology ("CAT") were collaborating on the development of antibodies.  Three CAT scientists, all of whom are inventors of the patents-in-suit, succeeded in isolating a human antibody called 4SE3 by July 1993.  However, 4SE3 did not have the sought-after qualities, and does not fall within the scope of the claims of the patents-in-suit.

By April 14, 1995, BASF and CAT scientists had succeeded in isolating a high affinity, neutralizing anti-hTNFα antibody, which they labeled "D2E7."  BASF then undertook pre-clinical and clinical testing of the antibody.

At some point, BASF scientists conceived of the idea to co-administer such an antibody with methotrexate to treat rheumatoid arthritis.  Abbott contends that one of the BASF scientists came up with the idea prior to the development of D2E7, because it was a well-known and obvious treatment.  None of them has taken credit for the concept nor remembers who is responsible.  Centocor contends that the idea was not obvious and that the BASF scientists co-opted the idea from Dr. Michael Weinblatt, who consulted with them about clinical development of an anti-hTNFα drug in January 1995.  Dr. Weinblatt, however, denies that he introduced the

---

[4] Methotrexate was invented in the 1940s, initially as a chemotherapy drug.  It is now categorized as a disease-modifying anti-rheumatic drug ("DMARD") and can be an effective treatment for rheumatoid arthritis. Physicians may prescribe only methotrexate—which was the standard treatment in April 1995—or may prescribe it in combination with a drug developed from anti-hTNFα antibodies.  The prescribing physician determines the frequency and dosage of methotrexate administrations.

concept to the BASF scientists.

In 1996, Abbott filed the '382 patent and for the first time disclosed a class of fully-human, high-affinity, neutralizing anti-hTNFα antibodies as well as certain uses of those antibodies. The '382 patent did not address co-administration of the antibodies with methotrexate.

From April 14, 1995, to February 10, 1997, other references to purportedly the same invention became public: two international patent applications, Kucherlapati WO 96/33735 and Kucherlapati WO 96/34096; the 1995 Kennedy Institute of Rheumatology Annual Report; two scientific papers, published in 1996 and 1997; a presentation by Dr. Salfeld, an Abbott scientist, in 1996; and two patent applications, U.S. Patent No. 6,075,081, filed April 27, 1995, and U.S. Patent No. 6,150,584, filed October 2, 1996.

## B.     The Asserted Patents

Abbott filed two patent applications on February 10, 1997—the '394 and '031 patents, the patents-in-suit—that are continuations of a patent in the '382 family. The listed inventors were Jochen G. Salfeld and twelve others; Dr. Weinblatt was not included. The '394 patent, issued in 2007, is directed to a method for treating rheumatoid arthritis by administering the human anti-hTNFα antibody with methotrexate. The '031 patent, issued in 2009, shares the same specification and claims substantially the same invention. Both patents claim priority to the 1997 Patent Cooperation Treaty application; Abbott contends that the date of invention was, at the latest, April 14, 1995, when it first developed D2E7.

The patents describe a genus of human anti-hTNFα antibodies, of which D2E7 is a member. They define the genus by its functional characteristics: a high affinity for hTNFα,

defined as a $K_d$ of -$10^{-8}$ M or less; a slow rate of dissociation, defined as a $K_{off}$ of -$10^{-8}$ sec$^{-1}$ or less; and an ability to neutralize hTNFα in vitro and in vivo.  The patents indicate possible methods of creating other antibodies within the genus, starting by making changes to D2E7, but do not indicate the total number of qualifying antibodies that exist.

Based on the technology disclosed in the '382 patent and its progeny—in particular, the '394 and '031 patents—Abbott developed a drug called Humira.  The FDA approved Humira in December 2002 to treat rheumatoid arthritis, either alone or in combination with methotrexate or other DMARDs.  Rheumatoid arthritis patients typically take a combination of Humira once every two weeks and methotrexate weekly, but may take Humira weekly when it is not prescribed in combination with methotrexate.

In the past decade, Centocor researchers also developed a fully-human, high-affinity, neutralizing anti-hTNFα antibody that meets the functional limitations of the '394 and '031 patents.  In 2009, Centocor obtained approval from the FDA to manufacture and sell a drug called Simponi that contains the antibody it developed.  Simponi is indicated for the treatment of moderate to severe rheumatoid arthritis, to be used in combination with methotrexate.  It is also indicated for the treatment of psoriatic arthritis, either alone or in combination with methotrexate, and ankylosing spondylitis.  For all three conditions, patients are administered monthly subcutaneous injections.

### C.    The Licensing Agreement

In late 2002, Abbott and Centocor agreed to cross-license a series of patents directed to anti-hTNFα antibodies.  Centocor extended to Abbott rights under its 2001 patent, which covered a method for treating arthritis by co-administering chimeric anti-hTNFα antibodies with

methotrexate.  In exchange, Abbott extended to Centocor rights under the '382 patent and other patents in the family, including U.S. Patent No. 6,509,015, which covered a method for treating rheumatoid arthritis (among other diseases) by co-administering human anti-hTNFα antibodies with a therapeutic agent.

### D.     Procedural History

Abbott initiated this action against Centocor in May 2009.  The parties then proceeded to arbitrate whether the 2002 agreement extended to Centocor an implied license under Abbott's '394 and '031 patents.  The arbitrator determined in June 2010 that the agreement did not cover the subject matter claimed in those patents.

On August 1, 2013, both Abbott and Centocor moved for summary judgment on multiple issues.  On that same date, Centocor also moved to exclude portions of the testimony of Abbott expert John Jarosz.

Centocor contended in its first of six summary judgment motions that the patent claims were invalid for lack of a written description; in its second motion that the claims were invalid for lack of enablement because the patents do not indicate the full scope of the claimed invention; in its third motion that the patents were invalid for failure to list an inventor; in its fourth motion that some claims were invalid for lack of enablement because the patents enable the creation of antibodies by only one method; in its fifth motion that it did not willfully infringe the patent; and in its sixth motion that the patents were invalid because references prior to the filing date are prior art and Abbott did not diligently reduce its invention to practice.  Part A of Abbott's motion contended that eight post-invention date references were not prior art; part B contended that the 4SE3 antibody was not prior art; and part C contended that the patents were

not invalid for failure to list an inventor.

On April 16, 2014, the Court denied all of Centocor's summary judgment motions and part A of Abbott's motion, but granted parts B and C of Abbott's motion.

On July 31, 2014, Abbott filed three motions to exclude certain testimony by Centocor's experts. Specifically, it moved to exclude all testimony by Sherry Knowles and parts of the testimony of Dr. Kathryn Doyle and Dr. Richard Gering.

On September 9, 2014, Centocor renewed its motion for summary judgment on the issue of willfulness and also moved to separate that issue from the others remaining in the case through bifurcation of trial. The Court denied the motion for bifurcation on October 27, 2014.

On October 16, 2014, the Court heard argument on both parties' pending motions to exclude expert testimony.

## II.    <u>Legal Framework</u>

The admission of expert testimony is governed principally by Rule 702 of the Federal Rules of Evidence.[5] The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

---

[5] Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

509 U.S. 579 (1993). *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). This gatekeeping function requires that the Court consider three issues: (1) whether the proposed expert is qualified by knowledge, skill, experience, training or education; (2) whether the subject matter of the proposed testimony properly concerns scientific, technical, or other specialized knowledge; and (3) "whether the testimony [will be] helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case." *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1996). The motions at issue in this case all relate to the third issue—the reliability of the experts' proffered testimony.

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). This requirement ensures that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that [the] reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93. In other words, Rule 702 requires the court to "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591). Significant analytical gaps between the data and the opinion proffered by an expert may undermine the reliability of an expert's testimony. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may choose to exclude an expert's opinion when it is "based on

conjecture or speculation from an insufficient evidentiary foundation," *Damon v. Sun Co.* 87

F.3d 1467, 1474 (1st Cir. 1996) (internal quotations omitted), or when it is "connected to

existing data only by the *ipse dixit* of the expert." *General Elec. Co.*, 522 U.S. at 146.

The focus of the Rule 702 inquiry is on the principles and methodology employed by the

expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the

role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather,

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *Id.* at 596. *See also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony

notwithstanding a lack of peer-reviewed publications because the opinion rested upon good

grounds generally and should be tested by the "adversarial process").

## III. <u>Analysis</u>

### A. <u>Abbott's Motions to Exclude Expert Testimony</u>

Abbott seeks to exclude all testimony by defense expert Sherry Knowles, along with

portions of the proffered testimony of defense experts Dr. Kathryn Doyle and Dr. Richard

Gering. The testimony of Ms. Knowles concerns the issue of willfulness; Abbott seeks to

exclude it in its entirety. As to Dr. Doyle, Abbott has moved to exclude all of her opinions

"concerning any alleged 'deficiencies' in the prosecution of the patents-in-suit or any related

patents." (Pl. Mem. at 9). With respect to Dr. Gering, Abbott asks the Court to exclude any

testimony "concerning the amount of lost profits due to [Abbott] for Centocor's infringement."

(Pl. Mem. at 11).

1. **Sherry Knowles**

Centocor intends to call Sherry Knowles as "an expert on issues relevant to Centocor's defense against [Abbott]'s charge of willful infringement." Knowles's expert report indicates that she would testify that a reasonably prudent corporate decision-maker in Centocor's position "would consider it reasonable to conclude that the asserted claims of [Abbott's] patents are invalid." (Knowles Rep. at 10). Her testimony would address the "objective" prong of the willful infringement inquiry.[6] She bases her opinions on her twenty-five years of experience as a patent attorney, including her four years as chief patent counsel at GlaxoSmithKline. (Def's Opp. at 1, 3).

Abbott objects to her testimony on the grounds that a determination as to objective reasonableness is one of law for the court to make, and that in any event Knowles is not qualified to opine on the objective reasonableness of Centocor's defenses. According to Abbott, Knowles's testimony would improperly invade the province of the court, because it would necessarily require her to draw a legal conclusion. Further, it contends that her testimony represents an effort by Centocor to bolster its evidence on the question of validity, and that her lack of a scientific background precludes her from testifying on that issue. Finally, Abbott contends that, based on her expert report, her testimony would consist largely of her recounting the facts in a manner intended to paint Centocor in the best possible light and Abbott in the worst possible light. (Pl. Mem. at 9). In short, it contends that her testimony would amount to

---

[6] Knowles's expert report also addressed the "subjective" prong of willfulness, and Abbott also moved to exclude that portion of her testimony. However, the parties have since stipulated that the subjective prong of willfulness is conditionally satisfied, upon findings that Abbott's patent claims are not invalid and that the objective prong of willfulness is satisfied. As a result, both sides agree that Ms. Knowles's proffered testimony on the subjective prong is now unnecessary and need not be considered in connection with Abbott's motion to exclude her testimony.

"nothing more than advocacy from the witness stand." *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363-64 (Fed. Cir. 2008).

Abbott's contentions are not completely baseless, and would be cause for at least some concern if she were to testify before a jury. However, as Abbott correctly points out, the "objective" prong of willfulness is a question of law to be decided by the court. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.*, 682 F.3d 1003, 1006-07 (Fed. Cir. 2012). Because Knowles's testimony relates only to that specific question, there is no reason for it to occur in the presence of the jury. Centocor does not object to having Knowles testify outside the presence of the jury. That would remove any risk of juror confusion while still allowing the court an opportunity to consider the substance of her testimony. To the extent that Knowles's testimony is inadmissible—for example, because it expresses a legal opinion or constitutes impermissible advocacy—the Court can deal with the issue on a question-by-question or topic-by-topic basis.

Accordingly, the testimony of Sherry Knowles will not be excluded, but will take place outside the presence of the jury. Abbott's motion to exclude the testimony in its entirety will be denied. That denial is without prejudice to Abbott's ability to challenge that testimony under Rule 702, or otherwise, during the trial.

### 2. Dr. Kathryn Doyle

Dr. Kathryn Doyle is a patent attorney whose practice has "focused primarily on client counseling and prosecution of patent applications in the technical fields of the life sciences." (Doyle Rep. ¶ 5). According to her expert report, she has "personally prepared and prosecuted over one thousand patent applications" and has "directly supervised the preparation and prosecution of many thousand more." (Doyle Rep. ¶ 10). Centocor proposes to call her as an

expert on the patent-application process in order to evaluate the prosecution histories of the relevant Abbott patents. Specifically, Dr. Doyle's proposed testimony would identify a number of (alleged) "specific defects in the application process for the patents at issue." (Def's Opp. at 4).

Abbott contends that Dr. Doyle should be precluded from testifying as to any alleged deficiencies in the specific prosecution histories of the relevant patents. It contends that she improperly draws inferences as to the patent examiner's state of mind based on instances of silence in the record. According to Abbott, her proposed testimony violates the "presumption that the [patent e]xaminer did his duty and knew what claims he was allowing." *See Intervet America, Inc. v. Kee-Vet Labs., Inc.*, 827 F.2d 1050, 1054 (Fed. Cir. 1989). Abbott further contends that allowing Dr. Doyle to testify as to her perceived deficiencies in the application process, based in part on instances of the examiner's silence, would be "inviting the jury to speculate about possible defects, errors, or omissions in the application process that led to the issuance of the patent[s]-in-suit." *See Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 255 (W.D.N.Y. 2000).

It is well-established that an expert may testify about the patent examination process in general and the prosecution history in particular. *Id.*; *see Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 n.2 (Fed. Cir. 2008). However, generalized testimony about the time constraints and other difficulties that patent examiners face, with the implication that these issues frequently result in the issuance of some invalid patents, is inadmissible. *Bausch & Lomb*, 79 F. Supp. 2d at 255. Nonetheless, an expert may draw inferences as to the validity of the patent based on the prosecution history if "[s]he tethers [her] testimony to objective facts in the record."

*Bone Care Intern. LLC v. Pentech Pharm., Inc.*, No. 08-1083, 2010 WL 3928598, at *15 (N.D. Ill. Oct. 1, 2010); *see Genzyme Corp. v. Transkaryotic Therapies, Inc.*, 346 F.3d 1094, 1103 n.3 (Fed. Cir. 2003). Among other things, if the expert has evidence "that there actually were defects in the particular application process at issue," that evidence may be permitted. *Bausch & Lomb*, 79 F. Supp. 2d at 256.

In substance, Abbott contends that Dr. Doyle's testimony is not "tether[ed] . . . to objective facts in the record" because it includes inferences drawn from the patent examiner's silence. Abbott cites to Federal Circuit precedent for the proposition that drawing inferences from an examiner's silence can be improper. *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1326 (Fed. Cir. 2001) ("Drawing inferences of the meaning of claim terms from an examiner's silence is not a proper basis on which to construe a patent claim."). However, the court in *DeMarini* was referring to the claim-construction context: the court specifically stated that "the meaning of claim terms" cannot be inferred from an examiner's silence. In other words, the court rejected the inference that the examiner's silence indicated something about his interpretation of particular terms. That type of inference necessarily involves drawing affirmative conclusions about the intent underlying silence in the record. It is a different, and much simpler, type of inference to conclude that silence in the record as to specific issues indicates that the examiner did not make a specific finding as to those issues. The only assumption required to draw that inference is that if the examiner had made such a finding, he likely would have recorded it. Based on her experience with the prosecution of patent applications, Dr. Doyle appears to be qualified to draw such an inference. Accordingly, she will be permitted to testify on that subject in that limited respect.

14

Abbott further contends that Dr. Doyle's testimony improperly speculates as to the examiner's state of mind. *See The Medicines Co. v. Mylan Inc.*, No. 11-1285, 2014 WL 1516599, at *4 (N.D. Ill. Apr. 17, 2014) ("Certain statements of [the expert] go beyond permissible opinions and speculate as to what the Examiner would have done or thought had she been given different information."). Dr. Doyle does, in some instances, propose to testify that the examiner failed to "consider" various aspects of the patents. (*See, e.g.*, Doyle Rep. at ¶ 213). That is not permissible; she may not speculate as to what the examiner did or did not think, or how different information would have impacted the examiner's opinions or thoughts. Her testimony must be limited to direct statements about the record, what it contains, and what it does not contain. Speculation about the thought processes or reasoning of the examiner is inadmissible.

Finally, Abbott contends that Dr. Doyle's testimony should be excluded because she declined at her deposition to answer certain questions relating to her experience as a patent attorney—experience on which she expressly bases her opinions—on privilege grounds. Abbott contends that, as a result, it has been unable to test the basis of her opinions. Centocor has moved separately to preclude Abbott from questioning Dr. Doyle about her specific experience prosecuting patent applications. The Court will address the issue in that context and will revisit the issue under Rule 702 to the extent necessary once that motion has been resolved.

Accordingly, the Court will grant Abbott's motion to exclude the testimony of Dr. Kathryn Doyle, to the extent that testimony concerns the likely thought processes or reasoning of the patent examiner.

### 3.    Dr. Richard Gering

Dr. Richard Gering is an economist who Centocor intends to call as an expert witness on the subject of Abbott's lost profits. "A lost profits award requires (1) showing that the patent owner would have made the sale but for the infringement, *i.e.*, causation existed, and (2) proper evidence for the computation of lost profits." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1372 (Fed. Cir. 1991). "Evidence that shows a reasonable probability that the patent owner would have made the infringing sales made by the infringer will suffice." *Id.* The "but for" inquiry requires "a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee would . . . have made." *Grain Processing Corp. v. Am. Maize-Prods., Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (internal quotation omitted)." That market reconstruction must be based on "sound economic proof." *Id.*

Here, Dr. Gering performed a lost-profit calculation using a three-step process. First, he isolated the sales of Simponi that directly resulted in an infringing use—in other words, those that resulted in a patient's taking Simponi in combination with methotrexate to treat rheumatoid arthritis. Next, he calculated the percentage of Simponi users who had previously used Humira. He subtracted sales to those users, on the theory that they were no longer potential consumers of Humira and thus should not factor into a lost-profits calculation. Finally, he used market-share data to determine the proportion of the remaining sales that would have gone to Abbott if they had not been made by Centocor. That method led him to conclude that Abbott's lost-profits damages, assuming infringement, total $24,335,574.[7]

Abbott seeks to exclude that testimony in its entirety on three grounds: (1) that Dr.

---

[7] This figure excludes Dr. Gering's calculation of reasonable-royalty damages for those sales excluded from the lost-profits calculation.

Gering should have included all sales of Simponi that were made for the treatment of rheumatoid arthritis (as opposed to just the portion of those sales that resulted in an infringing use); (2) that he made "speculative" and "unsupported" assumptions in determining the percentage of Simponi users that had previously taken Humira and other biopharmaceuticals; and (3) that his method of determining "line of use," which was a critical component of his analysis, was unreliable.

### a.     Whether Dr. Gering Should Have Included All Sales of Simponi

The parties do not dispute that only a portion of Centocor's sales of Simponi resulted in the drug being used in combination with methotrexate, because in many cases doctors prescribed the drug "off-label" as a monotherapy.  Abbott contends that Dr. Gering should have included all sales of Simponi that were made for treatment of rheumatoid arthritis, regardless of whether a patient ultimately used Simponi in combination with methotrexate or as a monotherapy.

In *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348 (Fed. Cir. 2009), the Federal Circuit held that the holder of a method patent is only entitled to damages based on sales that led to a user's actually "perform[ing] the steps of the claimed method."  *Id.* at 1358.  *See Standard Havens,* 953 F.2d at 1374 (holding that where defendant won a sale with a bid that described an infringing method and later switched to a non-infringing alternative, damages were limited to the sales that led to actual infringement); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 1 Fed. App'x 879, 883–84 (Fed. Cir. 2001) (reaffirming that principle in a case where defendant advertised a product's capability to carry out the patented method, but a dispute existed as to how often the product had actually been used to carry out the method).

Here, performing "the steps of the claimed method" consists of using or administering the biopharmaceutical (either Humira, Simponi, or an equivalent) in combination with

methotrexate.  Under the rule of *Cardiac Pacemakers*, only a portion of the sales of Simponi—those sales that actually resulted in its being used in combination with methotrexate—may properly factor into the lost-profits calculation.

Abbott contends that *Cardiac Pacemakers* is distinguishable and should not control.  In particular, it points to the fact that while some doctors did prescribe Simponi for use as a monotherapy, Centocor never sold the drug with a label indicating that use.  Every sale of Simponi for treatment of rheumatoid arthritis was made with a label specifically indicating that it be used in combination with methotrexate.  Indeed, that use was the only one approved by the FDA; Centocor was not legally permitted to market Simponi as a monotherapy.  Therefore, according to Abbott, a proper market reconstruction would include *all* sales of Simponi for treatment of rheumatoid arthritis, because the only legal way in which Centocor could sell the drug for that treatment was for use in combination with methotrexate.  Put differently, the only way Centocor could market Simponi legally for treatment of rheumatoid arthritis was to indicate the (allegedly) infringing use.  Abbott contends that Dr. Gering's market reconstruction contemplates a hypothetical world in which Centocor would continue to market Simponi for use with methotrexate (because that was its only legal option), but none of its purchasers would actually follow that indication (because all of, and only, Centocor's sales that did not lead to actual infringement would remain).  This, it contends, is a nonsensical result, and therefore Dr. Gering's testimony must be excluded.

Abbott's position has superficial appeal, but is ultimately unpersuasive.  Again, the goal of the exercise is to determine the profits lost by Abbott as a result of Centocor's infringing sales.  Under *Cardiac Pacemakers*, where method patents are concerned, only sales that actually

lead to infringement should be included in a lost-profits analysis. 576 F.3d at1348. *See Joy Tech. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993) ("[a] method claim is directly infringed only by one practicing the patented method"). Sales made by Centocor to physicians who then prescribed Simponi as a monotherapy are not infringing sales.

Abbott also argues that Centocor would be forced to stop selling Simponi if it could not make any infringing sales, and therefore the "but for" market reconstruction must reflect that fact. The parties do not dispute that Simponi may be marketed and sold for other indicated uses (specifically, treatment of psoriatic arthritis and ankylosing spondylitis). If infringing sales were removed, and Simponi were still available in the market, the same physicians who in fact prescribed it off-label (and who are likely sophisticated professionals who do not view Simponi and Humira as interchangeable commodities) would presumably continue to prescribe it as before. Abbott, however, contends that the economics of the market would change, forcing Centocor to cease selling Simponi entirely.

Whatever the merits of that argument, it appears to be foreclosed by *Standard Havens*. There, the patentee attempted to argue that the infringer had successfully bid on contracts using the infringing method, and then switched to a non-infringing method (while keeping the contracts); but for the improper bid, it argued, the infringer never would have been awarded those contracts. 953 F.2d at 1372. The Federal Circuit, however, held that because those contracts did not result in infringing sales, they could not form the basis for a lost-profits award. *Id.* Here, similarly, Centocor's sales of Simponi to doctors that prescribed it off-label did not result in infringing sales, and they therefore cannot form the basis of a lost-profits award.

In short, Abbott has not shown that Dr. Gering's assumptions or methodology as to the

issue of market definition are so erroneous as to require exclusion. Accordingly, that portion of his testimony will not be excluded.

### b.     Whether Dr. Gering Made Unsupported Conclusions

Abbott also contends that Dr. Gering's testimony should be excluded because it is based on unsupported assumptions about the percentage of Simponi users who had previously used Humira. The parties appear to agree that the market for biopharmaceuticals to treat rheumatoid arthritis is somewhat complex; among other things, it contains multiple products, all of which are at least somewhat different. A doctor will prescribe a course of treatment for a particular patient with one drug (the "first-line" use); if that is not successful, typically a different drug will be tried (the"second-line" use), and so on. Two products—Humira and a drug called Enbrel—account for more than half the rheumatoid arthritis biologic market.[8] According to Dr. Gering, Simponi's market share is 4.0%, putting it in eighth place in the market.

Dr. Gering estimated that 95% of third-line Simponi users, and 100% of fourth-line Simponi users, had previously used Humira.[9] Based on those estimates, and on his estimates as to how many Simponi users were third- or fourth- line users, he then calculated how many total Simponi users had previously used Humira. He then excluded those sales from his lost-profits analysis, on the ground that it was highly unlikely that someone who had tried Humira unsuccessfully would use that product again.

---

[8] Dr. Gering's report cites testimony by Abbott Vice President James Salanty and Dr. Michael Weinblatt indicating that Humira is most often prescribed as a first- or second-line option, and that third- or fourth-line Humira use is rare. It also cites data showing that three drugs—Humira, Enbrel, and Remicade—represented more than 80% of the market in 2009.

[9] A third-line user is one who has previously used two other biopharmaceuticals to treat rheumatoid arthritis; a fourth-line user is one who has previously used three others.

Abbott essentially contends that Dr. Gering provided no support for his estimate as to the third line and insufficient support for his estimate as to the fourth line. It contends that Dr. Gering does not cite to any "survey or other data source" to support either assumption. (Pl. Mem. at 5).

As to third-line users, Dr. Gering relied on evidence that Humira and Enbrel were typically the first and second treatment choices for rheumatologists. He then estimated "how big the patient pool was of people that have tried two TNFs or two biologics, and one of those two biologics was already Humira." (Gering Dep. at 226-27). His determination that the percentage of Simponi users was 5% at the third line took "into account the flow of patients, the fact that we're already talking third line, the fact that almost all of Humira sales are in first or second line, and . . . looking at the data that was out there." (*Id.* at 228-29).

According to Abbott, Dr. Gering acknowledged in his report that he did not have "data that indicates previous sources of Humira more than one line back (*i.e.*, second line patients)," and made a similar statement in his deposition. (Gering Rep. at 37; Gering Dep. at 226). It also contends that his report does not include any calculation as to how he arrived at those figures. And it contends that in his deposition, Dr. Gering agreed that the percentage of third-line users who previously used Humira—which, as noted, he estimated at five percent—could be as high as ten percent. (Gering Dep. at 231).[10]

In response, Centocor contends that Dr. Gering adequately revealed his data sources and

---

[10] Gering stated, "I estimated five because I thought it was a reasonable number." He was then asked:

    Q    It could be as high as ten, though, right?
    A    It could be.

(Gering Dep. at 231).

methodology, and that he testified that the number is probably closer to zero than five percent, but he used a number that was conservative and favored Abbott. (*See* Gering Dep. at 229). Dr. Gering acknowledged in his deposition that the five percent figure is "an estimate" and that "[t]here is very little fourth line data on anything." (Gering Dep. at 226, 232).

As to the estimate of fourth-line users, Abbott notes that Dr. Gering testified that approximately two to three percent of Humira users are fourth-line users:

Q      So of all the survey data that you're aware of, to the extent that it asks about fourth line use of Humira, it shows 2 or 3 percent such use, true?

A      In that range.

(Gering Dep. at 256). In Abbott's view, that testimony undermines Dr. Gering's conclusion that there are no fourth-line Simponi users who have never tried Humira.

In response, Centocor contends that the question for this Court to answer is not whether Humira is ever used as a fourth-line treatment, but rather what percentage of Simponi patients in the fourth line have never used Humira before. According to Gering, "all the data that I've seen would actually point to . . . the likelihood of [fourth line Simponi users never having been on Humira before being] very, very low, and so that zero is an appropriate calculation or answer." (Gering Dep. at 240).

Experts cannot utilize estimates that have been "plucked out of thin air based on vague qualitative notions." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012). An estimate based on reasonable inferences from limited data, however, is not the same as a number "plucked out of thin air." *See LaserDynamics, Inc.*, 694 F.3d at 69. Dr. Gering's description of his data sources and calculations appears to be thin at best. Nonetheless, the Court will not exclude his testimony entirely on that basis. Abbott is free to cross-examine Dr. Gering

on the basis for his estimates, and the jury is free to conclude that they are inaccurate.  But the testimony does not appear to be so baseless or without foundation as to merit exclusion.

### c.       Whether Dr. Gering's Methodology as to "Line of Use" Estimates Was Unsound

Finally, Abbott contends that Dr. Gering erred in his attempt to determine the percentage of Simponi patients at each line of use in the year 2009.  In order to arrive at those figures, Dr. Gering identified the average values from seven separate data sources, then adjusted the result such that the sum total was one hundred percent.  The table of these data sources and his resulting calculations is attached hereto as Exhibit A.

As shown in the table, three of the seven surveys reported only first- and second-line data.  According to Dr. Gering, those surveys aggregated all non-first-line use and listed it as second-line use.  (Gering Dep. at 299).  Two other surveys aggregated all use beyond the second line into an "other" category.  The remaining two surveys reported first-, second-, third-, and fourth- line use individually, along with a "fifth or more" category.  Where a survey did not report a number for a particular line of use, Dr. Gering did not include that survey in calculating the average for that line of use.  For example, his figure for third-line use comes from the average of the numbers reported by the two Centocor studies and those reported by the two BioTrends reports.  His figure for second-line use, by contrast, is derived from an average of the numbers reported by all seven surveys.  That is why his averages add up to over 100%, requiring the adjustment reflected in the right-hand column.

The Court agrees that Dr. Gering's calculations appear flawed, and difficult to reconcile with any basic statistical methodology.  He appears to have compared studies that do not measure data in the same way and averaged them as if they do.  Specifically, because four of the

surveys lump all non-first-line use into the row for second-line use, his averages necessarily overestimate second-line use. Dividing the resulting numbers by 115.4% does not correct for this mistake; instead, it compounds it by artificially deflating the figures for other lines of use.

Moreover, the number Dr. Gering reports within the "other" category is the result of an illogical combination of numbers that represent unlike kinds. The two surveys that report a non-zero number within the "other" category" (the two BioTrends reports) appear to include all use beyond third-line use in that category. But the columns created by Dr. Gering (the "2009 Average" and "2009 Adjusted Average" columns) individually report fourth-line use and uses that are at the fifth line or beyond, while still including the "other" category. Thus, that category represents something different from that which it represents in the BioTrends reports. Dr. Gering also included the 0.0% "other" figure that is reflected by the two Centocor studies in his averages, even though these studies included a separate "fifth or more" category. In these studies, "other" appears to be nothing more than a placeholder; "fifth or more" would necessarily encompass any line use not reflected in the first four columns. Those 0.0% numbers should have not been included in any average.

The result of Dr. Gering's calculations is an artificially high figure for second-line use, artificially low figures for the other lines of use, and what appears to be an entirely unreliable figure for "other" line use. His opinion as to the percentage of Simponi patients for each line of use in the year 2009 therefore does not appear to be the product of "reliable principles and methods," "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Accordingly, that portion of his testimony will be excluded.

## B.     Centocor's Motion to Exclude the Expert Testimony of John Jarosz

John Jarosz is an economist and expert witness for Abbott. His testimony, like that of Dr. Gering, centers on the proper measure of damages to be awarded to Abbott if Centocor is found liable for infringement.[11] Like Dr. Gering, he calculated both lost-profits damages and reasonable-royalty damages. Centocor objects to portions of his testimony about each measure of damages.

Jarosz arrived at two different possible figures for Centocor's total damages, based on two different sets of calculations. One set of calculations included only Centocor's infringing sales (about 66% of Simponi sales), and the other included all Simponi sales made for the treatment of rheumatoid arthritis, including off-label sales. (Jarosz Rep. at 52). Jarosz used those two parallel sets of assumptions in calculating both lost profits and reasonable royalties, but he used a different royalty rate within each set of calculations.[12] As a result of that difference, his conclusion as to the total royalty damages is the same under both scenarios. However, due to the difference in lost-profit damages, he concluded that Abbott's total damages are $138,283,379 if all sales are used and $103,004,461 if only infringing sales are used.

As noted, in method patent cases, a patentee can only recover damages that are derived from actual infringement. *Standard Havens Products, Inc.*, 953 F.2d at 1374; *Chiuminatta Concrete Concepts*, 1 Fed. App'x at 883-84; *Cardiac Pacemakers, Inc.*, 576 F.3d at 1359. Centocor contends that therefore Jarosz should be limited to testifying as to calculations that are

---

[11] Jarosz also submitted an opinion on the commercial success of Humira and Simponi, but this portion of his testimony is not the subject of Centocor's motion to exclude.

[12] Jarosz used a royalty rate of 10 percent for the scenario in which 100 percent of Simponi sales for the treatment of rheumatoid arthritis is subject to damages and a royalty rate of 15.2 percent for the scenario in which approximately 66 percent of such sales is subject to damages.

based only on sales that led to actual infringement. *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1308 (Fed. Cir. 2006) (affirming a trial court's exclusion of expert testimony that would have included sales of noninfringing products in a calculation of lost-profits damages).

In opposition, Abbott relies on *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409 (Fed. Cir. 1996). In *Stryker*, the patented product (a hip replacement prosthesis) consisted of two parts: a stem and a distal sleeve. *Id.* at 1412. The defendant made only 5,000 sales of the complete product, but almost 21,000 sales of the stem alone. *Id.* The court upheld the district court's award of lost profits on all 21,000 sales, noting that the defendant had consistently marketed the product as a "total system, including distal sleeves" and that the sleeve was always available to a surgeon during surgery. *Id.* at 1416. The court thus reasoned that each time the defendant sold a stem to a surgeon, the plaintiff had "lost the opportunity to make a sale." *Id.* at 1417. Emphasizing the similarity of these facts to the present case, Abbott contends that the logic of *Stryker* supports Jarosz's second set of calculations.

*Stryker*, however, involved an apparatus patent, not a method patent. In *Cardiac Pacemakers*, the Federal Circuit explained that the rule of *Stryker* does not apply to method patents. 576 F.3d at 1359. It focused on the fact that in *Stryker*, "the entire patented apparatus was 'supplied' during surgery," and that no analogous situation arises in method patent cases. *Id.* The court concluded that the plaintiff could "only receive infringement damages on those devices that actually performed the patented method." *Id.*[13]

Abbott attempts to distinguish *Cardiac Pacemakers* on three grounds. First, it points out that the plaintiff in that case sought only royalty damages, not lost profits. (Pl. Opp. at 8, n.5).

---

[13] The Court expresses no opinion as to the level of proof required for Abbott to establish the frequency of actual infringement.

Abbott supplies no explanation as to why this distinction is material, although the court in *Cardiac Pacemakers* did note it in distinguishing *Stryker*. 576 F.3d at 1359 ("In the present case, however, Cardiac is not seeking lost profits on an apparatus and therefore cannot rely on the reasoning in *Stryker*. Here, Cardiac seeks royalties on its patented method."). Ultimately, the court seemed to express its holding in broader terms, stating that Cardiac could only receive "infringement damages" where the patented method was actually performed. Moreover, *Stryker* itself operated as an exception to the more general rule of *Standard Havens* that infringement damages are limited to instances of actual infringement. *Cardiac Pacemakers* appears to limit *Stryker* and reaffirm the general *Standard Havens* rule for method-patent claims. Thus, the fact that *Cardiac Pacemakers* itself did not involve lost-profits damages does not mean that the rule of *Stryker* should apply here.

Second, Abbott attempts to distinguish *Cardiac Pacemakers* by contending that Centocor has an "established practice of paying royalties on all sales of Simponi [for the treatment of rheumatoid arthritis] in similar situations." (Pl. Opp. at 8 n.5). Centocor disputes this, but the contention (if true) could be relevant to a reasonable-royalty calculation. The most common approach to determining reasonable-royalty damages (and that adopted by both parties) attempts to approximate the terms to which the parties would have agreed if they had successfully negotiated a royalty agreement at the time of the alleged infringement. *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). "The hypothetical negotiation tries, as best as possible, to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement." *Id.* Evidence concerning Centocor's past negotiating positions could

affect a determination of these terms, both with respect to the royalty "base" and the rate. More generally, it is illogical to suggest that the parties, before the fact, would have agreed to a royalty base of exactly 66 percent of sales when they had no way of knowing the exact percentage of doctors that would prescribe Simponi as a monotherapy. They may have been able to estimate the percentage of sales that would result in infringement and use that as the base, but it would have been simpler (and equivalent) for Centocor to agree to pay a reduced-rate royalty on 100 percent of sales rather than a higher rate on 60-70 percent of sales.[14]

As noted above, Jarosz's reasonable-royalty calculations result in the same royalty figure regardless of whether 100 percent or 66 percent of Simponi sales for treatment of rheumatoid arthritis are included in the royalty base, because he adjusts the rate to account for the shifting base.[15] In other words, his proposed royalty damages total would not change based on the Court's ruling.

For those reasons, the Court will allow Jarosz to present his reasonable-royalty calculations with a base of 100 percent of Simponi sales. Centocor is free to cross-examine him as to whether the parties would have actually used that base, but that dispute goes to the weight of the evidence, not its admissibility.

The third distinction raised by Abbott between *Cardiac Pacemakers* and the present case is that, unlike the defendant in *Cardiac Pacemakers*, Centocor was legally prohibited from marketing the relevant product in any manner other than one promoting the infringing method.

---

[14] The Court does not mean to preclude argument or evidence that the parties would have agreed to a lower royalty base, but only to note that a shifting base need not affect the overall royalty payment, because the royalty rate can be adjusted accordingly.

[15] Centocor has not objected to this aspect of Jarosz's testimony.

(Pl. Opp. at 8, n.5). As discussed above, it is not immediately obvious how that factual difference should impact the holding of *Cardiac Pacemakers*. Abbott's basic point is that, in the "but-for infringement" world posited by the market-reconstruction approach (utilized by both Dr. Gering and Jarosz), Centocor realistically would not have made any sales of Simponi for treatment of rheumatoid arthritis, because its only legal way of doing so would promote (and thus risk) infringement. That may be so, but the focus of the market reconstruction approach is to compensate Abbott for the lost profits caused by actual infringement. *Cardiac Pacemakers* and *Standard Havens* both make clear that, even where related actions by defendants may have cost a plaintiff a sale, only those leading to or qualifying as actual infringement can give rise to lost profits.

Extending Abbott's argument to its logical endpoint demonstrates a potential flaw. According to Abbott, all sales of Simponi for treatment of rheumatoid arthritis should factor into a lost-profits analysis, even where only 66 percent of those sales resulted in infringement. Its stated reasons are that all such sales were made after Centocor had marketed the drug in a way that promoted an infringing use and that Centocor was legally prohibited from marketing it in any other way. Even if Centocor had been fully aware of the risk of infringement and been aiming to avoid infringing, it could not legally have marketed the drug in any way but to encourage infringement—thus, Abbott contends, it would not have sold it at all (and all of the consumers who purchased Centocor's product would have been available to Abbott). Presumably, on Abbott's logic, the result would be the same even if only 10 percent of Simponi sales for treatment of rheumatoid arthritis had actually resulted in infringement. And the same would be true if, say, 0.1 percent of such sales had resulted in infringement. Absent some

limiting principle, Abbott would demand damages on 100 percent of sales even in those cases. There is, in fact, no apparent reason why the same logic would not apply in a scenario in which *no* Simponi users actually paired the drug with methotrexate. Yet in that scenario, no infringement at all would have occurred. In short, there is no other coherent place at which to limit Abbott's lost-profits damages than at the point of actual infringement.

Accordingly, Jarosz's testimony about the version of his lost-profits analysis that includes 100 percent of Simponi sales for treatment of rheumatoid arthritis will be excluded.

Centocor's second objection to the testimony of Jarosz concerns his method of calculating the reasonable-royalty rate. Jarosz has concluded that the reasonable-royalty rate would be 10 percent if all Simponi sales for treatment of rheumatoid arthritis are considered, and 15.2 percent if only sales that led to infringement are considered. (Jarosz Op. Rep. at 116-17). Centocor contends that as part of his analysis Jarosz improperly considered prior license agreements that had "no relationship to the claimed invention" in order to "drive the royalty rate up to unjustified double-digit levels." See *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010). Specifically, Centocor objects to his consideration of four agreements in particular: (1) two agreements related to an anesthetic agent; (2) an agreement related to vascular interventional devices (known as stents); (3) an agreement related to an HIV treatment.

Those four agreements include royalty rates that range from 10 percent to 26 percent. By contrast, the agreements considered by Jarosz that involve antibodies (like Humira and Simponi) show rates ranging from 0.35 to 10 percent. (Jarosz Op. Rep. at 81, 84). Centocor contends that the four disputed agreements are not comparable to the hypothetical agreement between the parties, and that he included them specifically to justify his conclusion that the rate should be 10

to 15 percent. They point to recent Federal Circuit case law standing for the proposition that testimony on reasonable royalties can be excluded where an expert relies on licensing agreements that do not bear a sufficient relationship to the hypothetical agreement being evaluated. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *ResQNet.com*, 594 F.3d at 871-73 (criticizing an expert who "offer[ed] little or no evidence of a link between the [relied-upon] licenses and the claimed invention" and directing that, on remand, "the trial court should not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology").

Abbott does not appear to contend that these four disputed agreements are closely comparable to the hypothetical license agreement to be determined. Instead, it contends that those four agreements played only a minor role in Jarosz's analysis. It points out that the total discussion of the disputed agreements spans less than two pages of Jarosz's 120-page damages report. It notes that he considered many other agreements, besides just those four, and that all of those agreements played a role in only part of Jarosz's reasonable royalty opinion. Specifically, Jarosz analyzed the appropriate reasonable royalty calculation using a "market approach," an "income approach," and a "cost approach." (Jarosz Op. Rep. at 74, 89, 93). The prior license agreements he considered factored in only to the "market approach." Notably, the income approach—an approach that Centocor has not challenged—led him to conclude that a rate of up to 22 percent would be appropriate.

The relative completeness of Jarosz's analysis stands in contrast to that of the experts in

the cases cited by Centocor.  In *LaserDynamics* and *ResQNet.com*, the expert witness had not only relied on unrelated agreements, but had also ignored existing licenses for the patents-in-suit. 694 F.3d at 80-82; 594 F.3d at 870-71, 872-73.  This led the court in both cases to discredit the entire testimony of the experts on this point and remand to the trial court.  694 F.3d at 81-81; 594 F.3d at 872-73.  Here, there are no licenses for the patents-in-suit, and Jarosz appears to have considered all relevant license agreements along with the four in dispute.  Accordingly, there is not a sufficient basis to exclude his entire testimony on reasonable royalties.

Even though the testimony as a whole will not be excluded, Jarosz's specific testimony about the disputed license agreements could still merit exclusion.[16]  Generally, "[t]he degree of comparability of . . . license agreements . . . [is a] factual issue[] best addressed by cross examination and not exclusion."  *ActiveVideo Networks, Inc. v. Verizon Comm.*, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012).  Disputes over this issue generally "go to the weight to be afforded the testimony and not its admissibility."  *Id.*  However, to be admitted, the proposed evidence still must meet the minimum standard of being "sufficiently related to the case at hand."  *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010).  If it does not, the specific testimony would be excluded as irrelevant and unreliable.  Thus, if the disputed license agreements are indeed completely inapposite to a determination of the appropriate royalty rate in

---

[16] Beyond just "considering" the four disputed agreements amid a vast array of information, Jarosz testified that he relied on them in forming his opinion.  For example, as to the stent agreement, he testified:

Q    Did the [stent] agreement factor into the final royalty rate that you arrived at?
A    I considered the agreement, yes.
Q    But regardless of whether you picked it up, considered it and put it down, did the data from that agreement factor into you arriving at a royalty rate of 10 percent, as applied to a hundred percent of [rheumatoid arthritis] sales?
A    Yes.

(Jarosz Dep. at 229-30).

this case, then Jarosz should be precluded from testifying about them in particular.

Jarosz testified to two similarities between the four disputed license agreements and a hypothetical antibody license negotiation between these parties. First, he noted in his expert report that all four are agreements between Abbott and a company owned by the same parent company (Johnson & Johnson) that owns Centocor (Jarosz Op. Rep. at 79-80, nn. 389, 391, 394). Second, he testified at his deposition that the agreements in question bear a relationship to the hypothetical antibody agreement because they are "health and medical related." (Jarosz Dep. at 228). He has not claimed that the agreements directly relate to antibodies or biopharmaceutical products.

The fact that the agreements were "health and medical related" alone is not sufficient to make them closely comparable to the hypothetical license agreement at issue here. See *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328 (Fed. Cir. 2009) (holding that, in a software case, license agreements that were simply described as covering "PC-related patents," without more, were not sufficiently comparable to be relied upon). Nor does the fact that Abbott reached these agreements with companies under the same corporate umbrella as Centocor establish close comparability, where both the technology and the specific parties involved were different than those in the present case.

Close comparability, however, is not necessary—the evidence need only be "sufficiently related to the case at hand" to be admissible. *ActiveVideo Networks, Inc.*, 694 F.3d at 1333 (quoting *i4i Ltd. Partnership*, 598 F.3d at 852). Although the question is close, Jarosz's testimony as to the four disputed license agreements is not so far afield as to warrant exclusion. Centocor is free to cross-examine him on the basis behind the testimony, but it is ultimately the

jury's task to assess the weight of the evidence. Accordingly, that portion of his testimony will not be excluded.

Based on the foregoing, Centocor's motion will be granted to the extent that Jarosz will be excluded from testifying about his lost profits calculations that include 100 percent of Simponi sales for treatment of rheumatoid arthritis, but will otherwise be denied.

**IV.**     **Conclusion**

1.     Abbott's motion to exclude the testimony of Sherry Knowles is GRANTED as to any testimony on the subjective prong of willfulness, and is otherwise DENIED without prejudice. Her testimony as to the objective prong of willfulness will take place outside the presence of the jury.

2.     Abbott's motion to exclude the testimony of Dr. Kathryn Doyle is GRANTED as to any testimony concerning the likely thought process and reasoning of the patent examiner, and is otherwise DENIED.

3.     Abbott's motion to exclude the testimony of Dr. Richard Gering is GRANTED as to any testimony concerning the relative frequency of each line of use among Simponi users in 2009, and is otherwise DENIED.

4.     Centocor's motion to exclude the testimony of John Jarosz is GRANTED as to any testimony concerning the set of lost-profits calculations in which he included 100 percent of Centocor's sales of Simponi for treatment of rheumatoid arthritis, and is otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  December 19, 2014          United States District Judge

34